**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CHRISTINE SEVER, derivatively on behalf of NEKTAR THERAPEUTICS, | |
| Plaintiff, | **C.A. No. _____** |
| vs. | |
| HOWARD W. ROBIN, GIL M. LABRUCHERIE, JEFF AJER, ROBERT B. CHESS, SCOTT GREER, CHRISTOPHER A. KUEBLER, LUTZ LINGNAU, ROY A. WHITFIELD, and DENNIS L. WINGER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| NEKTAR THERAPEUTICS, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Christine Sever ("Plaintiff"), by her undersigned attorneys, derivatively and on behalf of Nominal Defendant Nektar Therapeutics ("Nektar" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Howard W. Robin, Gil M. Labrucherie, Jeff Ajer, Robert B. Chess, Scott Greer, Christopher A. Kuebler, Lutz Lingnau, Roy A. Whitfield, and Dennis L. Winger (collectively, the "Individual Defendants," and together with Nektar, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Nektar, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, she alleges the following based upon personal knowledge as to her and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nektar, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Nektar's directors and officers from at least November 11, 2017 through the present (the "Relevant Period").

2.      Nektar is a biopharmaceutical company that specializes in the research, discovery, and development of novel medications for areas in which there is sizeable unmet medical need. The Company's pipeline includes new investigational drugs for treatment and use in a variety of medical areas including cancer, chronic pain, and autoimmune disease.

3.      The Company purports to leverage its proprietary chemistry platform to develop new drug candidates which utilize Nektar's advanced polymer conjugate technology platforms, designed to allow the "development of new molecular entities that target known mechanisms of action."

4.      Nektar's proprietary programs include Immuno-oncology ("I-O") projects which are focused on developing targeted medicines to help the body's immune system fight cancer with medications designed to modify certain immune cell activities such as increasing their numbers and advancing their abilities to identify and attack cancer cells.

5.      Nektar's lead I-O drug candidate is NKTR-214, a biologic with biased signaling through Interleukin-2 ("IL-2"), which is a naturally occurring cytokine. NKTR-214 is designed to stimulate and facilitate the growth of "tumor-killing immune cells." The Company conducted a number of clinical trials evaluating NKTR-214 and its combination with other drug company products, including Bristol-Myers Squibb Company's ("BMS") Opdivo® (nivolumab) for purposes of commercializing NKTR-214.

6.      On October 1, 2018, a report published by Plainview LLC titled "NKTR-214: Pegging the Value at Zero" (the "Report") revealed that while the Company had touted NKTR-214 as a promising new cancer treatment drug, Nektar had only disclosed about 31% of response rates and withheld the rest of the data on dosed patients in its PIVOT study as of its presentation at the 2018 American Society of Clinical Oncology ("ASCO") annual meeting, where the

Company discussed its PIVOT phase 1/2 results. The Report maintained that the Company's hypothesis that "pegylating," i.e. adding polyethylene glycol molecules to, IL-2 would improve IL-2's function did not prove to be true. The Report further noted that pegylation actually impaired the efficacy of NKTR-214, making it an ineffective cancer treatment.

7.       On this news, the price per share of Nektar stock fell over the next two trading sessions, from a closing price of $60.96 on September 28, 2018, to a closing price of $56.65 on October 1, 2018 and to a closing price of $55.33 on October 2, 2018. The price per share of Company stock continued to drop after that, closing at $47.24 on October 11, 2018.

8.       During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*: (1) the complete data results from the PIVOT-02 trial; (2) that extending NKTR-214's half-life would create new problems including high-dose safety concerns and would not likely lead to the drug's effectiveness; (3) that previous trials related to pegylating IL-2 were unsuccessful; (4) that the combination of NKTR-214 with Opdivo had not established meaningfully positive results; (5) that IL-2 on its own was more effective than NKTR-214; and (6) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

9.       The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

3

10.     The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

11.     Furthermore, during the Relevant Period, seven of the Individual Defendants breached their fiduciary duties by engaging in insider sales, netting proceeds of over $61.8 million.

12.     In light of the Individual Defendants' misconduct, which has subjected Nektar, its Chief Executive Officer ("CEO"), and its Senior Vice President and Chief Financial Officer ("CFO"), to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Nektar's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

15.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

20.     Venue is proper in this District because Nektar and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Nektar common stock. Plaintiff has continuously held Nektar common stock since he purchased it at the beginning of the Relevant Period.

5

**Nominal Defendant Nektar**

22.     Nektar is a Delaware corporation with its principal executive offices at 455 Mission Bay Boulevard South, San Francisco, CA, 94158. Nektar's shares trade on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "NKTR."

**Defendant Robin**

23.     Defendant Howard W. Robin ("Robin") has served as the Company's President and CEO since January 2007, and as a Company director since February 2007. According to the Company's Schedule 14A filed with the SEC on April 30, 2018 (the "2018 Proxy Statement"), as of April 27, 2018, Defendant Robin beneficially owned 2,295,732 shares of the Company's common stock, which represented 1.34% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant Robin owned approximately $192 million worth of Nektar stock.

24.     For the fiscal year ended December 31, 2017, Defendant Robin received $18,097,411 in compensation from the Company. This included $940,700 in salary, $6,884,888 in stock awards, $8,544,658 in option awards, $1,599,190 in Non-Equity Incentive Plan Compensation, and $127,975 in all other compensation.

25.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Robin made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 12/13/2017 | 83,333 | $ 55.69 | $ 4,640,814.77 |
| 1/22/2018 | 83,333 | $ 75.82 | $ 6,318,308.06 |
| 2/16/2018 | 12,788 | $ 82.94 | $ 1,060,636.72 |
| 5/1/2018 | 43,334 | $ 83.65 | $ 3,624,889.10 |
| 5/2/2018 | 43,333 | $ 85.63 | $ 3,710,604.79 |

| 5/3/2018 | 43,333 | $ 82.86 | $ 3,590,572.38 |
| 5/16/2018 | 12,791 | $ 83.39 | $ 1,066,641.49 |
| 6/25/2018 | 43,334 | $ 51.82 | $ 2,245,567.88 |
| 6/26/2018 | 43,333 | $ 49.36 | $ 2,138,916.88 |
| 6/27/2018 | 43,333 | $ 47.39 | $ 2,053,550.87 |
| 11/16/2018 | 15,326 | $ 38.25 | $ 586,219.50 |

Thus, in total, before the fraud was exposed, he sold 467,571 Company shares on inside information, for which he received approximately $31 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

26.     Defendant Robin's son, Michael Robin, is employed as a non-executive officer of the Company and serves as a director in Nektar's project management group. The Company paid Defendant Robin's son approximately $1,661,068 in compensation during the fiscal year ended December 31, 2017.

27.     The Company's 2018 Proxy Statement stated the following about Defendant Robin:

*Howard W. Robin*[1], age 65, has served as our President and Chief Executive Officer since January 2007 and has served as a member of our board of directors since February 2007. Mr. Robin served as Chief Executive Officer, President and a director of Sirna Therapeutics, Inc., a biotechnology company, from July 2001 to November 2006 and from January 2001 to June 2001, served as their Chief Operating Officer, President and as a director. From 1991 to 2001, Mr. Robin was Corporate Vice President and General Manager at Berlex Laboratories, Inc. ("Berlex"), a pharmaceutical products company that is a subsidiary of Schering, AG, and from 1987 to 1991 he served as Vice President of Finance and Business Development and Chief Financial Officer. From 1984 to 1987, Mr. Robin was Director of Business Planning and Development at Berlex. He was a Senior Associate with Arthur Andersen & Co. prior to joining Berlex. He received his B.S. in Accounting and Finance from Fairleigh Dickinson University and serves as a member of its Board of Trustees.

---

[1] Emphasis in original unless otherwise noted in this Complaint.

**Defendant Labrucherie**

28.     Defendant Gil M. Labrucherie ("Labrucherie") has served as Nektar's Senior Vice President and CFO since June 2016. According to the 2018 Proxy Statement, as of April 27, 2018, Defendant Labrucherie beneficially owned 885,652 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant Labrucherie owned approximately $74 million worth of Nektar stock.

29.     For the fiscal year ended December 31, 2017, Defendant Labrucherie received $7,780,091 in compensation from the Company. This included $607,400 in salary, 2,958,794 in stock awards, $3,672,084 in option awards, $531,475 in Non-Equity Incentive Plan Compensation, and 10,338 in all other compensation.

30.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Labrucherie made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 2/16/2018 | 3,477 | $ 82.94 | $ 288,382.38 |
| 5/1/2018 | 30,000 | $ 83.65 | $ 2,509,500.00 |
| 5/2/2018 | 30,000 | $ 85.63 | $ 2,568,900.00 |
| 5/3/2018 | 30,000 | $ 82.86 | $ 2,485,800.00 |
| 5/16/2018 | 4,941 | $ 83.39 | $ 412,029.99 |
| 11/16/2018 | 6,515 | $ 38.25 | $ 249,198.75 |

Thus, in total, before the fraud was exposed, he sold 104,933 Company shares on inside information, for which he received approximately $8.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

31.    The Company's website states the following about Defendant Labrucherie:[2]

Gil M. Labrucherie was appointed Senior Vice President and Chief Financial Officer of the company in June 2016. In this role, Mr. Labrucherie oversees finance, legal, procurement and logistics and information technology functions for the company. Since joining Nektar in 2005, Mr. Labrucherie has held several senior leadership positions with increasing responsibility, most recently he served as Senior Vice President, General Counsel and Secretary of Nektar from 2007 to 2016.

Prior to joining Nektar, from October 2000 to September 2005, Mr. Labrucherie was Vice President of Corporate Development at E2open, Inc., where he was responsible for global corporate alliances and merger and acquisition activity. Prior to E2open, he was the Senior Director of Corporate Development at AltaVista Company, an Internet search company, where he was responsible for merger and acquisition transactions. Mr. Labrucherie began his career as an associate in the corporate practice of the law firm of Wilson Sonsini Goodrich & Rosati and Graham & James (DLA Piper Rudnick).

Mr. Labrucherie received his J.D. from University of California Boalt Hall School of Law, where he was a member of the California Law Review and Order of the Coif, and received his B.A. from the University of California, Davis.

**Defendant Ajer**

32.    Defendant Jeff Ajer ("Ajer") served as a Company director since September 2017. He also serves as a member of the Audit Committee and Organization and Compensation Committee. According to the 2018 Proxy Statement, as of April 27, 2018, Defendant Ajer beneficially owned 22,500 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant Ajer owned approximately $1.8 million worth of Nektar stock.

33.    For the fiscal year ended December 31, 2017, Defendant Ajer received $1,144,658 in compensation from the Company. This included $37,750 in fees earned or cash paid, $489,373 in stock awards, and $617,535 in option awards.

34.    The Company's 2018 Proxy Statement stated the following about Defendant Ajer:

---

[2] https://www.nektar.com/company/our-leadership. Last visited January 31, 2019.

*Jeff Ajer, age 55,* was appointed to the board of directors of in September 2017. Mr. Ajer currently serves as Executive Vice President and Chief Commercial Officer at BioMarin Pharmaceutical Inc. ("BioMarin"), a global biotechnology company that develops and commercializes innovative therapies for people with serious and life-threatening rare disorders. From October 2012 to January 2014, Mr. Ajer served as Senior Vice President and Chief Commercial Officer of BioMarin. From April 2009 to October 2012, Mr. Ajer served as BioMarin's Vice President, Commercial Operations, The Americas, where he had responsibility for commercial operations throughout the Americas and led product marketing, reimbursement, and sales operations for BioMarin. Prior to joining BioMarin, Mr. Ajer served in various roles at Genzyme Corporation (Genzyme) beginning in November 2003, most recently as Vice President, Global Transplant Operations from December 2004 to August 2005. Mr. Ajer's experience prior to Genzyme includes roles in sales, marketing and operations at SangStat Medical Corporation and ICN Pharmaceuticals. Mr. Ajer also served on the board of directors of True North Therapeutics. Mr. Ajer received both a B.S. in chemistry and an M.B.A. from the University of California, Irvine.

### Defendant Chess

35.     Defendant Robert B. Chess ("Chess") has served as a Company director since May 1992. He also serves as Chairman of the Board. Defendant Chess additionally served the Company in a variety of positions over the years. He served as acting President and CEO from March 2006 to January 2007, and as Executive Chairman from April 1999 to January 2007. Defendant Chess also served as Co-CEO from August 1998 to April 2000, as President from December 1991 to August 1998, and as CEO from May 1992 to August 1998. According to the 2018 Proxy Statement, as of April 27, 2018, Defendant Chess beneficially owned 472,723 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant Chess owned approximately $39.5 million worth of Nektar stock.

36.     For the fiscal year ended December 31, 2017, Defendant Chess received $556,763 in compensation from the Company. This included $114,000 in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

10

37.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chess made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/6/2018 | 25,000 | $ 92.14 | $ 2,303,500.00 |
| 5/3/2018 | 25,000 | $ 82.80 | $ 2,070,000.00 |
| 6/5/2018 | 10,000 | $ 55.16 | $ 551,600.00 |
| 9/19/2018 | 4,500 | $ 56.81 | $ 255,645.00 |

Thus, in total, before the fraud was exposed, he sold 64,500 Company shares on inside information, for which he received approximately $5.1 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

38.     The Company's 2018 Proxy Statement stated the following about Defendant Chess:

*Robert B. Chess*, age 61, is the Chairman of our board of directors and has served as a director since May 1992. From March 2006 until January 2007, Mr. Chess served as our Acting President and Chief Executive Officer, and from April 1999 to January 2007, served as Executive Chairman. He also served as our Co-Chief Executive Officer from August 1998 to April 2000, as President from December 1991 to August 1998, and as Chief Executive Officer from May 1992 to August 1998. Mr. Chess was previously the co-founder and President of Penederm, Inc., a publicly-traded dermatological pharmaceutical company that was sold to Mylan Laboratories. He has held management positions at Intel Corporation and Metaphor Computer Systems (now part of IBM), and was a member of the first President Bush's White House staff as a White House Fellow and Associate Director of the White House Office of Economic and Domestic Policy. From 1997 until his retirement in 2009, Mr. Chess served on the board of directors of the Biotechnology Industry Organization ("BIO"). Mr. Chess served as Chairman of BIO's Emerging Companies Section and Co-Chairman of BIO's Intellectual Property Committee. Mr. Chess was the initial Chairman of Bio Ventures for Global Health and continues to serve on its board. He also serves on the Board of Trustees of the California Institute of Technology where he chairs the Technology Transfer Committee. Mr. Chess is the co-founder and Chairman of Biota Technology, a private company developing industrial applications of the analysis of microbial communities, and also serves as a director of each of Pelvalon, Inc., a private medical device company, and Twist Bioscience, a private company in the synthetic DNA production field. He is currently a member of the faculty of the Stanford Graduate School of Business, where he teaches courses in the MBA

11

program on starting technology-based businesses and the healthcare industry. Mr. Chess received his B.S. degree in Engineering with honors from the California Institute of Technology and an M.B.A. from Harvard University.

**Defendant Greer**

39.     Defendant R. Scott Greer ("Greer") has served as a Company director since February 2010. He also serves as Chair of the Audit Committee and as a member of the Organization and Compensation Committee. According to the 2018 Proxy Statement, as of April 27, 2018, Defendant Greer beneficially owned 323,833 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant Greer owned approximately $27 million worth of Nektar stock.

40.     For the fiscal year ended December 31, 2017, Defendant Greer received $542,463 in compensation from the Company. This included $99,700 in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

41.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Greer made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 4/6/2018 | 30,000 | $  92.22 | $  2,766,600.00 |
| 6/4/2018 | 1,400 | $  61.99 | $       86,786.00 |
| 6/6/2018 | 8,600 | $  60.00 | $     516,000.00 |
| 9/4/2018 | 10,000 | $  67.39 | $     673,900.00 |

Thus, in total, before the fraud was exposed, he sold 50,000 Company shares on inside information, for which he received approximately $4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

42.     The Company's 2018 Proxy Statement stated the following about Defendant Greer:

*R. Scott Greer,* age 59, has served as our director since February 2010. Mr. Greer currently serves as Managing Director of Numenor Ventures, LLC, a venture capital firm. In 1996, Mr. Greer co-founded Abgenix, Inc. ("Abgenix"), a company that specialized in the discovery, development and manufacture of human therapeutic antibodies, and from June 1996 through May 2002, he served as its Chief Executive Officer. He also served as a director of Abgenix from 1996 and Chairman of the board of directors from 2000 until the acquisition of Abgenix by Amgen, Inc. in April 2006. Prior to Abgenix's formation, Mr. Greer held senior management positions at Cell Genesys, Inc., a biotechnology company, initially as Chief Financial Officer and Vice President of Corporate Development and later as Senior Vice President of Corporate Development, and various positions at Genetics Institute, Inc., a biotechnology research and development company. Mr. Greer currently serves as a member of the board of directors of Inogen, Inc., a medical device company that develops and markets oxygen therapy products, Sientra, Inc. a medical aesthetics company and Versartis, Inc., an endocrine focused biopharmaceutical company. Mr. Greer served as a member of the board of directors of Sirna Therapeutics, Inc., a biotechnology company, from 2003, and as its Chairman of the board of directors from 2005 through the closing of the acquisition of Sirna by Merck & Co., Inc. in December 2006. From 2015 through 2017 Mr. Greer served as the Chairman of the Board of Calimmune, Inc., a gene therapy company, which was acquired by CLS Behring in 2017; from May 2014 to May 2015, Mr. Greer served as director of Auspex Pharmaceuticals, a biopharmaceutical company developing drugs for patients with movement disorders and other rare diseases, which was acquired by Teva Pharmaceutical Industries in May 2015; from 2001 to 2005, he served as a member of the board of directors of Illumina, Inc., a provider of integrated systems for the analysis of genetic variation and biological function; and from 2001 to 2004, he served as member of the board of directors of CV Therapeutics, Inc., a biotechnology company. Mr. Greer also served as a member of the board of directors of StemCells, Inc., a biopharmaceutical company focused on stem cell therapeutics from 2010 to 2016. Mr. Greer received a B.A. in Economics from Whitman College and an M.B.A. degree from Harvard University. He also was a certified public accountant.

## **Defendant Kuebler**

43.     Defendant Christopher A. Kuebler ("Kuebler") served as a Company director from December 2001 until his retirement in December 2018. He also served as a member of the Organization and Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2018 Proxy Statement, as of April 27, 2018, Defendant Kuebler beneficially owned 194,000 shares of the Company's common stock. Given that the price per share

of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant Kuebler owned approximately $16.2 million worth of Nektar stock.

44.     For the fiscal year ended December 31, 2017, Defendant Kuebler received $515,263 in compensation from the Company. This included $72,500 in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

45.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kuebler made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 1/2/2018 | 30,000 | $ 58.66 | $ 1,759,800.00 |
| 3/6/2018 | 2,600 | $ 100.30 | $ 260,780.00 |
| 3/7/2018 | 37,400 | $ 97.41 | $ 3,643,134.00 |

Thus, in total, before the fraud was exposed, he sold 70,000 Company shares on inside information, for which he received approximately $5.6 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

46.     The Company's 2018 Proxy Statement stated the following about Defendant Kuebler:

*Christopher A. Kuebler*, age 64, has served as our director since December 2001. Mr. Kuebler also currently serves on the board of directors of Waters Corporation, an analytical technologies products and services company where he serves as a member of both the audit committee and compensation committee. From January 1997 to December 2005, Mr. Kuebler served as Chairman of the Board of Covance Inc., a drug development services company, and from November 1994 to December 2004, served as its Chief Executive Officer. From March 1993 through November 1994, he was the Corporate Vice President, European Operations for Abbott Laboratories, a diversified health care company. From January 1986 until March 1993, Mr. Kuebler served in various commercial positions for Abbott Laboratories' Pharmaceutical Division and was that Division's Vice President, Sales and Marketing prior to taking the position of Corporate Vice President, European

Operations. Before that, he held positions at Squibb Inc. and Monsanto Health Care. Mr. Kuebler holds a B.S. in Biological Science from Florida State University.

**Defendant Lingnau**

47.     Defendant Lutz Lingnau ("Lingnau") has served as a Company director since August 2007. He also serves as Chair of the Organization and Compensation Committee. According to the 2018 Proxy Statement, as of April 27, 2018, Defendant Lingnau beneficially owned 160,950 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant Lingnau owned approximately $13.4 million worth of Nektar stock.

48.     For the fiscal year ended December 31, 2017, Defendant Lingnau received $525,263 in compensation from the Company. This included $82,500 in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

49.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Lingnau made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 4/5/2018 | 30,000 | $ 101.74 | $   3,052,200.00 |
| 9/20/2018 | 9,000 | $  56.98 | $      512,820.00 |

Thus, in total, before the fraud was exposed, he sold 39,000 Company shares on inside information, for which he received approximately $3.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

50.     The Company's 2018 Proxy Statement stated the following about Defendant Lingnau:

*Lutz Lingnau*, age 75, has served as our director since August 2007. Mr. Lingnau retired from Schering AG Group, Germany, in December 2005 as a member of Schering AG's Executive Board and as Vice Chairman, President and Chief Executive Officer of Schering Berlin, Inc., a United States subsidiary. Prior to his retirement, Mr. Lingnau was responsible for Schering AG's worldwide specialized therapeutics and dermatology businesses. He joined Schering AG's business trainee program in 1966. Throughout his career at Schering AG, he served in various capacities and in a number of subsidiaries in South America and the United States, including his roles as President of Berlex Laboratories, Inc., from 1983 to 1985, as the Head of Worldwide Sales and Marketing in the Pharmaceutical Division of Schering AG, from 1985 to 1989, and as Chairman of Berlex Laboratories, Inc. from 1985 to 2005. Mr. Lingnau was a member of the Supervisory Board of LANXESS AG, a specialty chemicals company listed on the Frankfurt Stock Exchange from 2005 to May 2010. From December 2006 through September 2009, he served as Chairman of the board of directors of Micropharma Limited, a private biotechnology company, and was a member of was a member of the board of directors of Sirna Therapeutics, Inc., a biotechnology company, from February 2006 through the closing of the acquisition of Sirna by Merck & Co., Inc. in December 2006.

### **Defendant Whitfield**

51.     Defendant Roy A. Whitfield ("Whitfield") has served as a Company director since August 2000. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2018 Proxy Statement, as of April 27, 2018, Defendant Whitfield beneficially owned 355,500 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant Whitfield owned approximately $29.7 million worth of Nektar stock.

52.     For the fiscal year ended December 31, 2017, Defendant Whitfield received $525,513 in compensation from the Company. This included $82,750 in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

53.     The Company's 2018 Proxy Statement stated the following about Defendant Whitfield:

*Roy A. Whitfield*, age 64, has served as our director since August 2000. Mr. Whitfield is the former Chairman of the Board and Chief Executive Officer of Incyte Corporation ("Incyte"), a drug discovery and development company he co-

16

founded in 1991. From January 1993 to November 2001, Mr. Whitfield served as its Chief Executive Officer and from November 2001 until June 2003 as its Chairman. He also served as a director of Incyte from 1991 to January 2014. From 1984 to 1989, Mr. Whitfield held senior operating and business development positions with Technicon Instruments Corporation ("Technicon"), a medical instrumentation company, and its predecessor company, Cooper Biomedical, Inc., a biotechnology and medical diagnostics company. Prior to his work at Technicon, Mr. Whitfield spent seven years with the Boston Consulting Group's international consulting practice. He currently serves as a director of Illumina, Inc., a developer, manufacturer and marketer of integrated systems for analysis of genetic variations and biological functions, and Station X, Inc. a private company. Since February 2008, he has also served as Executive Chairman of the board of directors of Bioseek. Mr. Whitfield received a B.S. in mathematics from Oxford University and an M.B.A. from Stanford University.

**Defendant Winger**

54.     Defendant Dennis L. Winger ("Winger") served as a Company director from December 2009 until his resignation in September 2018. He also served as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2018 Proxy Statement, as of April 27, 2018, Defendant Winger beneficially owned 305,500 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant Winger owned approximately $25.5 million worth of Nektar stock.

55.     For the fiscal year ended December 31, 2017, Defendant Winger received $504,013 in compensation from the Company. This included $61,250 in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

56.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Winger made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 8/13/2018 | 17,125 | $ 61.04 | $ 1,045,310.00 |
| 8/14/2018 | 17,125 | $ 60.15 | $ 1,030,068.75 |

17

| 8/17/2018 | 15,000 | $ 59.62 | $ 894,300.00 |
| 8/21/2018 | 15,000 | $ 60.30 | $ 904,500.00 |

Thus, in total, before the fraud was exposed, he sold 64,250 Company shares on inside information, for which he received approximately $3.8 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

57.     The Company's 2018 Proxy Statement stated the following about Defendant Winger:

> *Dennis L. Winger*, age 70, has served as our director since December 2009. Mr. Winger was Senior Vice President and Chief Financial Officer of Applera Corporation, a life sciences company, from 1997 through December 2008. From 1989 to 1997, Mr. Winger served as Senior Vice President, Finance and Administration, and Chief Financial Officer of Chiron Corporation. From 1982 to 1989, Mr. Winger served various positions, including as the Chief Financial Officer of The Cooper Companies, Inc., Mr. Winger currently serves on the board of directors of Accuray Incorporated (NASDAQ: ARAY), a radiosurgery company. Mr. Winger recently served on the board of directors of each of Vertex Pharmaceuticals Incorporated, a pharmaceutical company, until May 2012, Cephalon, Inc. a pharmaceutical company, until its merger with Teva Pharmaceuticals Industry Limited in October 2011 and Cell Genesys, Inc. until its merger with BioSante Pharmaceuticals in October 2009. Mr. Winger received a B.A. from Siena College and an M.B.A. from the Columbia University Graduate School of Business.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

58.     By reason of their positions as officers, directors, and/or fiduciaries of Nektar and because of their ability to control the business and corporate affairs of Nektar, the Individual Defendants owed Nektar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Nektar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Nektar and its shareholders so as to benefit all shareholders equally.

59.     Each director and officer of the Company owes to Nektar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

60.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Nektar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

61.     To discharge their duties, the officers and directors of Nektar were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

62.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Nektar, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Nektar's Board at all relevant times.

63.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ-GS, the Individual Defendants had a duty to prevent and not to effect the dissemination

of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

64.     To discharge their duties, the officers and directors of Nektar were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Nektar were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Nektar's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Nektar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Nektar and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Nektar's operations would comply with all applicable laws and Nektar's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

65.     Each of the Individual Defendants further owed to Nektar and the shareholders the duty of loyalty requiring that each favor Nektar's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

66.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Nektar and were at all times acting within the course and scope of such agency.

67.     Because of their advisory, executive, managerial, and directorial positions with Nektar, each of the Individual Defendants had access to adverse, non-public information about the Company.

68.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Nektar.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

69.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

70.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

71.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Nektar, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

72.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

73.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Nektar and was at all times acting within the course and scope of such agency.

## NEKTAR'S CODE OF CONDUCT

74.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct"), states that it:

> reflects the business practices and principles of behavior that support the commitment to these high standards. This Code applies to all Nektar employees, officers and directors. Therefore, every employee, officer and director is expected to read and understand the Code and its application to the performance of his or her business responsibilities. Actions by members of your immediate family, significant other(s) or persons who live in your household may also potentially result in ethical issues to the extent they involve Nektar or its business.

75.     The Code of Conduct provides that the Company and its employees, officers, and directors are aware and comply with the law in all countries in which Nektar operates, stating in relevant part:

> We strive to comply not only with the letter but also with the spirit of the law. Our success depends upon everyone operating within legal guidelines and cooperating with local, national and international authorities. It is therefore essential that you understand the legal and regulatory requirements applicable to your business unit and area of responsibility. If you have a question in the area of legal compliance, you should seek answers from your supervisor or the Corporate Ethics Officer.

76.     The Code of Conduct provides that documents, records, and reports to the government and other agencies are "accurate, complete and understandable." Expanding on its disclosure policy, the Code of Conduct specifically states, in relevant part:

> The integrity of our records and public disclosure depends on the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. All records and reports should be made in a timely manner, and, when applicable, should be properly authorized and maintained. Financial and other activities are to be recorded in compliance with all applicable laws and accounting practices.
>
> Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the reports we file with the Securities and Exchange Commission ("SEC"). These reports must provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. In connection with these obligations:
>
>> • no one may knowingly take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;
>>
>> • everyone must cooperate fully with our Finance Department and Legal Department, as well as our independent public accountants and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and
>>
>> • no one should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

77.     The Code of Conduct provides reporting guidelines for suspected misconduct and outlines the Company's program of "Code awareness, training, and review" which the Code of

Conduct states is overseen by the Corporate Ethics Officer. The Code of Conduct states, in relevant part:

> If you are aware of a suspected or actual violation of the Code by others or a violation or possible violation of federal or state law or regulation, including violations relating to accounting, internal accounting controls or auditing matters ("Compliance Concerns"), you have a responsibility to report it. You are expected to promptly provide your supervisor or one of the Corporate Ethics Officers with a specific description of the violation that you believe has occurred, including any information you have about the persons involved and the time of the violation.

78.    The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

79.    Nektar is a biopharmaceutical company that specializes in researching, discovering, and developing innovative medications in areas with unaddressed significant medical need. The Company develops a number of investigational medications designed to treat cancer, autoimmune disease, and chronic pain.

80.    Nektar hold itself out to be a leader in the field of polymer conjugation, known as PEGylation ("pegylation"). Pegylation occurs through conjugating certain molecules with a non-immunogenic polymer called polyethylene glycol. The goal of pegylation is to enhance the pharmacokinetic behavior of a drug, or the way the drug is processed by the body. The Company aims to develop and design new drug candidates which then utilize Nektar's advanced pegylation platforms designed to engage activity at a molecular level. For example, the Company's I-O area

focuses on developing drugs that can "stimulate and sustain the body's immune response in order to fight cancer . . . . [by] directly or indirectly modulat[ing] the activity of key immune cells such as cytotoxic T cells and natural killer (NK) cells, to increase their numbers and improve their function to recognize and attack cancer cells."

81.     One such investigational medicine developed by the Company is NKTR-214. NKTR-214 is an immunotherapy, i.e. a treatment aimed at enabling the body's immune system to fight infections and diseases, designed specifically to supplement the body's natural ability to fight cancer. Specifically, the immune system has the natural capacity to produce cancer-killing cells such as "tumor-infiltrating lymphocytes" ("TILs"). TILs then produce certain proteins which function as receptors that then may signal the body to increase the production of cancer-killing cells. The signal is sent through IL-2, a cytokine molecule which naturally occurs in the body. Cytokines are proteins involved in cell signaling. NKTR-214 purportedly functions to stimulate the immune system's response to cancer and increase the production of certain cancer-killing cells, ultimately facilitating the body's capacity to attack and reduce tumor size. This is supposedly done through pegylating IL-2 in order to address some of the cytokine's weaknesses such as its short half-life and certain undesirable side effects which may result from using IL-2 on its own as a cancer therapy.

82.     The Company classifies NKTR-214 as an immunostimulatory cytokine drug. NKTR-214 is designed to preferentially activate IL-2 receptors to proliferate tumor-killing cells in the body without stimulating certain regulatory cells, thereby increasing IL-2's efficiency and NKTR-214's safety and efficacy as a cancer therapy. Nektar has conducted several clinical trials of NKTR-214 as a monotherapy (on its own) as well as in combination with other drugs, such as BMS's Opdivo® (nivolumab), a human monoclonal antibody cancer medication.

**False and Misleading Statements**

***November 11, 2017 Press Release***

83.    On November 11, 2017, Nektar issued a press release entitled "First Data for NKTR-214 in Combination with OPDIVO® (nivolumab) for Patients with Stage IV Melanoma, Renel Cell Carcinoma and Non-Small Cell Lung Cancers, Including Patients with PD-L1 Negative Status, Revealed at SITC 2017." The press release announced the results of a study done by the Company with BMS evaluating the combination of NKTR-214 with BMS's drug, Opdivo. The press release indicated that "[t]he initial results presented at the 2017 Society for Immunotherapy of Cancer (SITC) Annual Meeting reported both safety and efficacy data for patients enrolled in the dose-escalation phase of the trial."

84.    The press release also detailed the specific findings of the study, stating, in relevant part:

> "These initial findings underscore the potential benefit of the combination of Opdivo and NKTR-214 across several tumor types," said Fouad Namouni, M.D., Head of Oncology Development, Bristol-Myers Squibb. "We believe that a combination regimen which utilizes two different, complementary, and non-overlapping mechanisms designed to harness the body's own immune system to fight cancer has the potential to benefit patients and should be the subject of additional research."

> *Opdivo* is a PD-1 immune checkpoint inhibitor designed to overcome immune suppression. NKTR-214 is an investigational immuno-stimulatory therapy designed to expand and activate specific cancer-fighting T cells and natural killer (NK) cells directly in the tumor micro-environment and increase expression of cell-surface PD-1 on these immune cells.

> "In the dose-escalation stage of the PIVOT trial, we've observed important response rates across all three tumor types-melanoma, renal cell carcinoma and non-small lung cancer - in both PD-L1 positive and PD-L1 negative patients," said Mary Tagliaferri, M.D., Senior Vice President of Clinical Development at Nektar Therapeutics. "All patients with responses in the trial continue on treatment. Of note, we observed responses in 3 of 4 Stage IV non-small cell lung cancer patients whose tumors did not express PD-L1 and who had progressed on prior chemotherapy, including one patient who experienced a complete response. In the

27

combination treatment, there were no Grade 3 or higher immune-mediated adverse events at the recommended Phase 2 dose or below. Nektar and Bristol are now actively enrolling patients in the Phase 2 expansion part of the PIVOT study in 5 different tumor types."

85.     The press release continued to detail the study, highlighting important points that

had been presented in an oral session at the Society for Immunotherapy of Cancer Annual Meeting:

A total of 38 patients were enrolled in the dose-escalation phase of the ongoing PIVOT study in a number of dose cohorts. Responses were measured per RECIST 1.1 for efficacy-evaluable ( > 1 on treatment scan) patients as of November 2, 2017.

Highlights from the oral presentation include:

- Advanced Treatment-Naïve 1L Melanoma Patients (Stage IV):
  - Responses were observed in 7/11 (63%) efficacy-evaluable patients (2 CR and 5 PR). Median time to response was 1.7 months. DCR, also known as disease control rate (CR + PR + 3 SD), was 91%. All 7 patients with responses continue on treatment in the trial.
- Advanced Treatment-Naïve 1L Renal Cell Carcinoma Patients (Stage IV):
  - For patients with one or more baseline scans, responses were observed in 6/13 patients (46%) (1 CR+ and 5 PR). DCR (CR + PR + 5 SD) was 85%. Median time to response in these patients was 1.9 months. For patients with two or more scans available, responses were observed in 6/10 patients (60%) (1 CR, 5 PR, 2 SD). All 11 patients with disease control (CR, PR or SD) continue on treatment in the trial.
- Advanced 2L Renal Cell Carcinoma Patients (Stage IV, I-O Naïve)
  - For patients with one or more baseline scans, responses were observed in 1/7 patients (14%) (1 PR). DCR (CR + PR + 6 SD) was 100%. Median time to response was 3.5 months. All 7 patients with disease control (PR or SD) continue on treatment in the trial.
- Advanced 2L PD-L1 Negative Non-Small Cell Lung Cancer Patients (Stage IV, I-O Naïve)
  - Responses were observed in 3/4 patients (75%) (1 CR± and 2 PR). DCR (CR + PR) was 75%. Median time to response was 1.7 months. All 3 patients with responses continue on treatment in the trial.
- Robust expansion of ICOS+ CD4 and CD8+ T cells in the blood and increased ICOS gene expression in the tumor were both observed with the combination of NKTR-214 and nivolumab.
- The most common grade 1-2 adverse events were fatigue (74%), flu-like symptoms (68%), rash (60%) and pruritus (42%). There were no treatment discontinuations due to adverse events (AEs) or study deaths.

- There were no grade 3 or higher immune-mediated AEs (such as colitis, dermatitis, hepatitis, pneumonitis or endocrinopathies) at the recommended Phase 2 dose or below
- A recommended Phase 2 dose of NKTR-214 0.006 mg/kg q3w + nivolumab 360 mg q3w was established and is being evaluated in expansion cohorts in over 10 patient populations with melanoma, renal cell carcinoma, non-small cell lung cancer, bladder, and triple-negative breast cancers (n=~330).

86.    The press release briefly discussed the agreement between Nektar and BMS related

to the commercialization of NKTR-214 in combination with Opdivo, and touched on NKTR-214's

function and clinical results:

> Nektar and Bristol-Myers Squibb entered into a clinical collaboration in September of 2016 to evaluate the potential for the combination of *Opdivo* and NKTR-214 to show improved and sustained efficacy and tolerability above the current standard of care. Bristol-Myers Squibb and Nektar are equally sharing costs of the combined therapy trials. Nektar maintains its global commercial rights to NKTR-214.

> NKTR-214 preferentially binds to the CD122 receptor on the surface of cancer-fighting immune cells in order to stimulate their proliferation. In clinical and preclinical studies, treatment with NKTR-214 resulted in expansion of these cells and mobilization into the tumor micro-environment.1,2,3 NKTR-214 has an antibody-like dosing regimen similar to the existing checkpoint inhibitor class of approved medicines.

### March 1, 2018 Press Release and Form 10-K

87.    On March 1, 2018, Nektar issued a press release announcing the Company's

financial results for the fourth quarter and year ended December 31, 2017. The press release quoted

Defendant Robin touting NKTR-214's clinical success and the transformative year Nektar had

experienced:

> "This past year was truly transformational for Nektar as we achieved a number of successes with Nektar medicines across our three key therapeutic areas of immuno-oncology, immunology and pain," said Howard W. Robin, President and Chief Executive Officer of Nektar. "In the area of pain, we completed a successful Phase 3 program for NKTR-181 in over 2,100 patients and healthy volunteers that will comprise our NDA submission in the second quarter of this year. In immunology, we entered into a major partnership with Eli Lilly for NKTR-358, a potential first-in-class T regulatory resolution therapeutic, which will be developed to treat a broad range of auto-immune disorders. Finally, in immuno-oncology, the clinical success we achieved with NKTR-214 led to a groundbreaking collaboration with

Bristol-Myers Squibb that now enables us to broadly and rapidly advance NKTR-214 into over 20 registrational trials in up to 15,000 patients."

88.     On the same day, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by all the Individual Defendants.

89.     The 2017 10-K identified the Company as a leader in pegylation and further expanded on the limitations of current pegylation approaches stating, in relevant part:

> As a leader in the polymer conjugation field, we have advanced our technology platform to include new advanced polymer technologies that can be tailored in specific and customized ways with the objective of optimizing and significantly improving the profile of a wide range of molecules, including many classes of drugs targeting numerous disease areas. Polymer conjugation or PEGylation has been a highly effective technology platform for the development of therapeutics with significant commercial success, such as Amgen's Neulasta® (pegfilgrastim) and Roche's PEGASYS® (PEG-interferon alfa-2a). Nearly all of the PEGylated drugs approved over the last fifteen years were enabled with our PEGylation technology through our collaborations and licensing partnerships with a number of well-known biotechnology and pharmaceutical companies. PEGylation is a versatile technology as a result of polyethylene glycol (PEG) being a water soluble, amphiphilic, non-toxic, non-immunogenic compound that has been shown to safely clear from the body. Its primary use to date has been in currently approved biologic drugs to favorably alter their pharmacokinetic or pharmacodynamic properties. However, in spite of its widespread success in commercial drugs, there are some limitations with the first-generation PEGylation approaches that have been used with biologics. For example, these techniques cannot be used successfully to create small molecule drugs which could potentially benefit from the application of the technology. Other limitations of the early applications of PEGylation technology include sub-optimal bioavailability and bioactivity, and its limited ability to be used to fine-tune properties of the drug, as well as its inability to be used to create oral drugs.

90.     The 2017 10-K further touted Nektar's advancements in pegylation platforms as distinguished from previous approaches:

> With our expertise and proprietary technology in polymer conjugation, we have created the next generation of PEGylation technology. Our advanced polymer conjugation technology platform is designed to overcome the limitations of the first generation of the technology platform and to allow the platform to be utilized with a broader range of molecules across many therapeutic areas. We have also developed robust manufacturing processes for generating second generation

PEGylation reagents that allow us to utilize the full potential of these newer approaches.

91.     The 2017 10-K additionally outlined Nektar's activities relating to the combination of NKTR-214 and Opdivo. The 2017 10-K detailed the Company's agreement with BMS to commercially develop combination therapy drugs with NKTR-214 and BMS compounds:

> On September 21, 2016, we entered into a Clinical Trial Collaboration Agreement (BMS Agreement) with Bristol-Myers Squibb Company (BMS), pursuant to which we and BMS are collaborating to conduct Phase 1/2 clinical trials evaluating NKTR-214 and BMS' human monoclonal antibody that binds PD-1, known as Opdivo® (nivolumab), as a potential combination treatment regimen in at least five tumor types and eight indications, and such other clinical trials evaluating the combined therapy as may be mutually agreed upon by the parties (each, a Combined Therapy Trial). Under the BMS Agreement, BMS is responsible for 50% of all out-of-pocket costs reasonably incurred by us in connection with third party contract research organizations, laboratories, clinical sites and institutional review boards. Each party is otherwise responsible for its own internal costs, including internal personnel costs, incurred in connection with each Combination Therapy Trial.  Interim data from the dose-escalation phase of the trial was presented at the 2017 Society for Immunotherapy of Cancer (SITC) meeting in November 2017. We identified the Phase 2 dose for NKTR-214 and we are currently enrolling subjects in the expansion phase of the study.

> On February 13, 2018, we entered into a Strategic Collaboration Agreement (the BMS Collaboration Agreement) with BMS, pursuant to which we and BMS will jointly develop NKTR-214, including, without limitation, in combination with BMS's Opdivo® (nivolumab) and Opdivo® plus Yervoy® (ipilimumab), and other compounds of BMS, us or any third party. The parties have agreed to jointly commercialize NKTR-214 on a worldwide basis. BMS will pay us a non-refundable upfront cash payment of $1.0 billion and purchase $850.0 million of shares of our common stock at a purchase price of $102.60 per share pursuant to a Share Purchase Agreement (Purchase Agreement).

92.     Attached to the 2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Robin and Labrucherie attesting to the accuracy of the 2017 10-K.

*April 11, 2018 Press Release*

93.     On April 11, 2018, the Company issued a press release announcing the dosing of the first patient in the Phase 1/2 Clinical Study (the "REVEAL study") aimed at evaluating the safety and efficacy of combining Nektar's investigational medicines NKTR-214 and NKTR-262 to treat solid tumors. The press release stated specifically:

> "The REVEAL study is intended to show the synergistic impact on the entire immune activation cascade of an initial intratumoral injection of NKTR-262 followed by treatment with NKTR-214," said Mary Tagliaferri, M.D., Senior Vice President of Clinical Development and Chief Medical Officer at Nektar Therapeutics. "Engagement of the innate and adaptive immune cascades is the most effective way to restore immune surveillance mechanisms to drive both local tumor antigen production and a specific and sustained T cell response to attack a patient's tumors. We believe the combination approach of these two novel immuno-oncology agents could ultimately help patients with many types of advanced or metastatic solid tumor cancers, including those resistant to existing immunotherapies."

### April 30, 2018 Proxy Statement

94.     The Company filed its 2018 Proxy Statement with the SEC on April 30, 2018. Defendants Robin, Ajer, Chess, Greer, Kuebler, Lingnau, Winger, and Whitfield solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

95.     The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have adopted a code of business conduct and ethics that applies to all employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions."

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

96.     The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by seven of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

97.     The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

98.     The 2018 Proxy Statement also failed to disclose, *inter alia*: (1) the complete data results from the PIVOT-02 trial; (2) that extending NKTR-214's half-life would create new problems including high-dose safety concerns and would not likely lead to the drug's effectiveness; (3) that previous trials related to pegylating IL-2 were unsuccessful; (4) that the combination of NKTR-214 with Opdivo had not established meaningfully positive results; (5) that IL-2 on its own was more effective than NKTR-214; and (6) that the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *May 10, 2018 Press Release*

99.     On May 10, 2018, the Company issued a press release announcing its financial results for the first fiscal quarter ended March 31, 2018. Defendant Robin promoted the progress of the Company, its NKTR-214 studies, and collaboration with BMS, stating, in relevant part:

> Nektar begins 2018 in a very strong position with a major collaboration with Bristol-Myers Squibb for NKTR-214 and key advancements in our immuno-oncology and immunology pipeline . . . . The PIVOT study of NKTR-214 in combination with nivolumab continues to enroll patients and we are exceptionally

pleased that the preliminary data from PIVOT was accepted for an oral presentation at this year's ASCO Meeting.

### June 2, 2018 ASCO 2018 Presentation and Press Release

100.     On June 2, 2018, Nektar presented data from the Phase 1 dose-escalation and early data from the Phase 2 dose expansion phase of the Company's ongoing PIVOT study during an oral presentation at the ASCO annual meeting. The presentation disclosed objective response rates for 87 of the 283 patients that had been enrolled in the study as of May 7, 2018.[4]

101.     The same day, the Company issued a press release highlighting points from the oral presentation, stating in relevant part:

Stage IV Metastatic Treatment-Naïve 1L Melanoma Patients (Enrolled Per Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for Objective Response Rate (ORR) in Stage 1 (N1=13) with 11/13 (85%) of patients achieving either a partial response (PR) or complete response (CR). Median time on study for 28 patients in Stage 2 (N1+N2) is 4.6 months.  Responses were observed in 14/28 (50%) patients (3 CR, 10 PR, 1 uPR).  Amongst the 25 patients with known PD-L1 status, ORR in PD-L1 negative patients was 5/12 (42%) and in PD-L1 positive patients was 8/13 (62%).  One patient with unknown PD-L1 baseline status experienced a CR.

Stage IV Metastatic Treatment-Naïve 1L Renal Cell Carcinoma Patients (Enrolled Per Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for ORR in Stage 1 (N1=11) with 7/11 (64%) of patients achieving a partial response (PR).  Median time on study for 26 patients in Stage 2 (N1 + N2) is 5.6 months.  Responses were observed in 12/26 (46%) patients (11 PR, 1 uPR).  Amongst the 24 patients with known PD-L1 status, the ORR in PD-L1 negative patients was 9/17 (53%) and in PD-L1 positive patients was 2/7 (29%). One of two patients (50%) with unknown PD-L1 baseline status experienced a PR.

Stage IV Metastatic Treatment-Naïve 1L Urothelial Carcinoma (Enrolled Per Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for ORR in Stage 1 (N1=10) with 6/10 (60%) of patients achieving either a partial or complete response (2 uCR, 3 PR,

---

[4] https://ir.nektar.com/news-releases/news-release-details/preliminary-data-nktr-214-combination-opdivo-nivolumab-patients. Last visited February 13, 2019.

1 *u*PR). Median time on study for 10 patients in Stage 1 is 3.9 months. The ORR in PD-L1 negative patients was 3/5 (60%) and in PD-L1 positive patients was 3/5 (60%).

### August 8, 2018 Press Release

102.    On August 8, 2018, the Company issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2018, in which Defendant Robin boasted of Nektar's "significant progress," specifically stating, "[o]ver the past few months, we have reported significant progress across all areas of our pipeline, with notable milestones for our immuno-oncology, immunology and pain programs . . . ."

103.    The statements in ¶¶ 83-93 and 99-102 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose *inter alia*: (1) the complete data results from the PIVOT-02 trial; (2) that extending NKTR-214's half-life would create new problems including high-dose safety concerns and would not likely lead to the drug's effectiveness; (3) that previous trials related to pegylating IL-2 were unsuccessful; (4) that the combination of NKTR-214 with Opdivo had not established meaningfully positive results; (5) that IL-2 on its own was more effective than NKTR-214; and (6) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

104.    On October 1, 2018, Plainview published the Report, revealing that NKTR-214 did not live up to Nektar's claims and expectations with respect to the drug's safety and efficacy. According to the Report, the Company promoted NKTR-214 as "a promising treatment for cancer, particularly in combination with checkpoint inhibitors." Specifically, "Nektar hypothesized that

IL-2 could be improved by adding polyethylene glycol molecules to it (pegylating it) to extend the half-life and block interaction with IL2Rαβγ [a particular receptor.]" In truth, the Report noted, "the anticipated benefits did not materialize and pegylation has proved to be a drag on efficacy."

105.    The Report stated that Nektar's plan to create a "new universal cancer treatment" by taking an unsuccessful monotherapy and expecting success when used as part of a combination therapy "has **never** worked in practice." Furthermore, the Report stated that Nektar's decision to withhold 69% of response rates resulted in "an unprecedented level of data opacity" and stated further that the "[f]irst rule of biotechnology investing: if a company withholds data from investors, that data is always bad."

106.    Further delving into the comparative analysis between IL-2 on its own versus NKTR-214, the Report found "[i]n clinical trials and retrospective analysis" that, while IL-2 had a historic objective response rate (ORR) of 15%-29% from data between 1995 and 2005, "NKTR-214, on the other hand, posted a stunning 0% ORR."

107.    In addition, the Report explained that pegylating IL-2 was not a novel concept, stating, "NKTR-214 is not the first attempt at pegylating IL-2"; indeed, the first paper on the topic was published in 1987. Due to "NKTR-214's 0% ORR," the Report noted that it was "very hard to believe that NKTR-214 [would] work as part of a combination therapy," and stated, in relevant part:

> For combination therapies in oncology, 2+2=3, not 2+2=5—the total effect is nearly always less than the sum of the parts. We are unaware of any oncology drug that reported a 0% ORR as a monotherapy and then went on to achieve success as part of a combination therapy, but there are many therapies with meaningful monotherapy ORR rates that have failed to add value as part of a combination therapy.

108.    Although NKTR-214's intended mechanism was to trigger proliferation of certain lymphocytes for clinical success, according to the Report the Company's recent PIVOT trial data

revealed that the triggered response of lymphocytes came nowhere close to the required percent increase for actual effective treatment. Specifically, studies on IL-2 on its own established that "an IL-2 treatment requires a 200-300% increase in lymphocytes in order to elicit a response" and in "its most recent PIVOT trial data, NKTR-214 has induced a 33-50% increase in lymphocytes— missing the bar for efficacy by a wide margin and explaining why the monotherapy data was so poor."

109.    Turning to NKTR-214's extended half-life, the Report stated that it had no significant impact on the therapy's efficacy, specifically stating, "NKTR-214 is too weak to work, with a pharmacokinetic profile yielding only 7-20% of the active AUC of a standard cycle of IL-2 due to 1) lower maximum tolerated dose and 2) pegylation interfering with NKTR-214 drug activity." In fact, the extended half-life actually raised further safety issues due to the irreversibility of the front-loaded dosing.

110.    The Report pointed out that the Company's claims regarding CD8+ data were "brazenly misleading," and Nektar's frequently cited "30-fold average change in tumor-infiltrating lymphocyte (TIL) CD8+" was "distorted by a single outlier patient who purportedly recorded an extreme change in TIL CD8+ but saw no clinical benefit." Additionally, the Report noted that there was a "lack of significant effect [of NKTR-214] in combination with nivolumab," which was particularly concerning.

111.    In conclusion, the Report stated that the Company's aim to improve IL-2 resulted in a product "that is completely useless for treating cancer," and further determined that Nektar's approach with NKTR-214 was problematic from the start:

> Elongating half-life with pegylation makes sense for many indications where the goal is to reach and maintain steady state. These include many neurological or chronic conditions that cannot be cured directly, such as pain or ADHD. However,

it makes no sense for treating cancer. The goal is not to reach steady-state exposure to IL-2, it is to kill the malignant tumor cells.

In exchange for the long half-life of NKTR-214, Nektar was forced to sacrifice both total and peak therapeutic effect. NKTR-214's PEG polymers also forced Nektar to use a significantly lower dose compared to IL-2. The end result is a drug with AUC that is much lower than IL-2, therapeutic effect (target receptor binding) that is even lower than the AUC would imply, and a maximum concentration that does not appear to meet the minimum threshold for efficacy.

With a 0% ORR as a monotherapy, NKTR-214 has already failed where IL-2 succeeded, and by combining NKTR-214 with checkpoint inhibitors, Nektar is now trying to succeed where IL-2 failed. Neither the science nor the data support NKTR-214, and we are betting against it.

112.    When news of the Report reached the public, the Company's price per share dropped $5.63 over the next two trading sessions from a closing price of $60.96 on September 28, 2018 to a closing price of $55.33 on October 2, 2018, a decline of over 9%.

## DAMAGES TO NEKTAR

113.    As a direct and proximate result of the Individual Defendants' conduct, Nektar has lost and expended, and will lose and expend, many millions of dollars.

114.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

115.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

116.    As a direct and proximate result of the Individual Defendants' conduct, Nektar has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

117. Plaintiff brings this action derivatively and for the benefit of Nektar to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Nektar, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

118. Nektar is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

119. Plaintiff is a shareholder of Nektar and has continuously held Nektar common stock since she purchased it at the beginning of the Relevant Period. Plaintiff will adequately and fairly represent the interests of Nektar in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

120. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

121. A pre-suit demand on the Board of Nektar is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Robin, Ajer, Chess, Greer, Lingnau, and Whitfield (the "Director-Defendants"), and non-defendant Karin Eastham (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

122.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while four of them engaged in insider sales based on material non-public information, netting proceeds of over $43.8 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

123.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

124.     Additional reasons that demand on Defendant Robin is futile follow. Defendant Robin has served as the Company's President and CEO since January 2007 and as a member of the Board since February 2007. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Robin with his principal occupation, and he receives handsome compensation, including $18,097,411 during the fiscal year ended December 31, 2017. Defendant Robin was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the 2017 10-K, which he signed and signed a SOX certification for. As the Company's highest officer and as a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Robin is a defendant in the Securities Class Action. His insider sales before the fraud was exposed, which yielded at least $31 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  Defendant Robin's son, Michael Robin, is employed by the Company as a director in its project management group and was paid approximately $1,661,068 by the Company for the fiscal year ended December 31, 2017. Defendant Robin may fear retaliation against his son, in addition to himself, if he were to accept a demand.  For these reasons, too, Defendant Robin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.    Additional reasons that demand on Defendant Ajer is futile follow. Defendant Ajer has served as a Company director since September 2017 and serves as a member of the Audit Committee and Organization and Compensation Committee. Defendant Ajer receives lavish compensation, including $1,144,658 during the fiscal year ended December 31, 2017. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ajer signed, and thus personally made the false and misleading statements in, the 2017 10-K. For these reasons, too, Defendant Ajer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.    Additional reasons that demand on Defendant Chess is futile follow. Defendant Chess has served as a Company director since May 1992 and has served in a variety of positions

at Nektar throughout his years with the Company. From March 2006 to January 2007 he was the acting President and CEO; from April 1999-January 2007 he was the Executive Chairman; from August 1998 to April 2000, he was Co-CEO; from December 1991 to August 1998 he served as President; and from May 1992 to August 1998, he served as the Company's CEO. Defendant Chess receives handsome compensation, including $556,763 during the fiscal year ended December 31, 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Chess signed, and thus personally made the false and misleading statements in, the 2017 10-K. His insider sales before the fraud was exposed, which yielded at least $5.1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Chess breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127. Additional reasons that demand on Defendant Greer is futile follow. Defendant Greer has served as a Company director since February 2010 and serves as Chair of the Audit Committee and as a member of the Organization and Compensation Committee. Defendant Greer receives handsome compensation, including $542,463 during the fiscal year ended December 31, 2017. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Greer signed, and thus personally made the false and misleading statements in, the 2017 10-K. His insider sales before the fraud was

exposed, which yielded at least $4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Greer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant Lingnau is futile follow. Defendant Lingnau has served as a Company director since August 2007. He also serves as Chair of the Organization and Compensation Committee. Defendant Lingnau receives handsome compensation, including $525,263 during the fiscal year ended December 31, 2017. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Lingnau signed, and thus personally made the false and misleading statements in, the 2017 10-K. His insider sales before the fraud was exposed, which yielded at least $3.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Lingnau breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant Whitfield is futile follow. Defendant Whitfield has served as a Company director since August 2000. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Whitfield receives handsome compensation, including $525,513 during the fiscal year ended December 31, 2017. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously

disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Whitfield signed, and thus personally made the false and misleading statements, in the 2017 10-K. For these reasons, too, Defendant Whitfield breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130.    Additional reasons that demand on the Board is futile follow.

131.    As described above, four of the Director-Defendants directly engaged in insider trading, in violation of federal law. Director-Defendants Robin, Chess, Greer, and Lingnau collectively received proceeds of over $43.8 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

132.    Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

133.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading

statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

134.    Nektar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Nektar any part of the damages Nektar suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

135.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

136.    The acts complained of herein constitute violations of fiduciary duties owed by Nektar officers and directors, and these acts are incapable of ratification.

137.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Nektar. If there is a directors' and officers' liability

insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Nektar, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

138.     If there is no directors' and officers' liability insurance, then the Directors will not cause Nektar to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

139.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

140.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

141.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

142.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

143.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

144.    Under the direction and watch of the Director-Defendants, the 2018 Proxy Statement failed to disclose, *inter alia*: (1) the complete data results from the PIVOT-02 trial; (2) that extending NKTR-214's half-life would create new problems including high-dose safety concerns and would not likely lead to the drug's effectiveness; (3) that previous trials related to pegylating IL-2 were unsuccessful; (4) that the combination of NKTR-214 with Opdivo had not established meaningfully positive results; (5) that IL-2 on its own was more effective than NKTR-214; and (6) that the Company failed to maintain internal controls.

145.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-

performance" elements, while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

146.    The 2018 Proxy Statement also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The 2018 Proxy Statement failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

147.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

148.    The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Ajer, Chess, and Whitfield, which allowed them to continue breaching their fiduciary duties to Nektar.

149.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

150.    Plaintiff on behalf of Nektar has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

151.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

152.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nektar's business and affairs.

153.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

154.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nektar.

155.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

156.   In further breach of their fiduciary duties owed to Nektar, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*: (1) the complete data results from the PIVOT-02 trial; (2) that extending NKTR-214's half-life would create new problems including high-dose safety concerns and would not likely lead to the drug's effectiveness; (3) that previous trials related to pegylating IL-2 were unsuccessful; (4) that the combination of NKTR-214 with Opdivo had not established meaningfully positive results; (5) that IL-2 on its own was more effective than NKTR-214; and (6) that the Company failed to maintain internal controls. As a

result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

157.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

158.    In breach of their fiduciary duties, seven of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

159.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

160.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal

controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

161.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

162.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nektar has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

163.    Plaintiff on behalf of Nektar has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

164.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Nektar.

166.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Nektar that was tied to the performance or artificially inflated valuation of Nektar, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

167.    Plaintiff, as a shareholder and a representative of Nektar, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

168.    Plaintiff on behalf of Nektar has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

169.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

170.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

171.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

172.    Plaintiff on behalf of Nektar has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Nektar, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Nektar;

(c)      Determining and awarding to Nektar the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Nektar and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Nektar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Nektar to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Nektar restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: February 13, 2019

Respectfully submitted,

**PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A.**

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (Bar No. 110)
Megan C. Haney (Bar No. 5016)
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200

Email:jcp@pgmhlaw.com
Email: mch@pgmhlaw.com

Of Counsel:

*Attorneys for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net