**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE NEKTAR THERAPEUTICS DERIVATIVE LITIGATION | Lead Case No. 1:19-cv-00322-MN-JLH **DEMAND FOR JURY TRIAL** |

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Karen Hodes ("Plaintiff Hodes") and Plaintiff Christine Sever ("Plaintiff Sever," and together with Plaintiff Hodes, "Plaintiffs") by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Nektar Therapeutics ("Nektar" or the "Company"), file this Verified Consolidated Shareholder Derivative Complaint against Individual Defendants Howard W. Robin, Gil M. Labrucherie, Stephen K. Doberstein, Ivan P. Gergel, John Nicholson, Mary Tagliaferri, Jonathan Zalevsky, Jeff Ajer, Robert B. Chess, Karin Eastham, R. Scott Greer, Christopher A. Kuebler, Lutz Lingnau, Roy A. Whitfield, and Dennis L. Winger (collectively, the "Individual Defendants," and together with Nektar, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Nektar, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiffs' complaint against the Individual Defendants, they allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC")

filings, wire and press releases published by and regarding Nektar, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Nektar's directors and officers from at least January 10, 2017 through September 28, 2018 (the "First Relevant Period") and February 15, 2019 through the present (the "Second Relevant Period").

2.      Nektar is a biopharmaceutical company that specializes in the research, discovery, and development of novel medications for areas in which there is sizeable unmet medical need. The Company's pipeline includes new investigational drugs for treatment and use in a variety of medical areas including cancer, chronic pain, and autoimmune disease.

3.      The Company purports to leverage its proprietary chemistry platform to develop new drug candidates which utilize Nektar's advanced polymer conjugate technology platforms, designed to allow the "development of new molecular entities that target known mechanisms of action."

4.      Nektar's proprietary programs include Immuno-oncology ("I-O") projects that are focused on developing targeted medicines to help the body's immune system fight cancer with medications designed to modify certain immune cell activities, such as increasing their numbers and advancing their abilities to identify and attack cancer cells.

5.      Nektar's lead I-O drug candidate is NKTR-214, also known as "bempegaldesleukin" or "bempeg," a biologic with biased signaling through Interleukin-2 ("IL-

2

2"), a naturally occurring cytokine widely known in the scientific community to prompt the production of cancer-fighting cells within the body.  According to the Company's President and Chief Executive Officer ("CEO") Howard W. Robin ("Robin"), IL-2 is a "[m]aster [g]rowth [f]actor for T Cells and Natural Killer (NK) Cells." However, the safety profile of IL-2 has limited its usage as an effective cancer therapy. IL-2's short half-life requires high doses of the protein for effectiveness, and while IL-2 prompts the production of cancer-killing cells, it also triggers the production of "Treg" cells, which are immunosuppressive. As such, IL-2 presents challenges with toxicity when given in high doses. NKTR-214, through utilizing IL-2, is designed to stimulate and facilitate the growth of "tumor-killing immune cells." Specifically, NKTR-214 was created as a modified form of IL-2, to proliferate the production of cancer-killing cells, without triggering the production of immunosuppressive cells.

6.      The Company has conducted a number of clinical trials evaluating the efficacy of NKTR-214, including the in-human multicenter phase 1 study titled, EXCEL.

7.      During the First Relevant Period, the investing public was led to believe that NKTR-214 successfully achieved what IL-2 could not on its own: the proliferation of cancer-fighting cells in tumors without the concurrent increase in immunosuppressive cells. Specifically, the initial results achieved in EXCEL were negative, yet, the results reported by the Company to the market were skewed due to a drastic increase in the cancer-fighting cells experienced in one of the five patients participating in the trial, rendering the initial results of the study significantly (and misleadingly) positive. Nevertheless, throughout the First Relevant Period, the Individual Defendants caused the Company to repeatedly tout the study's false results, publicly, over 10 times, flaunting that NKTR-214 produces a "30-fold increase," or produces 30 times the number of cancer-fighting cells with negligible increase in immunosuppressive cells. Moreover, the

Company's claims pertaining to the supposed 30-fold increase produced by NKTR-214 misrepresented additional information that further rendered the statements false and misleading to the investing public. In addition to intentionally utilizing outlier data from a single patient, the Individual Defendants caused the Company to falsely report the size and composition of the data set, as well as the dosing schedule used in the EXCEL trial.

8.      In order to further develop NKTR-214 as a commercial cancer therapy, the Company also initiated clinical trials testing NKTR-214's combination with other drug company products, including Bristol-Myers Squibb Company's ("BMS") Opdivo® (nivolumab) in a Phase 2 clinical trial of NKTR-214 known as PIVOT-02, which remains ongoing. The Company announced the initial results of PIVOT-02 in November 2017, which the market reacted to favorably, resulting in an increase in the price of Nektar common stock. Soon after, in February 2018, the Company announced a collaboration agreement between BMS and Nektar to further analyze the combination of Opdivo and NKTR-214, with BMS providing the Company almost $2 billion upfront in cash and equity. Yet, similar to EXCEL, unbeknownst to the investing public, certain of the Individual Defendants were aware and/or actively engaged in manipulating the PIVOT-02 trial by, *inter alia*, presenting patient data that was unvalidated, prioritizing the presentation of positive results, and delaying less positive results, all of which ran contrary to industry standards and painted a false image of NKTR-214's success that was not sustainable long-term.

9.      Indeed, on June 2, 2018, the Company issued a press release concerning preliminary data from the ongoing PIVOT-02 trial. The press release revealed a significant drop in the treatment's efficacy, from a previous response rate of 85% in stage 1 of the study to a mere

50%. The results from the PIVOT-02 trial were deemed by news outlets to be both "confusing" and "disappointing" given the Company's previously touted string of success.

10. On this news, the price per share of Nektar stock plummeted approximately 41.82% from the previous day's closing price of $90.35 on June 1, 2018, to close at $52.57 on June 4, 2018.

11. The truth continued to emerge on October 1, 2018, when a detailed report published by short-seller Plainview LLC ("Plainview") titled, "NKTR-214: Pegging the Value at Zero" (the "Report"), revealed that while the Company had touted NKTR-214 as a promising new cancer treatment drug, Nektar had only disclosed about 31% of response rates and withheld the rest of the data on dosed patients in its PIVOT study as of its presentation at the 2018 American Society of Clinical Oncology ("ASCO") annual meeting, where the Company discussed its PIVOT phase 1/2 results. The Report maintained that the Company's hypothesis that "pegylating," i.e. adding polyethylene glycol molecules to, IL-2 would improve IL-2's function did not prove to be true. The Report further criticized that pegylation actually impaired the efficacy of NKTR-214, making it an ineffective cancer treatment. The Report pointed out the Company's frequent reference to a "30-fold average change" was due to a single outlier patient that had experienced drastic results, distorting the study's numbers, and categorized the statement as "Brazenly Misleading." The Report contained a link to the obscured data, buried in a clinical poster by Nektar from a European presentation that revealed that prior statements made about NKTR-214 were false. Lastly, the Report emphasized that the combination of NKTR-214 with Opdivo had not established meaningfully positive results and that IL-2 on its own was more effective than NKTR-214.

12. On this news, the price per share of Nektar stock fell over the next two trading sessions, from a closing price of $60.96 on September 28, 2018, to a closing price of $56.65 on

October 1, 2018, a decline of approximately 7%, and further fell to a closing price of $55.33 on October 2, 2018.

13.     Then, in late 2019, another disclosure revealed that the Company was not only engaged in substandard industry practices during its EXCEL and PIVOT-02 trials, but it also failed to comply with good manufacturing practices in its PIVOT-02 trials, implicating the vital study's clinical results.

14.     Beginning in February 2019, the Company reported clinical success in its second phase of experiments, and the Food and Drug Administration ("FDA") even bestowed Breakthrough Therapy Designation on the combination of NKTR-214 and Opdivo for the treatment of certain melanomas.

15.     However, on August 8, 2019, the Company admitted that, due to a manufacturing error, its latest PIVOT study's results had been compromised: two of the 20 experimental batches of NKTR-214 significantly varied from the rest.  Thus, phase two's positive experimental results were no longer reliable, because the varied data could no longer support a conclusion of clinical benefit.

16.     Following this announcement, the price per share of Company stock fell drastically, from a close of $29.57 on August 8, 2019 to close at $20.92 on August 9, 2019, representing a drop of over 29%.

17.     During the First Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly misrepresented and/or caused the Company to misrepresent the data results of the EXCEL clinical

6

trial by, *inter alia*, (1) knowingly including outlier data that skewed the trial results; (2) claiming the data set consisted of ten patients, when it consisted of five; (3) falsely implying that NKTR-214 selectively proliferated cancer-killing cells in the same patients that experienced negligible increases of immunosuppressive cells, when those results occurred in different groups of patients; (4) stating that the dosing schedule was every 3 weeks, when a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; and (5) failing to disclose that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

18.     In further breach of their fiduciary duties during the First Relevant Period, certain of the Individual Defendants engaged in a scheme to manipulate the clinical trial results of Nektar's PIVOT-02 trial by, *inter alia*, presenting patient data that was not validated, selectively choosing patients to participate in the trial, delaying the disclosure of results that were less positive while disclosing positive results, and neglecting the risks posed by the unsustainable fictional image they created of NKTR-214's success (the "PIVOT Manipulation Misconduct").

19.     During the Second Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia* that: (1) the Company failed to comply with current good manufacturing practices; (2) consequently, the quality of the experimental batches of NKTR-214 was internally inconsistent; (3) the differences between the batches used in the PIVOT-02 study significantly affected the experimental results; (4) thus, any preliminary finding of a clinical

benefit was invalidated by the absence of statistically significant results; and (5) that the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

20.     During the First and Second Relevant Periods, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public and by causing the Company to fail to maintain internal controls.

21.     Furthermore, during the First and Second Relevant Periods, twelve of the Individual Defendants breached their fiduciary duties by engaging in insider sales, netting proceeds of over $159 million.

22.     In light of the Individual Defendants' misconduct, which has subjected Nektar, its CEO, and a number of its current and former officers to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "First Class Action"),[1] and Nektar, its CEO and Senior Vice President and Chief Financial Officer ("CFO") to being named in a second securities fraud class action lawsuit, also pending the United States District Court for the Northern District of California (the "Second Class Action," and together with the First Class Action, the "Securities Class Actions"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company

---

[1] All references herein to the First Class Action refer to the Consolidated Class Action Complaint filed on May 15, 2019.

and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's CEO's and other officers' liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Nektar's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

25.     Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

29.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

30.     Venue is proper in this District because Nektar and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

31.     Plaintiff Hodes is a current shareholder of Nektar common stock and has continuously held Nektar common stock at all relevant times.

32.     Plaintiff Sever is a current shareholder of Nektar common stock and has continuously held Nektar common stock at all relevant times.

### Nominal Defendant Nektar

33.     Nektar is a Delaware corporation with its principal executive offices at 455 Mission Bay Boulevard South, San Francisco, CA, 94158. Nektar's shares trade on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "NKTR."

### Defendant Robin

34.     Defendant Robin has served as the Company's President and CEO since January 2007, and as a Company director since February 2007. According to the Company's Schedule 14A filed with the SEC on April 30, 2019 (the "2019 Proxy Statement"), as of April 15, 2019, Defendant Robin beneficially owned 2,175,053 shares of the Company's common stock, which represented 1.25% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 15, 2019 was $33.49, Defendant Robin owned approximately $72.8 million worth of Nektar stock.

35. For the fiscal year ended December 31, 2018, Defendant Robin received $13,330,667 in compensation from the Company. This included $968,921 in salary, $4,998,206 in stock awards, $5,618,256 in option awards, $1,647,100 in Non-Equity Incentive Plan Compensation, and $98,184 in all other compensation.

36. During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Robin made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 1/17/2017 | 87,500 | $ 12.35 | $ 1,080,625.00 |
| 2/8/2017 | 87,500 | $ 13.04 | $ 1,141,000.00 |
| 2/16/2017 | 8,636 | $ 13.14 | $ 113,477.04 |
| 5/16/2017 | 8,388 | $ 19.55 | $ 163,985.40 |
| 8/16/2017 | 91,714 | $ 19.29 | $ 1,769,163.06 |
| 9/6/2017 | 83,333 | $ 21.54 | $ 1,794,992.82 |
| 10/9/2017 | 83,333 | $ 24.20 | $ 2,016,658.60 |
| 11/1/2017 | 83,334 | $ 23.57 | $ 1,964,182.38 |
| 12/13/2017 | 83,333 | $ 55.69 | $ 4,640,814.77 |
| 1/22/2018 | 83,333 | $ 75.82 | $ 6,318,308.06 |
| 2/16/2018 | 12,788 | $ 82.94 | $ 1,060,636.72 |
| 5/1/2018 | 43,334 | $ 83.65 | $ 3,624,889.10 |
| 5/2/2018 | 43,333 | $ 85.63 | $ 3,710,604.79 |
| 5/3/2018 | 43,333 | $ 82.86 | $ 3,590,572.38 |
| 5/16/2018 | 12,791 | $ 83.39 | $ 1,066,641.49 |
| 6/25/2018 | 43,334 | $ 51.82 | $ 2,245,567.88 |
| 6/26/2018 | 43,333 | $ 49.36 | $ 2,138,916.88 |
| 6/27/2018 | 43,333 | $ 47.39 | $ 2,053,550.87 |
| 2/19/2019 | 42,215 | $ 42.35 | $ 1,787,805.25 |
| 2/20/2019 | 33,334 | $ 43.20 | $ 1,440,028.80 |
| 2/21/2019 | 33,333 | $ 41.01 | $ 1,366,986.33 |
| 5/16/2019 | 13,383 | $ 21.37 | $ 285,994.71 |
| 5/21/2019 | 33,333 | $ 32.93 | $ 1,097,655.69 |
| 5/22/2019 | 33,334 | $ 33.38 | $ 1,112,688.92 |
| 5/23/2019 | 33,333 | $ 32.69 | $ 1,089,655.77 |
| 7/23/2019 | 33,333 | $ 32.10 | $ 1,069,989.30 |
| 7/24/2017 | 33,334 | $ 32.11 | $ 1,070,354.74 |

| 7/25/2019 | 33,333 | $ 29.65 | $ 988,323.45 |

Thus, in total, before the fraud was exposed, he sold 1,308,248 Company shares on inside information, for which he received approximately $51.8 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

37.    Defendant Robin's son, Michael Robin, is employed as a non-executive officer of the Company and serves as a vice president in Nektar's project management group. The Company paid Defendant Robin's son approximately $838,237 in compensation during the fiscal year ended December 31, 2018.

38.    The Company's 2019 Proxy Statement stated the following about Defendant Robin:

*Howard W. Robin*[2], age 66, has served as our President and Chief Executive Officer since January 2007 and has served as a member of our board of directors since February 2007. Mr. Robin served as Chief Executive Officer, President and a director of Sirna Therapeutics, Inc., a biotechnology company, from July 2001 to November 2006 and from January 2001 to June 2001, served as their Chief Operating Officer, President and as a director. From 1991 to 2001, Mr. Robin was Corporate Vice President and General Manager at Berlex Laboratories, Inc. ("Berlex"), a pharmaceutical products company that is a subsidiary of Schering, AG, and from 1987 to 1991 he served as Vice President of Finance and Business Development and Chief Financial Officer. From 1984 to 1987, Mr. Robin was Director of Business Planning and Development at Berlex. He was a Senior Associate with Arthur Andersen & Co. prior to joining Berlex. He received his B.S. in Accounting and Finance from Fairleigh Dickinson University and serves as a member of its Board of Trustees.

**Defendant Labrucherie**

39.    Defendant Gil M. Labrucherie ("Labrucherie") has served as Nektar's Senior Vice President and CFO since June 2016. On September 25, 2019, Defendant Labrucherie was promoted to Chief Operating Officer. According to the 2019 Proxy Statement, as of April 15, 2019,

---

[2] Emphasis in original unless otherwise noted in this Complaint.

Defendant Labrucherie beneficially owned 948,459 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2019 was $33.49, Defendant Labrucherie owned over $31.7 million worth of Nektar stock.

40.     For the fiscal year ended December 31, 2018, Defendant Labrucherie received $5,733,928 in compensation from the Company. This included $631,696 in salary, $2,099,320 in stock awards, $2,359,382 in option awards, $631,600 in Non-Equity Incentive Plan Compensation, and $11,930 in all other compensation. Pursuant to Defendant Labrucherie's promotion, his base salary increased on September 25, 2019 from $661,000 to $750,000.

41.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Labrucherie made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 2/16/2017 | 2,359 | $ 13.14 | $ 30,997.26 |
| 3/2/2017 | 167,506 | $ 15.15 | $ 2,537,715.90 |
| 3/3/2017 | 32,494 | $ 15.21 | $ 494,233.74 |
| 5/16/2017 | 3,179 | $ 19.55 | $ 62,149.45 |
| 8/16/2017 | 3,177 | $ 19.32 | $ 61,379.64.00 |
| 10/2/2017 | 120,000 | $ 24.45 | $ 2,934,000.00 |
| 2/16/2018 | 3,477 | $ 82.94 | $ 288,382.38 |
| 5/1/2018 | 30,000 | $ 83.65 | $ 2,509,500.00 |
| 5/2/2018 | 30,000 | $ 85.63 | $ 2,568,900.00 |
| 5/3/2018 | 30,000 | $ 82.86 | $ 2,485,800.00 |
| 5/16/2018 | 4,941 | $ 83.39 | $ 412,029.99 |
| 5/16/2019 | 3,767 | $ 31.37 | $ 118,170.79 |
| 6/17/2019 | 25,000 | $ 33.71 | $ 842,750.00 |
| 7/10/2019 | 25,000 | $ 34.57 | $ 864,250.00 |

Thus, in total, before the fraud was exposed, he sold 480,900 Company shares on inside information, for which he received approximately $16.2 million. His insider sales made with

knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

42.    The Company's website states the following about Defendant Labrucherie:[3]

Gil M. Labrucherie was appointed Senior Vice President and Chief Financial Officer of the company in June 2016. In this role, Mr. Labrucherie oversees finance, legal, procurement and logistics and information technology functions for the company. Since joining Nektar in 2005, Mr. Labrucherie has held several senior leadership positions with increasing responsibility, most recently he served as Senior Vice President, General Counsel and Secretary of Nektar from 2007 to 2016. Prior to joining Nektar, from October 2000 to September 2005, Mr. Labrucherie was Vice President of Corporate Development at E2open, Inc., where he was responsible for global corporate alliances and merger and acquisition activity. Prior to E2open, he was the Senior Director of Corporate Development at AltaVista Company, an Internet search company, where he was responsible for merger and acquisition transactions. Mr. Labrucherie began his career as an associate in the corporate practice of the law firm of Wilson Sonsini Goodrich & Rosati and Graham & James (DLA Piper Rudnick).

Mr. Labrucherie received his J.D. from University of California Boalt Hall School of Law, where he was a member of the California Law Review and Order of the Coif, and received his B.A. from the University of California, Davis.

**Defendant Doberstein**

43.    Defendant Stephen K. Doberstein ("Doberstein") has served as Nektar's Chief Research and Development Officer ("CRDO") since January 2010. According to the 2019 Proxy Statement, as of April 15, 2019, Defendant Doberstein beneficially owned 469,304 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2019 was $33.49, Defendant Doberstein owned approximately $15.7 million worth of Nektar stock.

44.    For the fiscal year ended December 31, 2018, Defendant Doberstein received $4,811,856 in compensation from the Company. This included $600,000 in salary, $1,748,824 in

---

[3] https://www.nektar.com/company/our-leadership. Last visited September 26, 2019.

stock awards, $1,965,476 in option awards, $480,000 in Non-Equity Incentive Plan Compensation, and $17,556 in all other compensation.

45.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Doberstein made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 2/16/2017 | 1,261 | $ 13.14 | $ 16,569.54 |
| 4/5/2017 | 100,000 | $ 21.70 | $ 2,170,000 |
| 5/16/2017 | 1,701 | $ 19.55 | $ 33,254.55 |
| 8/16/2017 | 1,701 | $ 19.32 | $ 32,863.32 |
| 10/5/2017 | 43,677 | $ 24.97 | $ 1,090,614.69 |
| 11/6/2017 | 20,914 | $ 24.98 | $ 522,431.72 |
| 11/7/2017 | 75,409 | $ 25.78 | $ 1,944,044.02 |
| 11/8/2017 | 300,000 | $ 30.09 | $ 9,027,000.00 |
| 2/16/2018 | 2,426 | $ 82.94 | $ 201,212.44 |
| 4/6/2018 | 110,500 | $ 91.69 | $ 10,131,745.00 |
| 4/9/2018 | 49,500 | $ 96.13 | $ 4,758,435.00 |
| 5/16/2018 | 3,435 | $ 83.39 | $ 286,444.65 |
| 2/19/2019 | 3,310 | $ 42.39 | $ 140,310.90 |

Thus, in total, before the fraud was exposed, he sold 713,834 Company shares on inside information, for which he received over $30.3 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

46.     The Company's website states the following about Defendant Doberstein:[4]

Dr. Doberstein has over 25 years of experience in biotechnology research and development. Since joining Nektar in January 2010, he has spearheaded the discovery team at Nektar, which led to the identification and growth of the company's proprietary pipeline of drug candidates. This included development of NKTR-181 (a first-in-class opioid analgesic with strategic brain entry kinetics) and NKTR-214 (a CD122-biased agonist that is currently in multiple clinical studies across a wide range of tumor types). Dr. Doberstein also serves as a representative

---

[4] https://www.nektar.com/company/our-leadership. Last visited September 26, 2019.

of Nektar for the National Institute of Health (NIH) Public/Private Initiative to Address the Opioid Crisis.

Prior to joining Nektar, Dr. Doberstein was Vice President of Research at XOMA where he was responsible for directing discovery and development of multiple drug candidates, including antibody discovery and support of clinical development through non-clinical safety, translational medicine and pharmacokinetics/pharmacodynamics. Previously, Dr. Doberstein served as Vice President, Research at Five Prime Therapeutics, a protein and antibody discovery and development company where he built and led the discovery research and process development group. While at Five Prime, he created several successful drug candidate programs that resulted in multiple strategic alliances with pharmaceutical partners, and moved a number of product candidates from concept to clinical stage in diabetes, oncology, rheumatoid arthritis and osteoarthritis. Prior to that, Dr. Doberstein was the Vice President of Research at Xencor and also held senior leadership positions at Exelixis.

Dr. Doberstein received his Ph.D. in Biochemistry, Cell and Molecular Biology from the Johns Hopkins University School of Medicine and completed his postdoctoral work at UC Berkeley. Earlier in his career, Dr. Doberstein held a variety of engineering roles at DuPont after receiving his B.S.Ch.E. degree in Chemical Engineering from the University of Delaware.

**Defendant Gergel**

47.     Defendant Ivan P. Gergel ("Gergel") was Nektar's Chief Medical Office from 2014 until his resignation on December 2017.

48.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gergel made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 7/11/2017 | 8,389 | $ 21.04 | $ 176,504.56 |
| 7/12/2017 | 36,691 | $ 21.09 | $ 773,813.19 |
| 7/18/2017 | 54,920 | $ 21.10 | $ 1,158,812.00 |
| 8/16/2017 | 1,997 | $ 19.32 | $ 38,582.04 |
| 9/29/2017 | 43,296 | $ 24.04 | $ 1,040,835.84 |
| 10/2/2017 | 56,704 | $ 24.21 | $ 1,372,803.84 |

Thus, in total, before the fraud was exposed, he sold 201,997 Company shares on inside information, for which he received over $4.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Nicholson**

49.     Defendant John Nicholson ("Nicholson") served as Nektar's Senior Vice President and Chief Operating Officer ("COO") from June 2016 until his retirement in October 2019. According to the Company's Schedule 14A filed with the SEC on April 30, 2018 (the "2018 Proxy Statement"), as of April 27, 2018, Defendant Nicholson beneficially owned 916,426 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant Nicholson owned approximately $76.6 million worth of Nektar stock.

50.     For the fiscal year ended December 31, 2017, Defendant Nicholson received $7,831,160 in compensation from the Company. This included $625,800 in salary, $2,958,784 in stock awards, $3,672,084 in option awards, $547,575 in Non-Equity Incentive Plan Compensation, and $26,907 in all other compensation.

51.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Nicholson made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 2/2/2017 | 66,495 | $ 12.38 | $ 823,208.10 |
| 2/3/2017 | 8,505 | $ 12.48 | $ 106,142.40 |
| 2/16/2017 | 3,237 | $ 13.14 | $ 42,534.18 |
| 5/16/2017 | 3,146 | $ 19.55 | $ 61,504.30 |
| 6/7/2017 | 101,700 | $ 19.24 | $ 1,956,708.00 |
| 8/16/2017 | 3,177 | $ 19.32 | $ 61,379.64 |

| 11/13/2017 | 15,910 | $ 37.78 | $ 601,079.80 |
| 2/16/2018 | 4,879 | $ 82.94 | $ 404,664.26 |
| 3/6/2018 | 120,000 | $ 98.29 | $ 11,794,800.00 |
| 3/7/2018 | 100,144 | $ 100.45 | $ 10,059,464.80 |
| 5/16/2018 | 4,917 | $ 83.39 | $ 410,028.63 |
| 2/19/2019 | 3,822 | $ 42.39 | $ 162,014.58 |
| 5/16/2019 | 4,077 | $ 31.37 | $ 127,895.49 |

Thus, in total, before the fraud was exposed, he sold 440,009 Company shares on inside information, for which he received approximately $26.6 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

52.    The Company's website states the following about Defendant Nicholson:[5]

John Nicholson was appointed Senior Vice President and Chief Operating Officer (COO) of the company in June 2016. In this role, Mr. Nicholson oversees business development, marketing and product strategy, program management, alliance management and quality functions at the company.  Mr. Nicholson has over 30 years of finance and business operations experience in the pharmaceutical industry.  From 2007 to 2016, Mr. Nicholson was Senior Vice President and Chief Financial Officer (CFO). Previously, he was Senior Vice President, Corporate Development and Business Operations at Nektar.

Prior to joining Nektar, he served in a number of leadership roles at Bayer Schering Pharma AG, including Vice President, Corporate Development and Treasurer of Schering Berlin Inc., President of Schering Berlin Insurance Company, President of Bayer Pharma Chemicals Inc., and President of Schering Berlin Capital Corporation. Mr. Nicholson also served as Treasurer of Berlex Inc.

**Defendant Tagliaferri**

53.    Defendant Mary Tagliaferri ("Tagliaferri") has served as Nektar's Chief Medical Officer since December 2017.

54.    The Company's website states the following about Defendant Tagliaferri:[6]

---

[5] https://www.nektar.com/company/our-leadership. Last visited January 31, 2019.
[6] https://www.nektar.com/company/our-leadership. Last visited September 26, 2019.

Mary Tagliaferri, M.D. was appointed Chief Medical Officer in December 2017. Dr. Tagliaferri has over 20 years of experience in pharmaceutical drug development in oncology and women's health as well as extensive regulatory expertise. In her current role, Dr. Tagliaferri oversees clinical development and operations, biometrics and medical affairs functions for the company.  Since joining Nektar in January 2015, she has provided strategic development leadership for the company's immuno-oncology portfolio, including NKTR-214, a CD122 biased agonist, which is in multiple clinical studies across a wide range of tumor types. She serves as strategic development leader for the clinical collaboration between Nektar and Bristol-Myers Squibb.

Prior to joining Nektar, she was a clinical and regulatory consultant to InterMune before its acquisition by Roche. She also served as Chief Medical Officer at KangLaiTe USA, a privately-held biotechnology company which develops oncology drug candidates in multiple solid tumor settings. Dr. Tagliaferri was also co-founder and President and Chief Medical Officer of BioNovo where she led the company's clinical drug development strategy and global regulatory affairs, led data management and biostatistics, and oversaw clinical operations and compliance. Dr. Tagliaferri received the 2012 State of California Woman of the Year award for her advancements of clinical research in women's health and her mentorship of women in the biotechnology field.

Dr. Tagliaferri received her Bachelor of Science degree from Cornell University and her medical degree from the University of California, San Francisco (UCSF).

**Defendant Thomsen**

55.     Defendant Jillian B. Thomsen ("Thomsen") has served as Nektar's Chief Accounting Officer ("CAO") since April 2008 and Senior Vice President since 2006. According to the 2019 Proxy Statement, as of April 15, 2019, Defendant Thomsen beneficially owned 449,630 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2019 was $33.49, Defendant Thomsen owned approximately $15 million worth of Nektar stock.

56.     For the fiscal year ended December 31, 2018, Defendant Thomsen received $6,233,595 in compensation from the Company. This included $435,000 in salary, $4,461,657 in stock awards, $899,490 in option awards, $424,100 in Non-Equity Incentive Plan Compensation, and $13,347 in all other compensation.

57.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Thomsen made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 2/16/2017 | 1,965 | $ 13.14 | $ 25,820.10 |
| 3/20/2017 | 112,500 | $ 19.69 | $ 2,215,125.00 |
| 5/16/2017 | 2,651 | $ 19.55 | $ 51,827.05 |
| 8/16/2017 | 2,648 | $ 19.32 | $ 51,159.36 |
| 2/16/2018 | 2,545 | $ 82.94 | $ 211,082.30 |
| 4/16/2018 | 13,881 | $ 101.46 | $ 1,408,366.26 |
| 5/16/2018 | 3,576 | $ 83.39 | $ 298,202.64 |
| 2/19/2019 | 1,808 | $ 42.39 | $ 76,641.12 |
| 5/16/2019 | 1,928 | $ 31.37 | $ 60,481.36 |

Thus, in total, before the fraud was exposed, she sold 143,502 Company shares on inside information, for which she received approximately $4.4 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

58.     The Company's website states the following about Defendant Thomsen:[7]

Jillian B. Thomsen was appointed Chief Accounting Officer in April 2008. Ms. Thomsen has over 20 years of financial reporting and accounting experience. In her current role, Ms. Thomsen oversees accounting, financial reporting, planning & analysis, Sarbanes-Oxley compliance, treasury and tax functions at the company. Previously, she served as Vice President, Finance and Controller of Nektar.

Prior to joining Nektar in 2006, Ms. Thomsen was Deputy Controller of Calpine Corporation from September 2002 to February 2006. From December 1990 to May 2002, Ms. Thomsen performed various roles with Arthur Andersen starting as a staff accountant and concluding as a senior manager. Ms. Thomsen holds a Masters of Accountancy from the University of Denver and a B.A. in Business Economics from Colorado College.

---

[7] https://www.nektar.com/company/our-leadership. Last visited October 17, 2019.

**Defendant Zalevsky**

59.    Defendant Jonathan Zalevsky ("Zalevsky") has served as Nektar's Chief Research & Development Officer since October 1, 2019 when he was promoted by the Company. Prior to his current position, Defendant Zalevsky served as Chief Scientific Officer since December 2017. In connection with his promotion, Defendant Zalevsky's annual base salary increased from $559,333 to $650,000.

60.    The Company's website states the following about Defendant Zalevsky:[8]

Jonathan Zalevsky was appointed Chief Scientific Officer in December 2017 to lead biological and translational research and guide strategy for the Nektar discovery portfolio. In this role, he is also responsible for safety assessment, clinical and nonclinical pharmacology, bioanalytical/bioassay for small and large molecules, and process development for biologics. Since joining the company in July 2015, Dr. Zalevsky's expertise in immunology, as well as his experience across biological modalities and therapeutic areas, have helped fuel the growth of the company's immuno-oncology and immunology pipeline. Dr. Zalevsky led the discovery and preclinical development for NKTR-358 (a T regulatory cell stimulatory agent being developed for auto-immune diseases with partner Eli Lilly & Co.) and NKTR-262 (a small molecule TLR agonist being developed in combination with NKTR-214).

Prior to joining Nektar, Dr. Zalevsky was Global Vice President and Head of the Inflammation Drug Discovery Unit at Takeda Pharmaceuticals. As the leading immunologist for Takeda, he was responsible for an immunology pipeline that spanned from early target discovery to late-stage development and launched products. Prior to working at Takeda, Dr. Zalevsky held a number of research and development positions at Xencor, where he was responsible for the discovery and development of Xencor's first four clinical-stage assets.

Dr. Zalevsky received his Ph.D. in Biochemistry from the Tetrad Program at the University of California at San Francisco (UCSF). He received dual bachelor degrees in Biochemistry and Molecular, Cellular and Developmental Biology from the University of Colorado at Boulder.

---

[8] https://www.nektar.com/company/our-leadership. Last visited September 26, 2019.

**Defendant Ajer**

61.     Defendant Jeff Ajer ("Ajer") served as a Company director since September 2017. He also serves as a member of the Audit Committee and the Organization and Compensation Committee. According to the 2019 Proxy Statement, as of April 15, 2019, Defendant Ajer beneficially owned 54,333 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2019 was $33.49, Defendant Ajer owned approximately $1.8 million worth of Nektar stock.

62.     For the fiscal year ended December 31, 2018, Defendant Ajer received $709,051 in compensation from the Company. This included $92,250 in fees earned or cash paid, $289,322 in stock awards, and $327,479 in option awards.

63.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ajer made the following sale of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 9/20/2018 | 6,750 | $ 56.76 | $      383,130.00 |

Thus, in total, before the fraud was exposed, he sold 6,750 Company shares on inside information, for which he received $383,130. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

64.     The Company's 2019 Proxy Statement stated the following about Defendant Ajer:

*Jeff Ajer, age 56,* was appointed to the board of directors of in September 2017. Mr. Ajer currently serves as Executive Vice President and Chief Commercial Officer at BioMarin Pharmaceutical Inc. ("BioMarin"), a global biotechnology company that develops and commercializes innovative therapies for people with serious and life-threatening rare disorders. From October 2012 to January 2014, Mr. Ajer served as Senior Vice President and Chief Commercial Officer of BioMarin. From April 2009 to October 2012, Mr. Ajer served as BioMarin's Vice

President, Commercial Operations, The Americas, where he had responsibility for commercial operations throughout the Americas and led product marketing, reimbursement, and sales operations for BioMarin. Prior to joining BioMarin, Mr. Ajer served in various roles at Genzyme Corporation ("Genzyme") beginning in November 2003, most recently as Vice President, Global Transplant Operations from December 2004 to August 2005. Mr. Ajer's experience prior to Genzyme includes roles in sales, marketing and operations at SangStat Medical Corporation and ICN Pharmaceuticals. Mr. Ajer also served on the board of directors of True North Therapeutics. Mr. Ajer received both a B.S. in chemistry and an M.B.A. from the University of California, Irvine.

**Defendant Chess**

65.     Defendant Robert B. Chess ("Chess") has served as a Company director since May 1992. He also serves as Chairman of the Board. Defendant Chess additionally served the Company in a variety of positions over the years. He served as acting President and CEO from March 2006 to January 2007, and as Executive Chairman from April 1999 to January 2007. Defendant Chess also served as Co-CEO from August 1998 to April 2000, as President from December 1991 to August 1998, and as CEO from May 1992 to August 1998. According to the 2019 Proxy Statement, as of April 15, 2019, Defendant Chess beneficially owned 456,056 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2019 was $33.49, Defendant Chess owned approximately $15.3 million worth of Nektar stock.

66.     For the fiscal year ended December 31, 2018, Defendant Chess received $741,551 in compensation from the Company. This included $124,750 in fees earned or cash paid, $289,322 in stock awards, and $327,479 in option awards.

67.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chess made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 3/14/2017 | 5,000 | $ 15.41 | $ 77,050.00 |
| 4/17/2017 | 5,000 | $ 18.72 | $ 93,600.00 |
| 5/15/2017 | 5,000 | $ 19.79 | $ 98,950.00 |
| 9/21/2017 | 6,400 | $ 21.72 | $ 139,008.00 |
| 4/6/2018 | 25,000 | $ 92.14 | $ 2,303,500.00 |
| 5/3/2018 | 25,000 | $ 82.80 | $ 2,070,000.00 |
| 6/5/2018 | 10,000 | $ 55.16 | $ 551,600.00 |
| 9/19/2018 | 4,500 | $ 56.81 | $ 255,645.00 |

Thus, in total, before the fraud was exposed, he sold 85,900 Company shares on inside information, for which he received approximately $5.6 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

68.     The Company's 2019 Proxy Statement stated the following about Defendant Chess:

*Robert B. Chess*, age 62, is the Chairman of our board of directors and has served as a director since May 1992. From March 2006 until January 2007, Mr. Chess served as our Acting President and Chief Executive Officer, and from April 1999 to January 2007, served as Executive Chairman. He also served as our Co-Chief Executive Officer from August 1998 to April 2000, as President from December 1991 to August 1998, and as Chief Executive Officer from May 1992 to August 1998. Mr. Chess was previously the co-founder and President of Penederm, Inc., a publicly-traded dermatological pharmaceutical company that was sold to Mylan Laboratories. He has held management positions at Intel Corporation and Metaphor Computer Systems (now part of IBM), and was a member of the first President Bush's White House staff as a White House Fellow and Associate Director of the White House Office of Economic and Domestic Policy. From 1997 until his retirement in 2009, Mr. Chess served on the board of directors of the Biotechnology Industry Organization ("BIO"). Mr. Chess served as Chairman of BIO's Emerging Companies Section and Co-Chairman of BIO's Intellectual Property Committee. Mr. Chess was the initial Chairman of Bio Ventures for Global Health and continues to serve on its board. He also serves on the Board of Trustees of the California Institute of Technology where he chairs the Technology Transfer Committee. Mr. Chess is the co-founder and Chairman of Biota Technology, a private company developing industrial applications of the analysis of microbial communities, and also serves as a director of Twist Bioscience, a publicly-traded company in the synthetic DNA production field. He is currently a member of the faculty of the Stanford Graduate School of Business, where he teaches courses in the MBA program on starting technology-based businesses and the healthcare industry. Mr. Chess received his B.S. degree in Engineering with

24

honors from the California Institute of Technology and an M.B.A. from Harvard University.

**Defendant Eastham**

69.     Defendant Karin Eastham ("Eastham") has served as a Company director since September 2018. She also serves as a member of the Audit Committee and the Organization and Compensation Committee. According to the 2019 Proxy Statement, as of April 15, 2019, Defendant Eastham beneficially owned 3,777 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2019 was $33.49, Defendant Eastham owned approximately $126,491 worth of Nektar stock.

70.     For the fiscal year ended December 31, 2018, Defendant Eastham received $1,143,749 in compensation from the Company. This included $40,000 in fees earned or cash paid, $517,734 in stock awards, and $586,015 in option awards.

71.     The Company's 2019 Proxy Statement stated the following about Defendant Eastham:

> *Karin Eastham*, age 69, was appointed to the board of directors in September 2018. Ms. Eastham currently serves on the boards of directors of several life sciences companies. Ms. Eastham has served on the board of directors of Geron Corporation since March 2009, Illumina, Inc. since August 2004 and Veracyte, Inc. since December 2012. From May 2004 to September 2008, Ms. Eastham served as Executive Vice President and Chief Operating Officer, and as a member of the Board of Trustees, of the Burnham Institute for Medical Research (now Sanford Burnham Prebys Medical Discovery Institute), a non-profit corporation engaged in biomedical research. From April 1999 to May 2004, Ms. Eastham served as Senior Vice President, Chief Financial Officer and Secretary of Diversa Corporation, a biotechnology company. Ms. Eastham previously held similar positions with CombiChem, Inc., a computational chemistry company, and Cytel Corporation, a biopharmaceutical company. Ms. Eastham also held several positions, including Vice President, Finance, at Boehringer Mannheim Diagnostics, from 1976 to 1988. Ms. Eastham served as a member of the board of directors of MorphoSys AG from May 2012 to May 2017, Amylin Pharmaceuticals, Inc. from September 2005 until its acquisition in August 2012, Genoptix, Inc. from July 2008 until its acquisition in March 2011, Tercica, Inc. from December 2003 until its acquisition in October 2008, and Trius Therapeutics, Inc. from February 2007 until its acquisition in

September 2013. Ms. Eastham received a B.S. in Accounting and an M.B.A. from Indiana University and is a Certified Public Accountant.

**Defendant Greer**

72.     Defendant R. Scott Greer ("Greer") has served as a Company director since February 2010. He also serves as Chair of the Audit Committee and as a member of the Organization and Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 15, 2019, Defendant Greer beneficially owned 326,666 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2019 was $33.49, Defendant Greer owned approximately $10.9 million worth of Nektar stock.

73.     For the fiscal year ended December 31, 2018, Defendant Greer received $732,551 in compensation from the Company. This included $115,750 in fees earned or cash paid, $289,322 in stock awards, and $327,479 in option awards.

74.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Greer made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/6/2018 | 30,000 | $  92.22 | $  2,766,600.00 |
| 6/4/2018 | 1,400 | $  61.99 | $       86,786.00 |
| 6/6/2018 | 8,600 | $  60.00 | $     516,000.00 |
| 9/4/2018 | 10,000 | $  67.39 | $     673,900.00 |

Thus, in total, before the fraud was exposed, he sold 50,000 Company shares on inside information, for which he received approximately $4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

75.     The Company's 2019 Proxy Statement stated the following about Defendant Greer:

26

*R. Scott Greer,* age 60, has served as our director since February 2010. Mr. Greer currently serves as Managing Director of Numenor Ventures, LLC, a venture capital firm. In 1996, Mr. Greer co-founded Abgenix, Inc. ("Abgenix"), a company that specialized in the discovery, development and manufacture of human therapeutic antibodies, and from June 1996 through May 2002, he served as its Chief Executive Officer. He also served as a director of Abgenix from 1996 and Chairman of the board of directors from 2000 until the acquisition of Abgenix by Amgen, Inc. in April 2006. Prior to Abgenix's formation, Mr. Greer held senior management positions at Cell Genesys, Inc., a biotechnology company, initially as Chief Financial Officer and Vice President of Corporate Development and later as Senior Vice President of Corporate Development, and various positions at Genetics Institute, Inc., a biotechnology research and development company. Mr. Greer currently serves as a member of the board of directors of Inogen, Inc., a medical device company that develops and markets oxygen therapy products. Mr. Greer served as a member of the board of directors of Sirna Therapeutics, Inc., a biotechnology company, from 2003, and as its Chairman of the board of directors from 2005 through the closing of the acquisition of Sirna by Merck & Co., Inc. in December 2006. From 2015 through 2017, Mr. Greer served as the Chairman of the board of Calimmune, Inc., a gene therapy company, which was acquired by CLS Behring in 2017; from May 2014 to May 2015, Mr. Greer served as director of Auspex Pharmaceuticals, a biopharmaceutical company developing drugs for patients with movement disorders and other rare diseases, which was acquired by Teva Pharmaceutical Industries in May 2015; from 2001 to 2005, he served as a member of the board of directors of Illumina, Inc., a provider of integrated systems for the analysis of genetic variation and biological function; and from 2001 to 2004, he served as member of the board of directors of CV Therapeutics, Inc., a biotechnology company. Mr. Greer also served as a member of the board of directors of StemCells, Inc., a biopharmaceutical company focused on stem cell therapeutics from 2010 to 2016 and additionally from 2010-2016 was Chairman of the board of Ablexis, an antibody technology company. Mr. Greer received a B.A. in Economics from Whitman College and an M.B.A. degree from Harvard University. He also was a certified public accountant.

### **Defendant Kuebler**

76.     Defendant Christopher A. Kuebler ("Kuebler") served as a Company director from December 2001 until his retirement in December 2018. He also served as a member of the Organization and Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2018 Proxy Statement, as of April 27, 2018, Defendant Kuebler beneficially owned 194,000 shares of the Company's common stock. Given that the price per share

of the Company's common stock at the close of trading on April 27, 2018 was $83.66, Defendant

Kuebler owned approximately $16.2 million worth of Nektar stock.

77.     For the fiscal year ended December 31, 2018, Defendant Kuebler received

$708,179 in compensation from the Company. This included $83,500 in fees earned or cash paid,

$289,322 in stock awards, $327,479 in option awards, and $7,878 in other compensation.

78.     During the period of time when the Company materially misstated information to

the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant

Kuebler made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/5/2017 | 15,000 | $  21.88 | $      328,200.00 |
| 9/22/2017 | 4,000 | $  21.86 | $        87,440.00 |
| 1/2/2018 | 30,000 | $  58.66 | $   1,759,800.00 |
| 3/6/2018 | 2,600 | $ 100.30 | $      260,780.00 |
| 3/7/2018 | 37,400 | $  97.41 | $   3,643,134.00 |

Thus, in total, before the fraud was exposed, he sold 89,000 Company shares on inside information,

for which he received approximately $6 million. His insider sales made with knowledge of material

non-public information before the material misstatements and omissions were exposed

demonstrate his motive in facilitating and participating in the scheme.

79.     The Company's 2018 Proxy Statement stated the following about Defendant

Kuebler:

> *Christopher A. Kuebler*, age 64, has served as our director since December 2001.
> Mr. Kuebler also currently serves on the board of directors of Waters Corporation,
> an analytical technologies products and services company where he serves as a
> member of both the audit committee and compensation committee. From January
> 1997 to December 2005, Mr. Kuebler served as Chairman of the Board of Covance
> Inc., a drug development services company, and from November 1994 to December
> 2004, served as its Chief Executive Officer. From March 1993 through November
> 1994, he was the Corporate Vice President, European Operations for Abbott
> Laboratories, a diversified health care company. From January 1986 until March
> 1993, Mr. Kuebler served in various commercial positions for Abbott Laboratories'
> Pharmaceutical Division and was that Division's Vice President, Sales and

Marketing prior to taking the position of Corporate Vice President, European Operations. Before that, he held positions at Squibb Inc. and Monsanto Health Care. Mr. Kuebler holds a B.S. in Biological Science from Florida State University.

**Defendant Lingnau**

80.     Defendant Lutz Lingnau ("Lingnau") has served as a Company director since August 2007. He also serves as Chair of the Organization and Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2019 Proxy Statement, as of April 15, 2019, Defendant Lingnau beneficially owned 174,783 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2019 was $33.49, Defendant Lingnau owned over $5.8 million worth of Nektar stock.

81.     For the fiscal year ended December 31, 2018, Defendant Lingnau received $715,301 in compensation from the Company. This included $98,500 in fees earned or cash paid, $289,322 in stock awards, and $327,479 in option awards.

82.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Lingnau made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 2/21/2017 | 30,000 | $ 13.08 | $ 392,400.00 |
| 4/7/2017 | 7,000 | $ 20.05 | $ 140,350.00 |
| 7/14/2017 | 30,000 | $ 20.76 | $ 622,800.00 |
| 9/22/2017 | 5,000 | $ 21.97 | $ 109,850.00 |
| 4/5/2018 | 30,000 | $ 101.74 | $ 3,052,200.00 |
| 9/20/2018 | 9,000 | $ 56.98 | $ 512,820.00 |
| 7/8/2019 | 10,000 | $ 34.63 | $ 346,300.00 |

Thus, in total, before the fraud was exposed, he sold 121,000 Company shares on inside information, for which he received over $5.1 million. His insider sales made with knowledge of

material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

83.     The Company's 2019 Proxy Statement stated the following about Defendant Lingnau:

> *Lutz Lingnau*, age 76, has served as our director since August 2007. Mr. Lingnau retired from Schering AG Group, Germany, in December 2005 as a member of Schering AG's Executive Board and as Vice Chairman, President and Chief Executive Officer of Schering Berlin, Inc., a United States subsidiary. Prior to his retirement, Mr. Lingnau was responsible for Schering AG's worldwide specialized therapeutics and dermatology businesses. He joined Schering AG's business trainee program in 1966. Throughout his career at Schering AG, he served in various capacities and in a number of subsidiaries in South America and the United States, including his roles as President of Berlex Laboratories, Inc., from 1983 to 1985, as the Head of Worldwide Sales and Marketing in the Pharmaceutical Division of Schering AG, from 1985 to 1989, and as Chairman of Berlex Laboratories, Inc. from 1985 to 2005. Mr. Lingnau was a member of the Supervisory Board of LANXESS AG, a specialty chemicals company listed on the Frankfurt Stock Exchange from 2005 to May 2010. From December 2006 through September 2009, he served as Chairman of the board of directors of Micropharma Limited, a private biotechnology company, and was a member of was a member of the board of directors of Sirna Therapeutics, Inc., a biotechnology company, from February 2006 through the closing of the acquisition of Sirna by Merck & Co., Inc. in December 2006.

**Defendant Whitfield**

84.     Defendant Roy A. Whitfield ("Whitfield") has served as a Company director since August 2000. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2019 Proxy Statement, as of April 15, 2019, Defendant Whitfield beneficially owned 383,333 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 15, 2019 was $33.49, Defendant Whitfield owned approximately $12.8 million worth of Nektar stock.

85.     For the fiscal year ended December 31, 2018, Defendant Whitfield received $708,301 in compensation from the Company. This included $91,500 in fees earned or cash paid, $289,322 in stock awards, and $327,479 in option awards.

86.     The Company's 2019 Proxy Statement stated the following about Defendant Whitfield:

> *Roy A. Whitfield*, age 65, has served as our director since August 2000 and as Lead Independent Director since January 2019. Mr. Whitfield is the former Chairman of the Board and Chief Executive Officer of Incyte Corporation ("Incyte"), a drug discovery and development company he co-founded in 1991. From January 1993 to November 2001, Mr. Whitfield served as its Chief Executive Officer and from November 2001 until June 2003 as its Chairman. He also served as a director of Incyte from 1991 to January 2014. From 1984 to 1989, Mr. Whitfield held senior operating and business development positions with Technicon Instruments Corporation ("Technicon"), a medical instrumentation company, and its predecessor company, Cooper Biomedical, Inc., a biotechnology and medical diagnostics company. Prior to his work at Technicon, Mr. Whitfield spent seven years with the Boston Consulting Group's international consulting practice. He currently serves as a director of Station X, Inc. a private company. Mr. Whitfield previously served as the Executive Chairman of the board of directors of Bioseek and as member of the board of directors of Illumina, Inc. Mr. Whitfield received a B.S. in mathematics from Oxford University and an M.B.A. from Stanford University.

**Defendant Winger**

87.     Defendant Dennis L. Winger ("Winger") served as a Company director from December 2009 until his resignation in September 2018. He also served as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

88.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Winger made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 8/13/2018 | 17,125 | $ 61.04 | $ 1,045,310.00 |
| 8/14/2018 | 17,125 | $ 60.15 | $ 1,030,068.75 |
| 8/17/2018 | 15,000 | $ 59.62 | $ 894,300.00 |
| 8/21/2018 | 15,000 | $ 60.30 | $ 904,500.00 |

Thus, in total, before the fraud was exposed, he sold 64,250 Company shares on inside information, for which he received over $3.8 million. His insider sales made with knowledge of material non-

public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

89.    The Company's 2018 Proxy Statement stated the following about Defendant Winger:

> *Dennis L. Winger*, age 70, has served as our director since December 2009. Mr. Winger was Senior Vice President and Chief Financial Officer of Applera Corporation, a life sciences company, from 1997 through December 2008. From 1989 to 1997, Mr. Winger served as Senior Vice President, Finance and Administration, and Chief Financial Officer of Chiron Corporation. From 1982 to 1989, Mr. Winger served various positions, including as the Chief Financial Officer of The Cooper Companies, Inc., Mr. Winger currently serves on the board of directors of Accuray Incorporated (NASDAQ: ARAY), a radiosurgery company. Mr. Winger recently served on the board of directors of each of Vertex Pharmaceuticals Incorporated, a pharmaceutical company, until May 2012, Cephalon, Inc. a pharmaceutical company, until its merger with Teva Pharmaceuticals Industry Limited in October 2011 and Cell Genesys, Inc. until its merger with BioSante Pharmaceuticals in October 2009. Mr. Winger received a B.A. from Siena College and an M.B.A. from the Columbia University Graduate School of Business.

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

90.    By reason of their positions as officers, directors, and/or fiduciaries of Nektar  and because of their ability to control the business and corporate affairs of Nektar, the Individual Defendants owed Nektar  and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Nektar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Nektar and its shareholders so as to benefit all shareholders equally.

91.    Each director and officer of the Company owes to Nektar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

92. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Nektar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

93. To discharge their duties, the officers and directors of Nektar were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

94. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Nektar, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Nektar's Board at all relevant times.

95. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ-GS, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company

to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

96.     To discharge their duties, the officers and directors of Nektar were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Nektar were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Nektar's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Nektar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Nektar and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Nektar's operations would comply with all

applicable laws and Nektar's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

97.      Each of the Individual Defendants further owed to Nektar and the shareholders the duty of loyalty requiring that each favor Nektar's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

98.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Nektar and were at all times acting within the course and scope of such agency.

99.      Because of their advisory, executive, managerial, and directorial positions with Nektar, each of the Individual Defendants had access to adverse, non-public information about the Company.

100.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Nektar.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

101.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

102.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

103.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, Defendants Robin, Ajer, Chess, Greer, Lingnau, and Whitfield, all directors of Nektar, were each a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

104.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

105.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Nektar and was at all times acting within the course and scope of such agency.

## NEKTAR'S CODE OF CONDUCT

106.    The Company's Code of Business Conduct and Ethics (the "Code of Conduct"), states that it:

> …reflects the business practices and principles of behavior that support the commitment to these high standards. This Code applies to all Nektar employees, officers and directors. Therefore, every employee, officer and director is expected to read and understand the Code and its application to the performance of his or her business responsibilities. Actions by members of your immediate family, significant other(s) or persons who live in your household may also potentially result in ethical issues to the extent they involve Nektar or its business.

107.    The Code of Conduct provides that the Company and its employees, officers, and directors are aware and comply with the law in all countries in which Nektar operates, stating in relevant part:

> We strive to comply not only with the letter but also with the spirit of the law. Our success depends upon everyone operating within legal guidelines and cooperating with local, national and international authorities. It is therefore essential that you understand the legal and regulatory requirements applicable to your business unit and area of responsibility. If you have a question in the area of legal compliance, you should seek answers from your supervisor or the Corporate Ethics Officer.

108.    The Code of Conduct provides that documents, records, and reports to the government and other agencies are "accurate, complete and understandable." Expanding on its disclosure policy, the Code of Conduct specifically states, in relevant part:

> The integrity of our records and public disclosure depends on the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. All records and reports should be made in a timely manner, and, when applicable, should be properly authorized and maintained. Financial and other activities are to be recorded in compliance with all applicable laws and accounting practices.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the reports we file with the Securities and Exchange Commission ("SEC"). These reports must provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. In connection with these obligations:

> • no one may knowingly take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

> • everyone must cooperate fully with our Finance Department and Legal Department, as well as our independent public accountants and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

> • no one should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

109.     The Code of Conduct provides reporting guidelines for suspected misconduct and outlines the Company's program of "Code awareness, training, and review" which the Code of Conduct states is overseen by the Corporate Ethics Officer. The Code of Conduct states, in relevant part:

> If you are aware of a suspected or actual violation of the Code by others or a violation or possible violation of federal or state law or regulation, including violations relating to accounting, internal accounting controls or auditing matters ("Compliance Concerns"), you have a responsibility to report it. You are expected to promptly provide your supervisor or one of the Corporate Ethics Officers with a specific description of the violation that you believe has occurred, including any information you have about the persons involved and the time of the violation.

110.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the schemes to engage in the PIVOT Manipulation Misconduct, to issue materially false

and misleading statements to the public, and to facilitate and disguise the Individual Defendants'
violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust
enrichment, and violations of Section 14(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

111.    Nektar is a biopharmaceutical company that specializes in researching, discovering,
and developing innovative medications in areas with unaddressed significant medical need. The
Company develops a number of investigational medications designed to treat cancer, autoimmune
disease, and chronic pain.

112.    Nektar hold itself out to be a leader in the field of polymer conjugation, known as
PEGylation ("pegylation"). Pegylation occurs through conjugating certain molecules with a non-
immunogenic polymer called polyethylene glycol. The goal of pegylation is to enhance the
pharmacokinetic behavior of a drug, or the way the drug is processed by the body. The Company
aims to develop and design new drug candidates which then utilize Nektar's advanced pegylation
platforms designed to engage activity at a molecular level. For example, the Company's I-O area
focuses on developing drugs that can "stimulate and sustain the body's immune response in order
to fight cancer . . . . [by] directly or indirectly modulat[ing] the activity of key immune cells such
as cytotoxic T cells and natural killer (NK) cells, to increase their numbers and improve their
function to recognize and attack cancer cells."

113.    One such investigational medicine developed by the Company is NKTR-214, also
known as bempegaldesleukin or bempeg. NKTR-214 is an immunotherapy, i.e. a treatment aimed
at enabling the body's immune system to fight infections and diseases, designed specifically to
supplement the body's natural ability to fight cancer. Specifically, the immune system has the

natural capacity to produce cancer-killing cells such as "tumor-infiltrating lymphocytes" ("TILs").
TILs then produce certain proteins which function as receptors that then may signal the body to
increase the production of cancer-killing cells. The signal is sent through IL-2, a cytokine molecule
which naturally occurs in the body. Cytokines are proteins involved in cell signaling. NKTR-214
purportedly functions to stimulate the immune system's response to cancer and increase the
production of certain cancer-killing cells, ultimately facilitating the body's capacity to attack and
reduce tumor size. This is supposedly done through pegylating IL-2 in order to address some of
the cytokine's weaknesses such as its short half-life and certain undesirable side effects which may
result from using IL-2 on its own as a cancer therapy.

114.    According to the Company's annual report filed on March 1, 2019 with the SEC on
Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"), the Company is
"highly dependent" on the success of NKTR-214, stating in relevant part: "[w]e are highly
dependent on the success of NKTR-214, our lead I-O candidate. We are executing a broad
development program for NKTR-214 and clinical and regulatory outcomes for NKTR-214, if not
successful, will significantly harm our business." The 2018 10-K further outlined the vital
importance of the Company's success in its clinical trials on its market valuation and overall
performance, stating in relevant part that:

> To date, reported clinical outcomes from NKTR-214 have had a significant impact
> on our market valuation, financial position, and business prospects and we expect
> this to continue in future periods. If one or more clinical studies of NKTR-214 are
> delayed or not successful, it would materially harm our market valuation, prospects,
> financial condition and results of operations. For example, under the BMS
> Collaboration Agreement, we are entitled to up to $1.43 billion in development
> milestones that are based upon clinical and regulatory successes from the NKTR-
> 214 development program. One or more failures in NKTR-214 studies could
> jeopardize such milestone payments, and any product sales or royalty revenue or
> commercial milestones that we would otherwise be entitled to receive could be
> reduced, delayed or eliminated.

115.    The Company classifies NKTR-214 as an immunostimulatory cytokine drug. NKTR-214 is designed to preferentially activate IL-2 receptors to proliferate tumor-killing cells in the body without stimulating certain regulatory cells, thereby increasing IL-2's efficiency and NKTR-214's safety and efficacy as a cancer therapy. Nektar has conducted several clinical trials of NKTR-214 as a monotherapy (on its own) as well as in combination with other drugs, such as BMS's Opdivo® (nivolumab), a human monoclonal antibody cancer medication.

116.    Nektar began Phase 1 of its EXCEL clinical trial of NKTR-214 in December 2015 and announced the dosing of the first set of human patients with advanced solid tumors. The study was initiated to evaluate the usage, efficacy, and safety of NKTR-214 as a monotherapy in a variety of tumor types. Throughout 2017 and 2018, the Individual Defendants repeatedly touted that NKTR-214 supposedly increased cancer-fighting cells by an average of 30-fold in the tumors of ten patients dosed with NKTR-214 every 3 weeks. The Individual Defendants presented the impressive results at several healthcare conferences during the First Relevant Period. Notably, these claims were not accompanied by context or supportive data.

117.    As noted above, the performance of NKTR-214 was and remains a significant aspect of the Company's success and valuation and as such, the Company's clinical trials, including PIVOT-02 were and remain of vital importance to Nektar. Consequently, each of the Individual Defendants had motive to participate in the fraud, directly or indirectly, in order to reap the benefits secured by insider sales, lavish compensation packages, and incentive plans further discussed below.

**The PIVOT Manipulation Misconduct**

118.    In September 2016, the Company entered into a collaboration agreement with BMS to conduct Phase 1/2 trials evaluating the combination of NKTR-214 and BMS's Opdivo in thirty-

eight patients (the PIVOT-02 study). Phase 2 of the PIVOT-02 study evaluated the clinical benefit, safety, and tolerability of the combined therapy in thirty-eight patients. The Company presented interim data from the study at the 2017 Society for Immunotherapy of Cancer ("SITC") meeting in November 2017. The Company presented impressive early-stage trial data for the study of NKTR-214, and those results were well received by the market. Market analysts published positive reports on the news, with *Investor Business Daily* reporting on November 13, 2017 that "Nektar Therapeutics launched to a nearly 17-year high Monday on strong combination data for its immune-oncology drug combined with Bristol-Myers Squibb's Opdivo in skin, kidney and lung cancers."[9]

119.    In February 2018, Nektar and BMS entered into a second collaboration agreement to jointly develop NKTR-214, including in combination with Opdivo and other drugs. Pursuant to the joint commercialization agreement, BMS paid Nektar $1 billion cash upfront and purchased $850.0 million of Nektar's common stock at a purchase price of $102.60.[10] The collaboration agreement provides that BMS and Nektar will develop and conduct clinical studies of NKTR-214 to determine the safety, benefit, and tolerability of the combined therapy.

120.    Although the PIVOT-02 trial seemed a success from the outset, during the First Relevant Period, certain of the Individual Defendants engaged in a scheme to manipulate the clinical trial results of Nektar's PIVOT-02 trial by presenting patient data that was not validated, selectively choosing patients to participate in the trial, delaying the disclosure of results that were less positive while disclosing positive results, and neglecting the risks posed by the unsustainable fictional image they created of NKTR-214's success. The details of the scheme are provided by

---

[9]https://www.investors.com/news/technology/biotech-nektar-therapeutics-stock-nears-17-year-high-on-cancer-regimen/. Last visited December 10, 2019.
[10] *See* Nektar's 2018 10-K.

former employees of the Company cited to in the First Class Action as confidential witnesses, who were aware of and personally witnessed practices that formed part of the misconduct discussed herein.

121.     One of these employees, a former Nektar Director of Clinical Development Operations identified in the First Class Action as "CW # 1" worked on the development of NKTR-214 and reported directly to Defendant Tagliaferri. According to CW # 1, the Company directed employees to ignore standard protocols for reading scans, leading to reports of inaccurate and overly-positive data. CW # 1 claimed that the PIVOT trial was actually ineffective and required amending several times and that rather than await conclusive data on the research being conducted in the trial, certain of the Individual Defendants directed telephone calls to the trial sites in order to obtain unverified patient data to announce at public conference presentations.

122.     Another former employee who worked in the same department throughout the First Relevant Period, identified in the First Class Action as "CW # 2," reported to both Defendants Gergel and Tagliaferri and maintained that, due to the focus on reporting positive trial data for the PIVOT-02 trial, the environment at the Company was "chaotic." CW # 2 further confirmed the outlier patient data behind the Company's "30-fold" claims and claimed that the Individual Defendants were aware of the issues posed by the use of this information and were only concerned with making the Company look good through positive clinical trial data that would, in turn, allow Nektar to gain support and attention from other biopharmaceutical companies that could offer funding for Nektar. According to CW # 2, certain of the Individual Defendants, including Defendants Gergel and Tagliaferri would contact doctors involved in the PIVOT-02 study for unverified data, but would exclude patient data that was negative by utilizing deadlines and extensions for those deadlines selectively.  This unverified patient data would then be presented at

public presentations, including ASCO conferences in 2017 and 2018 and the SITC conference in November 2017. The positive data reported by Nektar at these conferences was critical to driving the positive perception of the Company in the market and as such, the stock price. Moreover, according to CW # 2, Defendants Gergel and Tagliaferri, neither of whom had the requisite scientific qualifications, were actively engaged in the patient information reported, including by cherry-picking which patients to exclude from the study altogether. According to CW # 2, Defendants Robin, Doberstein, Nicholson, Zalevsky, Tagliaferri, and Gergel were all aware of these practices and discussed them at bi-weekly Executive Committee meetings and ultimately "came out with data and jumped to a bunch of conclusions with a very small amount of data focusing on the positives and sweeping some of the lesser positive stuff under the carpet."

### False and Misleading Statements During the First Relevant Period

#### *January 10, 2017 JP Morgan Conference*

123.   On January 10, 2017, Defendant Robin, on behalf of Nektar, gave an oral presentation at the 35th  annual JP Morgan Healthcare Conference. The presentation included data from the Phase 1 trial of NKTR-214 with results based on a sample size of 10 patients.[11] The Company later included this same data in its presentation at 2017 ASCO GU in February.

---

[11]https://seekingalpha.com/article/4036035-nektar-therapeutics-nktr-presents-35th-annual-j-p-morgan-healthcare-conference. Last visited October 3, 2019.



124.    At the conference, Defendant Robin made several remarks during his presentation

representing that this data came from a single 10-patient data pool that experienced a single, unified

treatment plan, stating, in relevant part:

> We've designed a new IL-2 molecule with a biased action to the beta gamma
> receptors and not the alpha receptor. And ***consequently, there, you can produce
> significant quantities of CD8-positive cells without affecting the production or
> the proliferation of regulatory T-cells.*** The other thing we've done is made a
> prodrug because one of the problems you have with native IL-2 is when you
> administer a native IL-2, it releases immediately in plasma, and you get this massive
> unwanted immune response. It's very short-lived but it has very, very serious side
> effects in terms of cytokine storm, et cetera. ***And what we've done is designed a
> molecule where the biological linker's released in the tumor microenvironment,
> and you don't see—and therefore, you get the full effect of the cytokine in the
> tumor, not in circulation.*** So with that, you're also able to achieve antibody-like
> dosing. So we're dosing—***we're dosing NKTR-214 once every 2 to—once every 3
> weeks in an outpatient setting***.

> So here's some data from the Phase 1 trial. Demonstrating—and ***there are 10
> patients where we have tumor biopsies.*** And you can clearly see that ***we had a
> significant increase in CD8-positive T-effector cells with no increase in T-reg***

*cells... And this is clearly what we set out to do, cause the proliferation of regulatory T-effector cells and not cause the proliferation of regulatory T-cells.*

(Emphasis added).

### March 7, 2017 Cowen & Company Healthcare Conference

125.     On March 7, 2017, Defendant Doberstein, on behalf of Nektar, showed a data slide at the 37th annual Cowen & Company Healthcare Conference. The slide was identical to one of those displayed at the JP Morgan Conference in January 2017. This same data was included in the Company's presentation at 2017 ASCO GU in February 2017.



126.     At the conference, Defendant Doberstein made several remarks about the data, again purporting to show data from a single 10-patient data pool that experienced a unified treatment plan, stating, in relevant part:

Now, what we have found in patients from NKTR-214 is that first, *as a monotherapy, it does pretty much exactly what we designed it to do. You can see*

*a 30-fold increase in CD8 cells inside the tumors of patients from tumor biopsies who received NKTR-214 with almost no increase in T-regs*, and that's exactly the way that we designed the medicine to act.

(Emphasis added).

### May 1, 2017 Proxy Statement

127.    The Company filed its Schedule 14A (the "2017 Proxy Statement") with the SEC on May 1, 2017. Defendants Robin, Chess, Greer, Kuebler, Lingnau, Winger, and Whitfield, as well as non-Defendant Joseph J. Krivulka, solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[12]

128.    The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have adopted a code of business conduct and ethics that applies to all employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions."

129.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by eight of the Individual Defendants (as of May 1, 2017), and the Individual Defendants' failures to report violations of the Code of Conduct.

130.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "performance-

---

[12] Plaintiffs' allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

based incentives," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

131.    The 2017 Proxy Statement also failed to disclose, *inter alia*, the PIVOT Manipulation Misconduct and that: (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) the data set consisted of five patients, as opposed to ten; (3) NKTR-214 did not selectively proliferate cancer-killing cells in the same patients that experienced negligible increases of immunosuppressive cells, those results occurred in different groups of patients; (4) a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (5) thus, the claim that patients experienced a 30-fold average increase in CD8 cells with negligible increases in immunosuppressive cells was not supported by the clinical data relied on and; (6) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *May 22, 2017 UBS Healthcare Conference*

132.    On May 22, 2017, Defendant Zalevsky, on behalf of Nektar, displayed a data slide at the UBS Healthcare Conference. The slide was identical to one of those displayed at the JP Morgan Conference and the Cowen & Company Conference in January 2017 and March 2017, respectively. This same data was included in the Company's presentation at 2017 ASCO GU in February.



133.    At the conference, Defendant Zalevsky made several remarks about the data, representing that this data came from a single 10-patient data pool that experienced a unified treatment plan, stating that "CD8 T-cells increased by 30-fold in the tumor microenvironment. This is shown just after a single-dose administration of NKTR-214, and completely consistent with the design, the T-regs, which are not touched due to the bias of the molecule, are unchanged."

*June 3, 2017 ASCO Annual Meeting & Investor & Analyst Event*

134.    On June 3, 2017, Dr. Adi Diab, an assistant professor of melanoma oncology at MD Anderson and Co-Chair of the Scientific Advisory Board for the PIVOT Program, displayed a NKTR-214 data slide at the annual ASCO Meeting and Analyst & Investor Event. The slide was a slightly modified version of a slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, and the UBS Healthcare Conference in January,

March, and May 2017, respectively. This same data was included in the Company's presentation

at 2017 ASCO GU in February.



135.    At the conference, Dr. Diab made several remarks about the data, again

representing the source of the data as a 10-patient data pool that experienced a single, unified

treatment plan, stating, in relevant part:

> And so to summary, this—*the most important, as you can see when you look at the left column here*, and you can see what we've been talking about, and I reemphasize that point because this *is a very important marker, not only mobilizing the T-cells in the tumor microenvironment, but you're also mobilizing CD8 more than T-regs, achieving very high CD8-to-T reg ratio of—in the tumor microenvironment, that's very impressive.* That's very beneficial for the patients… *And NKTR-214, in addition of mobilizing the CD8 cells, there is also increasing in the number of NK cells, the natural killers. This happens without an increase of the T-regulatory cells and that a—leads to the high ratio of CD8 to T-regs.*

(Emphasis added).

*June 7, 2017 Jeffries Conference*

136.    On June 7, 2017, Defendant Doberstein, representing the Company, displayed a NKTR-214 data slide at the Jeffries Conference. The slide was identical to a slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, and the UBS Healthcare Conference in January, March, and May 2017, respectively. This same data was included in the Company's presentation at 2017 ASCO GU in February.

137.    At the conference, Defendant Doberstein made several remarks about the data, once more representing its source as a single 10-patient data pool that experienced a unified treatment plan, stating, in relevant part:

> It's very important that there be resident T-cells there in the tumor so that we can activate them and even when we think about using checkpoint inhibitors, if there are no T-cells there to release the brakes on, then that—then those therapies aren't going to work. So very important that we increase the T-cell populations. ***You can see here when we do Q3-week dosing, almost a thirtyfold increase in tumor cells within the biopsy—T-cells within the tumor biopsy of the effector cell type.*** So very important observations from the biomarker standpoint.

(Emphasis added).

*November 11, 2017 Press Release and Investor Meeting*

138.    On November 11, 2017, Nektar issued a press release entitled "First Data for NKTR-214 in Combination with OPDIVO® (nivolumab) for Patients with Stage IV Melanoma, Renal Cell Carcinoma and Non-Small Cell Lung Cancers, Including Patients with PD-L1 Negative Status, Revealed at SITC 2017." The press release announced the results of a study done by the Company with BMS evaluating the combination of NKTR-214 with BMS's drug, Opdivo. The press release indicated that "[t]he initial results presented at the 2017 Society for Immunotherapy of Cancer (SITC) Annual Meeting reported both safety and efficacy data for patients enrolled in the dose-escalation phase of the trial."

139.    The press release also detailed the specific findings of the study, including

statements about the treatment's purported success from Defendant Tagliaferri. The release stated,

in relevant part:

> "These initial findings underscore the potential benefit of the combination of
> Opdivo and NKTR-214 across several tumor types," said Fouad Namouni, M.D.,
> Head of Oncology Development, Bristol-Myers Squibb. "We believe that a
> combination regimen which utilizes two different, complementary, and non-
> overlapping mechanisms designed to harness the body's own immune system to
> fight cancer has the potential to benefit patients and should be the subject of
> additional research."
>
> *Opdivo* is a PD-1 immune checkpoint inhibitor designed to overcome immune
> suppression. NKTR-214 is an investigational immuno-stimulatory therapy
> designed to expand and activate specific cancer-fighting T cells and natural killer
> (NK) cells directly in the tumor micro-environment and increase expression of cell-
> surface PD-1 on these immune cells.
>
> "In the dose-escalation stage of the PIVOT trial, we've observed important response
> rates across all three tumor types-melanoma, renal cell carcinoma and non-small
> lung cancer - in both PD-L1 positive and PD-L1 negative patients," said Mary
> Tagliaferri, M.D., Senior Vice President of Clinical Development at Nektar
> Therapeutics. "All patients with responses in the trial continue on treatment. Of
> note, we observed responses in 3 of 4 Stage IV non-small cell lung cancer patients
> whose tumors did not express PD-L1 and who had progressed on prior
> chemotherapy, including one patient who experienced a complete response. In the
> combination treatment, there were no Grade 3 or higher immune-mediated adverse
> events at the recommended Phase 2 dose or below. Nektar and Bristol are now
> actively enrolling patients in the Phase 2 expansion part of the PIVOT study in 5
> different tumor types."

140.    The press release continued to detail the study, highlighting important points that

had been presented in an oral session at the Society for Immunotherapy of Cancer Annual Meeting:

> A total of 38 patients were enrolled in the dose-escalation phase of the ongoing
> PIVOT study in a number of dose cohorts. Responses were measured per RECIST
> 1.1 for efficacy-evaluable (> 1 on treatment scan) patients as of November 2,
> 2017.
>
> Highlights from the oral presentation include:
> - Advanced Treatment-Naïve 1L Melanoma Patients (Stage IV):
>   - Responses were observed in 7/11 (63%) efficacy-evaluable patients (2
>     CR and 5 PR). Median time to response was 1.7 months. DCR, also

known as disease control rate (CR + PR + 3 SD), was 91%. All 7 patients with responses continue on treatment in the trial.

- Advanced Treatment-Naïve 1L Renal Cell Carcinoma Patients (Stage IV):
  - For patients with one or more baseline scans, responses were observed in 6/13 patients (46%) (1 CR+ and 5 PR). DCR (CR + PR + 5 SD) was 85%. Median time to response in these patients was 1.9 months. For patients with two or more scans available, responses were observed in 6/10 patients (60%) (1 CR, 5 PR, 2 SD). All 11 patients with disease control (CR, PR or SD) continue on treatment in the trial.
- Advanced 2L Renal Cell Carcinoma Patients (Stage IV, I-O Naïve)
  - For patients with one or more baseline scans, responses were observed in 1/7 patients (14%) (1 PR). DCR (CR + PR + 6 SD) was 100%. Median time to response was 3.5 months. All 7 patients with disease control (PR or SD) continue on treatment in the trial.
- Advanced 2L PD-L1 Negative Non-Small Cell Lung Cancer Patients (Stage IV, I-O Naïve)
  - Responses were observed in 3/4 patients (75%) (1 CR± and 2 PR). DCR (CR + PR) was 75%. Median time to response was 1.7 months. All 3 patients with responses continue on treatment in the trial.
- Robust expansion of ICOS+ CD4 and CD8+ T cells in the blood and increased ICOS gene expression in the tumor were both observed with the combination of NKTR-214 and nivolumab.
- The most common grade 1-2 adverse events were fatigue (74%), flu-like symptoms (68%), rash (60%) and pruritus (42%). There were no treatment discontinuations due to adverse events (AEs) or study deaths.
- There were no grade 3 or higher immune-mediated AEs (such as colitis, dermatitis, hepatitis, pneumonitis or endocrinopathies) at the recommended Phase 2 dose or below
- A recommended Phase 2 dose of NKTR-214 0.006 mg/kg q3w + nivolumab 360 mg q3w was established and is being evaluated in expansion cohorts in over 10 patient populations with melanoma, renal cell carcinoma, non-small cell lung cancer, bladder, and triple-negative breast cancers (n=~330).

141.   The press release briefly discussed the agreement between Nektar and BMS related to the commercialization of NKTR-214 in combination with Opdivo, and touched on NKTR-214's function and clinical results.

142.   The day of the press release, the Company also held an Investor Meeting at the annual meeting for the SITC to discuss the PIVOT-02 trial results and to expound on the efficacy of NKTR-214 when combined with Opdivo. Defendant Zalevsky made statements to this effect during the meeting, stating that "we know that in the presence of 214 there's such a high amount

of activated immune cells. Different clones of immune cells recognizing multiple antigens, increasing the tumor killing army."

### November 15, 2017 Jeffries London Healthcare Conference

143.    On November 15, 2017, Defendant Zalevsky, on behalf of the Company, displayed a NKTR-214 data slide at the Jeffries London Healthcare Conference. The slide was identical to the slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, the UBS Healthcare Conference, and the Jeffries Conference in January, March, May, and June of 2017, respectively. This same data was included at the Company's presentation at 2017 ASCO GU in February 2017.

144.    At the conference, Defendant Zalevsky gave an oral presentation with the slideshow about the benefits of NKTR-214. In describing the data on the slide, he stated, in relevant part:

> *We know that with NKTR-214, it can fill the gap of actually replenishing the patient's own immune system. In fact as a T-cell growth factor, it acts like an engine to grow armies and armies of antigen-specific, tumor reactive T-cells.* These T-cells can infiltrate into the body, *they can enter the tumor microenvironment and they can go to work, attacking the tumor with cells…*

> We profiled NKTR-214 in a monotherapy clinical trial and we reported these results over the last year and a half. Now *the key with this monotherapy study was that we wanted to prove the mechanism of action in the patient's tumor itself.* And so we collected a number of biopsies, both pretreatment and on-treatment, and we use those biopsies to characterize the functions of NKTR-214, *shown here in this slide is the effect that NKTR-214 has on inducing T-cell infiltrates into the tumor. And you can see there's a 30-fold increase in the amount of CD8 T-cells that entered into the tumor and because of the biased signaling, you can see there's no change in Tregs. So this is very much skewed and dominated tumor killing cytotoxic T-cell response.*

(Emphasis added).

*November 28, 2017 Piper Jaffray Healthcare Conference*

145.    On November 28, 2017, Defendant Zalevsky, on behalf of the Company, displayed a NKTR-214 data slide at the Piper Jaffray Healthcare Conference. The slide was identical to the slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, the UBS Healthcare Conference, the Jeffries Conference, and the Jeffries London Conference in January, March, May, June, and November of 2017, respectively. This same data was included at the Company's presentation at 2017 ASCO GU in February 2017.

*January 9, 2018 JP Morgan Healthcare Conference*

146.    On January 9, 2018, Defendant Robin, displayed a NKTR-214 data slide at the 36th Annual JP Morgan Healthcare Conference. This same data was included in the Company's presentation at 2017 ASCO GU in February.



147.    At the conference, Defendant Robin made several remarks about the data, again representing that the patient pool received a single, unified treatment plan, stating, in relevant part:

So what we've done is, using our technology we have a biased receptor binding in such a way that *we cause the proliferation of effector T-cells and we don't cause an increase in regulatory T-cells. And because of that, you can give very low doses of NKTR-214 dosed on an antibody-like schedule once every 3 weeks on an outpatient basis. You see nominal side effects, and you get a profound stimulation of the immune system… Here you could see on the chart on the left, a great— significant increase in effector T-cells with no increase in regulatory T-cell.* Also, very important, in the left chart, you see that NKTR-214also increases PD-1 expression. We take patients who are PD-L1 negative and turn them PD-L1 positive, another very, very important aspect of treating patients in the immunotherapy world.

(Emphasis added).

### March 1, 2018 Press Release and Form 10-K

148.     On March 1, 2018, Nektar issued a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2017. The press release quoted Defendant Robin touting NKTR-214's clinical success and the transformative year Nektar had experienced:

"This past year was truly transformational for Nektar as we achieved a number of successes with Nektar medicines across our three key therapeutic areas of immuno-oncology, immunology and pain," said Howard W. Robin, President and Chief Executive Officer of Nektar. "In the area of pain, we completed a successful Phase 3 program for NKTR-181 in over 2,100 patients and healthy volunteers that will comprise our NDA submission in the second quarter of this year. In immunology, we entered into a major partnership with Eli Lilly for NKTR-358, a potential first-in-class T regulatory resolution therapeutic, which will be developed to treat a broad range of auto-immune disorders. Finally, in immuno-oncology, the clinical success we achieved with NKTR-214 led to a groundbreaking collaboration with Bristol-Myers Squibb that now enables us to broadly and rapidly advance NKTR-214 into over 20 registrational trials in up to 15,000 patients."

149.     On the same day, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by Defendants Robin, Labrucherie, Thomsen, Chess, Ajer, Greer, Kuebler, Lingnau, Whitfield, and Winger.

150.    The 2017 10-K outlined Nektar's activities relating to the combination of NKTR-214 and Opdivo. The 2017 10-K detailed the Company's agreement with BMS to commercially develop combination therapy drugs with NKTR-214 and BMS compounds:

> On September 21, 2016, we entered into a Clinical Trial Collaboration Agreement (BMS Agreement) with Bristol-Myers Squibb Company (BMS), pursuant to which we and BMS are collaborating to conduct Phase 1/2 clinical trials evaluating NKTR-214 and BMS' human monoclonal antibody that binds PD-1, known as Opdivo® (nivolumab), as a potential combination treatment regimen in at least five tumor types and eight indications, and such other clinical trials evaluating the combined therapy as may be mutually agreed upon by the parties (each, a Combined Therapy Trial). Under the BMS Agreement, BMS is responsible for 50% of all out-of-pocket costs reasonably incurred by us in connection with third party contract research organizations, laboratories, clinical sites and institutional review boards. Each party is otherwise responsible for its own internal costs, including internal personnel costs, incurred in connection with each Combination Therapy Trial. Interim data from the dose-escalation phase of the trial was presented at the 2017 Society for Immunotherapy of Cancer (SITC) meeting in November 2017. We identified the Phase 2 dose for NKTR-214 and we are currently enrolling subjects in the expansion phase of the study.

> On February 13, 2018, we entered into a Strategic Collaboration Agreement (the BMS Collaboration Agreement) with BMS, pursuant to which we and BMS will jointly develop NKTR-214, including, without limitation, in combination with BMS's Opdivo® (nivolumab) and Opdivo® plus Yervoy® (ipilimumab), and other compounds of BMS, us or any third party. The parties have agreed to jointly commercialize NKTR-214 on a worldwide basis. BMS will pay us a non-refundable upfront cash payment of $1.0 billion and purchase $850.0 million of shares of our common stock at a purchase price of $102.60 per share pursuant to a Share Purchase Agreement (Purchase Agreement).

151.    Attached to the 2017 10-K were SOX certifications signed by Defendants Robin and Labrucherie attesting to the accuracy of the 2017 10-K.

### March 14, 2018 Cowen & Company Healthcare Conference

152.    On March 14, 2018, Defendant Zalevsky, on behalf of Nektar, showed a data slide at the 38th annual Cowen & Company Healthcare Conference. This same data was included in the Company's presentation at 2017 ASCO GU in February.



153.    At the conference, Defendant Zalevsky made several remarks about the data, representing that this data came from a patient pool that experienced a single, unified treatment plan, stating, in relevant part:

> And we're evaluating immunological changes in those biopsy tissues. And shown *on the left is the proportion of the cytotoxic T-cells or regulatory T-cells that you see is a full change from week 3 to baseline. And you can see that there's a 30-fold induction of CD8 T-cells, but there's essentially no change in Tregs. This is exactly the design goal and this drives a very high CD8-to-Treg ratio.*

(Emphasis added).

*April 30, 2018 Proxy Statement*

154.    The Company filed its 2018 Proxy Statement with the SEC on April 30, 2018. Defendants Robin, Ajer, Chess, Greer, Kuebler, Lingnau, Winger, and Whitfield solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material

misstatements and omissions.[13]Among the proposals to be voted on by shareholders was the approval of an amendment and restatement to the Company's 2017 Performance Incentive Plan to increase the available shares under the plan by 10.9 million shares for a total reserve of 19.2 million shares for use as awards to both members of the Board as well as the Company's executive officers.

155.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have adopted a code of business conduct and ethics that applies to all employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions."

156.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by ten of the Individual Defendants (as of April 30, 2018), and the Individual Defendants' failures to report violations of the Code of Conduct.

157.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "performance-based incentives," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

158.    The 2018 Proxy Statement also failed to disclose, *inter alia*, the PIVOT Manipulation Misconduct and that: (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) the data set consisted of five patients, as

---

[13] Plaintiffs' allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

opposed to ten; (3) NKTR-214 did not selectively proliferate cancer-killing cells in the same

patients that experienced negligible increases of immunosuppressive cells, those results occurred

in different groups of patients; (4) a 2-week dosing schedule was used for at least two of the five

dosed patients, including the outlier patient; (5) thus, the claim that patients experienced a 30-fold

average increase in CD8 cells with negligible increases in immunosuppressive cells was not

supported by the clinical data relied on and; (6) the Company failed to maintain internal controls.

Due to the foregoing, Defendants' statements regarding the Company's business, operations, and

prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant

times.

### May 10, 2018 Press Release

159.     On May 10, 2018, the Company issued a press release announcing its financial

results for the first fiscal quarter ended March 31, 2018. Defendant Robin promoted the progress

of the Company, its NKTR-214 studies, and collaboration with BMS, stating, in relevant part:

> Nektar begins 2018 in a very strong position with a major collaboration with
> Bristol-Myers Squibb for NKTR-214 and key advancements in our immuno-
> oncology and immunology pipeline . . . . The PIVOT study of NKTR-214 in
> combination with nivolumab continues to enroll patients and we are exceptionally
> pleased that the preliminary data from PIVOT was accepted for an oral presentation
> at this year's ASCO Meeting.

### The Truth Begins to Emerge as to the First Relevant Period While False and Misleading Statements Continue

### June 2, 2018 ASCO 2018 Presentation and Press Release

160.     On June 2, 2018, the rose-colored image that the Individual Defendants had painted

of the Company's successful clinical trials, including the PIVOT-02 study, began to reveal its true

colors. Nektar presented data from the Phase 1 dose-escalation and early data from the Phase 2

dose expansion phase of the Company's ongoing PIVOT study during an oral presentation at the

ASCO annual meeting. The presentation disclosed objective response rates for 87 of the 283

patients that had been enrolled in the study as of May 7, 2018.[14] Following the presentation, Nektar

held an "Analyst and Investor Event" where a number of the same slides used during the ASCO

presentation were shown. The data presented revealed that the overall response rate for NKTR-

214 in treating melanoma had dropped significantly from the 85% response rate reported by the

Company in November 2017 to a mere 50%.

161.     The same day, the Company issued a press release highlighting points from the oral

presentation, stating in relevant part:

Stage IV Metastatic Treatment-Naïve 1L Melanoma Patients (Enrolled Per
Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for Objective Response Rate (ORR) in
Stage 1 (N1=13) with 11/13 (85%) of patients achieving either a partial response
(PR) or complete response (CR). Median time on study for 28 patients in Stage 2
(N1+N2) is 4.6 months.  Responses were observed in 14/28 (50%) patients (3 CR,
10 PR, 1 *u*PR).  Amongst the 25 patients with known PD-L1 status, ORR in PD-
L1 negative patients was 5/12 (42%) and in PD-L1 positive patients was 8/13
(62%).  One patient with unknown PD-L1 baseline status experienced a CR.

Stage IV Metastatic Treatment-Naïve 1L Renal Cell Carcinoma Patients (Enrolled
Per Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for ORR in Stage 1 (N1=11) with 7/11
(64%) of patients achieving a partial response (PR).  Median time on study for 26
patients in Stage 2 (N1 + N2) is 5.6 months.  Responses were observed in 12/26
(46%) patients (11 PR, 1 *u*PR).  Amongst the 24 patients with known PD-L1 status,
the ORR in PD-L1 negative patients was 9/17 (53%) and in PD-L1 positive patients
was 2/7 (29%). One of two patients (50%) with unknown PD-L1 baseline status
experienced a PR.

Stage IV Metastatic Treatment-Naïve 1L Urothelial Carcinoma (Enrolled Per
Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for ORR in Stage 1 (N1=10) with 6/10
(60%) of patients achieving either a partial or complete response (2 *u*CR, 3 PR,
1 *u*PR). Median time on study for 10 patients in Stage 1 is 3.9 months. The ORR

---

[14] https://ir.nektar.com/news-releases/news-release-details/preliminary-data-nktr-214-
combination-opdivo-nivolumab-patients. Last visited February 13, 2019.

Case 1:19-cv-00322-MN-JLH   Document 14   Filed 12/12/19   Page 62 of 94 PageID #: 154

in PD-L1 negative patients was 3/5 (60%) and in PD-L1 positive patients was 3/5 (60%).

162.   These disappointing results came as a shock to investors, who had been primed by the Individual Defendants throughout the First Relevant Period to expect further positive results. On this news, the price per share of Nektar stock plummeted approximately 41.82% from the previous day's closing price of $90.35 on June 1, 2018, to close at $52.57 on June 4, 2018.

### June 2018 Mechanism of Action Video

163.   In June 2018, Nektar released a video purporting to demonstrate (with digitally created graphics) the efficacy of NKTR-214, including the successful creation of CD8 T-cells without triggering growth of Tregs, or regulatory T-cells, within a tumor. In addition to the computer graphics representation, the video was voice-narrated, describing the events depicted in the visual representation. The narration contained information based partially on data from the Company's poster at the February 2017 ASCO Conference, stating, in relevant part:

> Cancer immunotherapies are designed to enable a patient's own immune system to attack tumor cells, but existing therapies do not work for most patients, in part due to an insufficient number of cancer-fighting cells, and too many suppressive cells, which can blunt tumor-killing. What is needed is an immunotherapy that expands, mobilizes and accumulates these powerful cancer-fighting cells, namely CD8-positive effector T-cells and NK cells, within tumors—without expanding unwanted suppressive regulatory T-cells. ***NKTR-214 selectively grows cancer-fighting cells, with the goal of making cancer immunotherapy more effective. Administration of this biologic pro-drug is by infusion once every three weeks.*** In the body, active conjugates emerge slowly over time, which avoids the overstimulation of the immune system. ***Activated NKTR-214 targets CD122 receptors found on the surfaces of cancer-fighting cells, which in turn drives their proliferation and accumulation inside the tumor. In clinical studies, treatment with NKTR-214 resulted in increases in cancer-fighting cells of up to 30-fold.***

(Emphasis added).

### June 6, 2018 Jeffries Conference

164.    On June 6, 2018, Defendant Zalevsky, representing the Company displayed a NKTR-214 data slide at the Jeffries Conference. The slide was identical to one that had been previously displayed at the 2018 Cowen & Company Conference in June. This same data was included in the Company's presentation at 2017 ASCO GU in February.

165.    At the conference, Defendant Zalevsky made several remarks about the data, representing that this data came from a patient pool that experienced a single, unified treatment plan, stating, in relevant part:

> Now this slide shows clinical data from the monotherapy program for NKTR-214. What you can see in the bar chart on the right-hand side, you can see that *for patients for whom we have collected several biopsies, you can see an elevation up to 30-fold in the proportion off tumor-infiltrating cytotoxic T-cells*, shown in orange, with essentially no change in regulatory T-cells or Tregs. This is exactly the design goals of NKTR-214, demonstrated in principle in human patients.

(Emphasis added).

### August 8, 2018 Press Release

166.    On August 8, 2018, the Company issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2018, in which Defendant Robin boasted of Nektar's "significant progress," specifically stating, "[o]ver the past few months, we have reported significant progress across all areas of our pipeline, with notable milestones for our immuno-oncology, immunology and pain programs . . . ."

167.    The statements in ¶¶ 123-6, 132-53, 159, and 163-166 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose *inter alia*, the PIVOT Manipulation Misconduct and that: (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) the data set consisted of five patients, as opposed to ten; (3) NKTR-214 did not selectively proliferate cancer-killing cells in the

same patients that experienced negligible increases of immunosuppressive cells, those results occurred in different groups of patients; (4) a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (5) thus, the claim that patients experienced a 30-fold average increase in CD8 cells with negligible increases in immunosuppressive cells was not supported by the clinical data relied on and; (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges as to the First Relevant Period

168.    On October 1, 2018, Plainview published the Report, revealing that NKTR-214 did not live up to Nektar's claims and expectations with respect to the drug's safety and efficacy. According to the Report, the Company promoted NKTR-214 as "a promising treatment for cancer, particularly in combination with checkpoint inhibitors." Specifically, "Nektar hypothesized that IL-2 could be improved by adding polyethylene glycol molecules to it (pegylating it) to extend the half-life and block interaction with IL2Rαβγ [a particular receptor.]" In truth, the Report noted, "the anticipated benefits did not materialize and pegylation has proved to be a drag on efficacy."

169.    The Report stated that Nektar's plan to create a "new universal cancer treatment" by taking an unsuccessful monotherapy and expecting success when used as part of a combination therapy "has **never** worked in practice." Furthermore, the Report stated that Nektar's decision to withhold 69% of response rates resulted in "an unprecedented level of data opacity" and stated further that the "[f]irst rule of biotechnology investing: if a company withholds data from investors, that data is always bad."

170.    Further delving into the comparative analysis between IL-2 on its own versus NKTR-214, the Report found "[i]n clinical trials and retrospective analysis" that, while IL-2 had

a historic objective response rate (ORR) of 15%-29% from data between 1995 and 2005, "NKTR-214, on the other hand, posted a stunning 0% ORR."

171.    In addition, the Report explained that pegylating IL-2 was not a novel concept, stating, "NKTR-214 is not the first attempt at pegylating IL-2"; indeed, the first paper on the topic was published in 1987. Due to "NKTR-214's 0% ORR," the Report noted that it was "very hard to believe that NKTR-214 [would] work as part of a combination therapy," and stated, in relevant part:

> For combination therapies in oncology, 2+2=3, not 2+2=5—the total effect is nearly always less than the sum of the parts. We are unaware of any oncology drug that reported a 0% ORR as a monotherapy and then went on to achieve success as part of a combination therapy, but there are many therapies with meaningful monotherapy ORR rates that have failed to add value as part of a combination therapy.

172.    Although NKTR-214's intended mechanism was to trigger proliferation of certain lymphocytes for clinical success, according to the Report the Company's recent PIVOT trial data revealed that the triggered response of lymphocytes came nowhere close to the required percent increase for actual effective treatment. Specifically, studies on IL-2 on its own established that "an IL-2 treatment requires a 200-300% increase in lymphocytes in order to elicit a response" and in "its most recent PIVOT trial data, NKTR-214 has induced a 33-50% increase in lymphocytes—missing the bar for efficacy by a wide margin and explaining why the monotherapy data was so poor."

173.    Turning to NKTR-214's extended half-life, the Report stated that it had no significant impact on the therapy's efficacy, specifically stating, "NKTR-214 is too weak to work, with a pharmacokinetic profile yielding only 7-20% of the active AUC of a standard cycle of IL-2 due to 1) lower maximum tolerated dose and 2) pegylation interfering with NKTR-214 drug

activity." In fact, the extended half-life actually raised further safety issues due to the irreversibility of the front-loaded dosing.

174.    The Report pointed out that the Company's claims regarding CD8+ data were "brazenly misleading," and Nektar's frequently cited "30-fold average change in tumor-infiltrating lymphocyte (TIL) CD8+" was "distorted by a single outlier patient who purportedly recorded an extreme change in TIL CD8+ but saw no clinical benefit." The source of this claim, as revealed by the Report was a chart contained in a poster displayed at a February 2017 ASCO symposium. Specifically, a line chart included in the poster revealed the outlier patient data and further depicted that no patient had actually experienced a 30-fold increase, but one patient—the outlier patient— saw a 300x increase, thereby skewing the reported average as reflected in the chart below provided in the Report:



175.    However, until the Report was published, investors had little to no opportunity to examine the relevant data themselves. The line chart, provided by the Report via accessible link, showed the charted data for the five patients in the study and further revealed that two of the five patients were dosed on a 2 week, rather than 3-week dosing schedule. Moreover, the data reported for negligible increases of Tregs came from five different patients. The repeated implication of the Individual Defendants throughout the First Relevant Period was that NKTR-214 drastically increased    cancer-fighting    cells    while    concurrently    causing    minimal    increases    in

immunosuppressive cells in ten patients, revealing that the Individual Defendants' conclusions

about NKTR-214's success and efficacy rested on fragile data that provided no reasonable basis

for such conclusions. Additionally, the Report noted that there was a "lack of significant effect [of

NKTR-214] in combination with nivolumab," which was particularly concerning.

176.    In conclusion, the Report stated that the Company's aim to improve IL-2 resulted

in a product "that is completely useless for treating cancer," and further determined that Nektar's

approach with NKTR-214 was problematic from the start:

> ***Elongating half-life with pegylation makes sense for many indications where the goal is to reach and maintain steady state.*** These include many neurological or chronic conditions that cannot be cured directly, such as pain or ADHD. ***However, it makes no sense for treating cancer.*** The goal is not to reach steady-state exposure to IL-2, it is to kill the malignant tumor cells.
>
> In exchange for the long half-life of NKTR-214, Nektar was forced to sacrifice both total and peak therapeutic effect. NKTR-214's PEG polymers also forced Nektar to use a significantly lower dose compared to IL-2. ***The end result is a drug with AUC that is much lower than IL-2, therapeutic effect (target receptor binding) that is even lower than the AUC would imply, and a maximum concentration that does not appear to meet the minimum threshold for efficacy.***
>
> With a 0% ORR as a monotherapy, ***NKTR-214 has already failed where IL-2 succeeded, and by combining NKTR-214 with checkpoint inhibitors, Nektar is now trying to succeed where IL-2 failed. Neither the science nor the data support NKTR-214, and we are betting against it.***

(Emphasis added).

177.    When news of the Report reached the public, the Company's price per share

dropped $5.63 over the next two trading sessions from a closing price of $60.96 on September 28,

2018 to a closing price of $55.33 on October 2, 2018, a decline of over 9%. One article reporting

on the Report stated in relevant part:

> Top-line data from the phase 1/2 PIVOT trial of NKTR-214 in combination with Bristol-Myers Squibb's checkpoint inhibitor Opdivo were reported at this year's ASCO meeting and spooked investors by showing a reduced overall response rate from an earlier read-out. While the company said the patients hadn't been on the combination long enough to show a response, concerns were voiced that the

company may be pitching into a phase 3 program with a fairly limited set of clinical data.[15]

178.    On October 3, 2018, *Seeking Alpha* published a response to the Report, by Nektar's Senior Vice President for Investor Relations and Corporate Affairs, Jennifer Ruddock which confirmed the source cited to in the Report for the claim that NKTR-214 resulted in a 30-fold increase in cancer-fighting cells. The response criticized the Report for not using more recent data, though notably, the Company itself relied on such data in a number of its presentations in 2018. Moreover, the response failed to include a more recent source to support the repeated 30-fold claim.

179.    On October 4, 2018, Plainview published a reply to Nektar's response to the Report highlighting that that the Company's more recent data "appears to be manipulated to portray NKTR214 as having a strong effect when it actually doesn't."[16]

**False and Misleading Statements as to the Second Relevant Period**

***February 15, 2019 ASCO 2019 Presentation and Press Release***

180.    On February 15, 2019, the Company gave a presentation at the 2019 ASCO Genitourinary Cancers Symposium. The presentation reported favorable results in the PIVOT study's treatment of bladder cancers. A press release issued by the Company the same day highlighted the presentation in relevant part:

**Highlights from the ASCO-GU presentation in 1L metastatic urothelial carcinoma patients include:**

***Clinical Efficacy***
*Response measured per RECIST 1.1 for per protocol efficacy-evaluable patients treated at the recommended Phase 2 dose (RPD) and with ≥1 post-treatment scan as of December 3, 2018:*

---

[15]https://www.fiercebiotech.com/biotech/nektar-s-long-acting-il-2-nktr-214-has-zero-value-claims-analyst. Last visited December 10, 2019.
[16] *See* Plainview's responsive article published on *Seeking Alpha* October 4, 2018, included hereto as Exhibit 1.

- Best overall response rate (ORR) was 48% (13/27) in efficacy-evaluable patients, with a 19% (5/27) complete response (CR) rate.
- ORR by immune-related RECIST (irRECIST) was 52% (14/27); ORR in patients with visceral non-nodal metastases was 53% (8/15).
- ORR in patients that refused standard of care was 55% (6/11); in cisplatin-ineligible patients ORR was 44% (7/16).
- Disease control rate (DCR) was 70% (defined as CR + partial response (PR) + stable disease (SD)).
- Median percent reduction in target lesions from baseline in all 27 efficacy-evaluable patients was 32%.
- Median percent reduction in target lesions from baseline in all 13 responders was 78%.
- Median time to response was 2.0 months.
- In patients with RECIST response, no patients discontinued due to relapse.
- Amongst the 23 patients with known pre-treatment programmed death-ligand 1 (PD-LI) status, ORR in PD-LI negative patients was 45% (5/11) and in PD-LI positive patients was 50% (6/12).

181.     The press release also included a statement from Defendant Tagliaferri:

Preliminary data from the ongoing PIVOT-02 trial in metastatic urothelial cancer patients demonstrated important response rates, including complete responses, in patients who were cisplatin-ineligible or refused standard of care… These responses were observed regardless of baseline PD-LI expression and no relapses occurred. In this cohort of Stage IV bladder cancer patients with a median age of 70, the combination therapy was generally well tolerated with no Grade 4 or 5 adverse events reported. Of note, our translational research demonstrated that in patients with the highest unmet medical need—those whose tumors did not express PD-LI at their baseline scan—treatment with combination resulted in 70 percent of patients converting to PD-LI positive expressors. These data support our development strategy in this tumor setting, including the Phase 2 PIVOT-10 study underway in cisplatin-ineligible urothelial cancer patients with low PD-LI tumor expression.

### *March 1, 2019 Form 10-K*

182.     On March 1, 2019, Nektar filed the 2018 10-K, which was signed by Defendants

Robin, Labrucherie, Thomsen, Chess, Ajer, Greer, Lingnau, Whitfield, and Eastham.

183.     The 2018 10-K included, in its "Risk Factor" section, a discussion of NKTR-214's

paramount importance to the success of the Company, stating, in relevant part:

***We are highly dependent on the success of NKTR-214, our lead I-O candidate. We are executing a broad development program for NKTR-214 and clinical and regulatory outcomes for NKTR-214, if not successful, will significantly harm our business.***

Our future success is highly dependent on our ability to successfully develop, obtain regulatory approval for, and commercialize NKTR-214. In general, most early stage investigatory drugs, including oncology drug candidates such as NKTR-214, do not become approved drugs. Accordingly, there is a very meaningful risk that NKTR-214 will not succeed in one or more clinical trials sufficient to support one or more regulatory approvals. To date, reported clinical outcomes from NKTR-214 have had a significant impact on our market valuation, financial position, and business prospects and we expect this to continue in future periods. If one or more clinical studies of NKTR-214 are delayed or not successful, it would materially harm our market valuation, prospects, financial condition and results of operations. For example, under the BMS Collaboration Agreement, we are entitled to up to $1.43 billion in development milestones that are based upon clinical and regulatory successes from the NKTR-214 development program. One or more failures in NKTR-214 studies could jeopardize such milestone payments, and any product sales or royalty revenue or commercial milestones that we would otherwise be entitled to receive could be reduced, delayed or eliminated.

184.   In reference to the Company's manufacturing operations, and the harm that

manufacturing errors could have on its business, the 2018 10-K stated the following:

***Our manufacturing operations and those of our contract manufacturers are subject to laws and other governmental regulatory requirements, which, if not met, would have a material adverse effect on our business, results of operations and financial condition.***

We and our contract manufacturers are required in certain cases to maintain compliance with current good manufacturing practices (cGMP), including cGMP guidelines applicable to active pharmaceutical ingredients and drug products, and with laws and regulations governing manufacture and distribution of controlled substances, and are subject to inspections by the FDA, the Drug Enforcement Administration or comparable agencies in other jurisdictions administering such requirements. We anticipate periodic regulatory inspections of our drug manufacturing facilities and the manufacturing facilities of our contract manufacturers for compliance with applicable regulatory requirements. Any failure to follow and document our or our contract manufacturers' adherence to such cGMP and other laws and governmental regulations or satisfy other manufacturing and product release regulatory requirements may disrupt our ability to meet our manufacturing obligations to our customers, lead to significant delays in the availability of products for commercial use or clinical study, result in the termination or hold on a clinical study or delay or prevent filing or approval of marketing applications for our products. Failure to comply with applicable laws and regulations may also result in sanctions being imposed on us, including fines,

injunctions, civil penalties, failure of regulatory authorities to grant marketing approval of our products, delays, suspension or withdrawal of approvals, license revocation, seizures, administrative detention, or recalls of products, operating restrictions and criminal prosecutions, any of which could harm our business. Regulatory inspections could result in costly manufacturing changes or facility or capital equipment upgrades to satisfy the FDA that our manufacturing and quality control procedures are in substantial compliance with cGMP. Manufacturing delays, for us or our contract manufacturers, pending resolution of regulatory deficiencies or suspensions could have a material adverse effect on our business, results of operations and financial condition.

(Emphasis added).

185.    Attached to the 2018 10-K were SOX certifications signed by Defendants Robin and Labrucherie attesting to the accuracy of the 2018 10-K.

### *April 30, 2019 Proxy Statement*

186.    The Company filed its 2019 Proxy Statement with the SEC on April 30, 2019. Defendants Robin, Ajer, Chess, Greer, Lingnau, Whitfield, and Eastham, solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[17] Among the proposals to be voted on by shareholders was the approval of the Company's 2017 Performance Incentive Plan for both members of the Board as well as the Company's executive officers.

187.    The 2019 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have adopted a code of business conduct and ethics that applies to all employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions."

---

[17] Plaintiffs' allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

188.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by twelve of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

189.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "performance-based incentives," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

190.    The 2019 Proxy Statement also failed to disclose, *inter alia*: (1) the Company failed to maintain manufacturing standards; (2) consequently, the quality of the experimental batches of NKTR-214 was internally inconsistent; (3) this difference between the batches used in the PIVOT-02 study significantly affected the experimental results; (4) thus, any preliminary finding of a clinical benefit was no invalidated by the absence of mathematically significant results; and (5) that the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *June 1, 2019 ASCO Meeting*

191.    On June 1, 2019, the Company gave a presentation at the 2019 American Society of Clinical Oncology Meeting. In an accompanying press release, Defendant Zalevsky reported on the purported success of the PIVOT study, stating, in relevant part:

> The Stage IV melanoma patients enrolled in the ongoing PIVOT-02 study continue to experience both deepening and durability of response over time… This translated into a 34% rate of complete response at a 12-month follow-up for the 38 efficacy-evaluable patients in this cohort. Further, 42% of patients achieved a 100% reduction in target lesions. Finally, corresponding lymphocyte data highlight the

benefit of replenishing and stimulating T cells continuously over the course of treatment with an I-O doublet regimen.

### *August 1, 2019 Press Release*

192.   On August 1, 2019, the Company issued a press release to announce that the U.S. Food and Drug Administration had designated the combination treatment of NKTR-214 and Opdivo as a "Breakthrough Therapy Designation" for the treatment of certain melanomas. The press release[18] stated, in relevant part:

> Nektar Therapeutics (Nasdaq: NKTR) and Bristol-Myers Squibb (NYSE: BMY) today announced that the U.S. Food and Drug Administration (FDA) has granted Breakthrough Therapy Designation for investigational agent bempegaldesleukin (NKTR-214) in combination with Bristol-Myers Squibb's Opdivo (nivolumab) for the treatment of patients with previously untreated unresectable or metastatic melanoma. The Breakthrough Therapy Designation is based on clinical data which were recently reported at the 2019 American Society of Clinical Oncology (ASCO) Annual Meeting from the cohort of patients with metastatic melanoma that were treated with the doublet therapy in the ongoing PIVOT-02 Phase 1/2 clinical study.

> FDA Breakthrough Therapy Designation is intended to expedite the development and review of medicines aimed at treating a serious or life-threatening disease where there is preliminary clinical evidence that the investigational therapy may offer substantial improvement over existing therapies on at least one clinically significant endpoint.

193.   The statements in ¶¶ 180-5 and 191-2 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company failed to comply with current good manufacturing practices; (2) consequently, the quality of the experimental batches of NKTR-214 was internally inconsistent; (3) the differences between the batches used in the PIVOT-02 study significantly affected the

---

[18]https://ir.nektar.com/news-releases/news-release-details/nektar-therapeutics-and-bristol-myers-squibb-announce-us-fda. Last visited October 17, 2019.

experimental results; (4) thus, any preliminary finding of a clinical benefit was invalidated by the

absence of statistically significant results; and (5) that the Company failed to maintain internal

controls. Due to the foregoing, Defendants' statements regarding the Company's business,

operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact

at all relevant times.

## The Truth Emerges as to the Second Relevant Period

194.    On August 8, 2019, after the market closed, Nektar held a conference call wherein

Defendant Robin revealed that the PIVOT-02 experimental trials had been tainted due to a

manufacturing error, stating, in relevant part:

> … if you remember back when we presented data at ASCO in 2018, many of you
> asked us about the ***softening in response rates between the first and second***
> ***Fleming cohorts in melanoma*** and what could be the underlying cause of this
> variance.
> As more patient data have matured and become available over the past six months,
> we've continued to analyze all of the pivot cohorts closely and an effort to
> understand whether there was a root cause to this observation or whether it was a
> result of normal variability.
> Now, let me tell you what we've learned… With [] new assays, we conducted a
> thorough characterization of all of the 22 lots of bempeg peg produced to-date,
> including all of those which currently supply and we'll supply our current and
> future registrational studies.
> ***The characterization work from these new assays revealed that two of the***
> ***earliest production batches of bempeg were different than the other 20 batches***
> ***produced. These two early manufacturing lots are known as lots two and five***
> ***and the time of their production bidding beginning in 2016*** it was early on in the
> manufacturing campaign and these lots were within the manufacturing controls
> and release specifications.

(Emphasis added).

195.    Defendant Robin went on to state that the Company, under these apparently lax

manufacturing controls, failed to notice any difference in the batches despite medically salient

"physical differences," stating, in relevant part:

> ***As such, we did not detect any meaningful variability upon their release. Various***
> ***early production batches of bempeg were sequentially distributed in PIVOT-02,***

***lots one, two, three and five.*** As more clinical data matured and became available in PIVOT-02 and once we had identified the outlier variances of lots two and five, we then had the basis to start analyzing any potential differences between data from patients that started treatment with lots one and three as compared to lots two and five. ***We found notable correlations in several cohorts with evidence of an improved clinical benefit and patients who started treatment with lots one and three as compared to patients who started treatment with lots two and five.***
***We have identified the cause of the physical differences between these lots, which we now stemmed from a single suboptimal batch of in-process intermediate*** that was used to produce only these two lots, lots two and five of the 22 lots we've made to-date…
Lot two had already been full used in PIVOT and lot five was almost full utilized PIVOT and PROPEL. No material from lot two or five is currently being used in any of the ongoing clinical trials and this material has not been used at all in any of the ongoing registrational trials...

(Emphasis added).

196.    On this news, the Company's price per share dropped $8.65 (over 29%) during a single trading session from a closing price of $29.57 per share on August 8, 2019 to close at $20.92 per share on August 9, 2019.

## DAMAGES TO NEKTAR

197.    As a direct and proximate result of the Individual Defendants' conduct, Nektar has lost and expended, and will lose and expend, many millions of dollars.

198.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, and certain of its officers, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

199.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including incentive bonuses provided by the 2017 Performance Incentive Plan and other bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

200.    As a direct and proximate result of the Individual Defendants' conduct, Nektar has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

201.    Plaintiffs bring this action derivatively and for the benefit of Nektar to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Nektar, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

202.    Nektar is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

203.    Plaintiffs are shareholders of Nektar and have continuously held Nektar common stock at all relevant times. Plaintiffs will adequately and fairly represent the interests of Nektar in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

204.    Plaintiffs incorporate by reference and re-alleges each and every allegation stated above as if fully set forth herein.

205.    A pre-suit demand on the Board of Nektar is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Robin, Ajer, Chess, Greer, Lingnau, Whitfield, and Eastham (the "Directors"). Plaintiffs need only

to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

206.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while five of them engaged in insider sales based on material non-public information, netting proceeds of approximately $67 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

207.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly engaged in the PIVOT Manipulation Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

208.    Additional reasons that demand on Defendant Robin is futile follow. Defendant Robin has served as the Company's President and CEO since January 2007 and as a member of the Board since February 2007. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Robin with his principal occupation, and he receives handsome compensation, including $13,330,667 during the fiscal year ended December 31, 2018. Defendant Robin was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the 2017, and 2018 10-Ks, which he signed and signed

SOX certifications for and the false representations made in various healthcare conference presentations. As the Company's highest officer and as a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Robin is a defendant in the Securities Class Actions. His insider sales before the fraud was exposed, which yielded at least $51.8 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Defendant Robin's son, Michael Robin, is employed by the Company as a vice president in its project management group and was paid approximately $838,237 by the Company for the fiscal year ended December 31, 2018.  Defendant Robin may further fear retaliation against his son, in addition to himself, if he were to consider a demand against the Individual Defendants.  For these reasons, too, Defendant Robin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209.    Additional reasons that demand on Defendant Ajer is futile follow. Defendant Ajer has served as a Company director since September 2017 and serves as a member of the Audit Committee and Organization and Compensation Committee. Defendant Ajer receives lavish compensation, including $709,051 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ajer signed,

and thus personally made the false and misleading statements in, the 2017 and 2018 10-Ks. His insider sale before the fraud was exposed, which yielded $383,130 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Ajer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210.    Additional reasons that demand on Defendant Chess is futile follow. Defendant Chess has served as a Company director since May 1992 and has served in a variety of positions at Nektar throughout his years with the Company. From March 2006 to January 2007 he was the acting President and CEO; from April 1999-January 2007 he was the Executive Chairman; from August 1998 to April 2000, he was Co-CEO; from December 1991 to August 1998 he served as President; and from May 1992 to August 1998, he served as the Company's CEO. Defendant Chess receives handsome compensation, including $741,551 during the fiscal year ended December 31, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Chess signed, and thus personally made the false and misleading statements in, the 2017, and 2018 10-Ks. His insider sales before the fraud was exposed, which yielded at least $5.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Chess breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.    Additional reasons that demand on Defendant Greer is futile follow. Defendant Greer has served as a Company director since February 2010 and serves as Chair of the Audit Committee and as a member of the Organization and Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Greer receives handsome compensation, including $732,551 during the fiscal year ended December 31, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Greer signed, and thus personally made the false and misleading statements in, the 2017, and 2018 10-Ks. His insider sales before the fraud was exposed, which yielded at least $4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Greer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on Defendant Lingnau is futile follow. Defendant Lingnau has served as a Company director since August 2007. He also serves as Chair of the Organization and Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Lingnau receives handsome compensation, including $715,301 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Lingnau signed, and

thus personally made the false and misleading statements in, the 2017, and 2018 10-Ks. His insider sales before the fraud was exposed, which yielded at least $5.1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Lingnau breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213.    Additional reasons that demand on Defendant Whitfield is futile follow. Defendant Whitfield has served as a Company director since August 2000. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Whitfield receives handsome compensation, including $708,301 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Whitfield signed, and thus personally made the false and misleading statements, in the 2017, and 2018 10-Ks. For these reasons, too, Defendant Whitfield breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214.    Additional reasons that demand on Defendant Eastham is futile follow. Defendant Eastham has served as a Company director since September 2018. She also serves as a member of the Organization and Compensation Committee and as a member of the Audit Committee. Defendant Eastham receives handsome compensation, including $1,143,749 during the fiscal year ended December 31, 2018. As a Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously

disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Eastham signed, and thus personally made the false and misleading statements, in the 2018 10-K. For these reasons, too, Defendant Eastham breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

215.    Additional reasons that demand on the Board is futile follow.

216.    According to the Company's Charter of the Organization and Compensation Committee of the Board of Directors, the Organization and Compensation Committee's responsibilities included "[r]eview[ing] the Company's executive compensation arrangements to evaluate whether incentive and other forms of compensation do not encourage inappropriate or excessive risk taking and review[ing] and discuss[ing], at least annually, the relationship between risk management policies and practices, corporate strategy and the Company's executive compensation arrangements." Defendants Ajer, Eastham, Greer, and Lingnau failed to appropriately carry out these responsibilities adequately, as evidenced by the Individual Defendants' engagement in the PIVOT Manipulation Misconduct and/or the dissemination of false and misleading statements throughout the relevant periods.

217.    As described above, five of the Directors directly engaged in insider trading, in violation of federal law. Directors Robin, Ajer Chess, Greer, and Lingnau collectively received proceeds of nearly $67 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

218.    Demand in this case is excused because the Directors face a substantial likelihood of liability on Plaintiffs' proxy claims. In both the 2018 and 2019 Proxy Statements, the Directors had personal interests at stake in the approval of the 2017 Performance Incentive Plan, which would not have been voted for were it not for the dissemination of the false and misleading statements discussed herein. The approval of the 2017 Performance Incentive Plan further damaged the Company by providing unjust benefits to the Individual Defendants while they breached their fiduciary duties to the Company. The Directors would not be able to view such a demand impartially. As the 2018 and 2019 Proxy Statements recognized, "[a]ll members of the board of directors and all of the Company's executive officers will be eligible for awards under the 2017 Plan and thus have a personal interest in the approval of the amendment and restatement to the 2017 Plan." For these reasons too, a demand against the Directors would be futile.

219.    Demand in this case is further excused because the Directors control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

220.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' schemes to engage in the PIVOT Manipulation Misconduct, to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and

83

violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

221.    Nektar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Nektar any part of the damages Nektar suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

222.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

223.    The acts complained of herein constitute violations of fiduciary duties owed by Nektar officers and directors, and these acts are incapable of ratification.

224.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Nektar. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any

action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Nektar, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

225.    If there is no directors' and officers' liability insurance, then the Directors will not cause Nektar to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

226.    Thus, for all of the reasons set forth above, all of the Directors and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

227.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

228.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

229.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

230.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

231.    Under the direction and watch of the Directors, the 2017 and 2018 Proxy Statements failed to disclose, *inter alia*: (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) the data set consisted of five patients, as opposed to ten; (3) NKTR-214 did not selectively proliferate cancer-killing cells in the same patients that experienced negligible increases of immunosuppressive cells, those results occurred in different groups of patients; (4) a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (5) thus, the claim that patients experienced a 30-fold average increase in CD8 cells with negligible increases in immunosuppressive cells was not supported by the clinical data relied on and; (6) the Company failed to maintain internal controls.

232.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company failed to comply with current good manufacturing

86

practices; (2) consequently, the quality of the experimental batches of NKTR-214 was internally inconsistent; (3) the differences between the batches used in the PIVOT-02 study significantly affected the experimental results; (4) thus, any preliminary finding of a clinical benefit was invalidated by the absence of statistically significant results; and (5) that the Company failed to maintain internal controls.

233.    The Individual Defendants also caused the 2017, 2018, and 2019 Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "performance-based incentives," while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

234.    The 2017, 2018, and 2019 Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The 2017, 2018, and 2019 Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

235.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017, 2018, and 2019 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2017, 2018, and 2019 Proxy Statements, including, but not

limited to, election of directors, ratification of an independent auditor, and the approval and/or amendment of the 2017 Performance Incentive Plan.

236.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Robin and Winger, which allowed them to continue breaching their fiduciary duties to Nektar. In a similar manner, the statements in the 2018 Proxy Statement led to the re-election of Defendants Ajer, Chess, and Whitfield, and the 2019 Proxy Statement led to the re-election of Defendants Greer and Lingnau.

237.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017, 2018, and 2019 Proxy Statements.

238.    Plaintiffs on behalf of Nektar have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

239.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

240.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nektar's business and affairs.

241.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

242.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nektar.

243.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

244.   In further breach of their fiduciary duties owed to Nektar during the First Relevant Period the Individual Defendants willfully or recklessly engaged in and/or caused the Company to engage in the PIVOT Manipulation Misconduct and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia* that: (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) the data set consisted of five patients, as opposed to ten; (3) NKTR-214 did not selectively proliferate cancer-killing cells in the same patients that experienced negligible increases of immunosuppressive cells, those results occurred in different groups of patients; (4) a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (5) thus, the claim that patients experienced a 30-fold average increase in CD8 cells with negligible increases in immunosuppressive cells was not supported by the clinical data relied on and; (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

245.   Also in breach of their fiduciary duties owed to the Company, during the Second Relevant Period the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company failed to comply with current good manufacturing practices; (2) consequently, the quality of the experimental batches of NKTR-214 was internally inconsistent; (3) the differences between the batches used in the PIVOT-02 study significantly affected the experimental results; (4) thus, any preliminary finding of a clinical benefit was invalidated by the absence of statistically significant results; and (5) that the Company failed to

maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

246.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

247.    In breach of their fiduciary duties, twelve of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

248.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

249.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the

Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

250.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

251.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nektar has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

252.     Plaintiffs on behalf of Nektar have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

253.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Nektar.

255.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Nektar that was tied to the performance or artificially inflated valuation of Nektar, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

256.     Plaintiffs, as shareholders and representatives of Nektar, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

257.     Plaintiffs on behalf of Nektar have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

258.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

259.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

260.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

261.     Plaintiffs on behalf of Nektar have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiffs may maintain this action on behalf of Nektar, and that Plaintiffs are adequate representatives of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Nektar;

(c)      Determining and awarding to Nektar the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Nektar and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Nektar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Nektar to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Nektar restitution from the Individual Defendants, and each of them;

(f)      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: December 12, 2019                    Respectfully submitted,

                                            **PHILLIPS,  GOLDMAN,  MCLAUGHLIN
                                            & HALL, P.A.**

                                            */s/ John C. Phillips, Jr.*
                                            John C. Phillips, Jr. (Bar No. 110)
                                            Megan C. Haney (Bar No. 5016)
                                            1200 North Broom Street
                                            Wilmington, DE 19806
                                            Telephone: (302) 655-4200
                                            Facsimile: (302) 655-4210
                                            Email: jcp@pgmhlaw.com
                                                   mch@pgmhlaw.com

                                            *Liaison Counsel for Plaintiffs*

                                            **THE ROSEN LAW FIRM, P.A.**
                                            Phillip Kim
                                            275 Madison Avenue, 40th Floor
                                            New York, NY 10016
                                            Telephone: (212) 686-1060
                                            Facsimile: (212) 202-3827
                                            Email: pkim@rosenlegal.com

                                            *Co-Lead Counsel for Plaintiffs*

                                            **THE BROWN LAW FIRM, P.C.**
                                            Timothy Brown
                                            240 Townsend Square
                                            Oyster Bay, NY 11771
                                            Telephone: (516) 922-5427
                                            Facsimile: (516) 344-6204
                                            Email: tbrown@thebrownlawfirm.net

                                            *Co-Lead Counsel for Plaintiffs*