**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE NEKTAR THERAPEUTICS DERIVATIVE LITIGATION | Lead Case No. 1:19-cv-00322-MN-JLH **DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE
CONSOLIDATED AMENDED COMPLAINT**

**INTRODUCTION**

Plaintiff Karen Hodes ("Plaintiff Hodes") and Plaintiff Christine Sever ("Plaintiff Sever," and together with Plaintiff Hodes, "Plaintiffs") by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Nektar Therapeutics ("Nektar" or the "Company"), file this Verified Shareholder Derivative Consolidated Amended Complaint against Individual Defendants Howard W. Robin, Stephen K. Doberstein, Jonathan Zalevsky, Jeff Ajer, Robert B. Chess, R. Scott Greer, Christopher A. Kuebler, Lutz Lingnau, Roy A. Whitfield, and Dennis L. Winger (collectively, the "Individual Defendants," and together with Nektar, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Nektar, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiffs' complaint against the Individual Defendants, they allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nektar, legal filings, news reports,

1

securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Nektar's directors and officers from at least January 10, 2017 through September 28, 2018 (the "Relevant Period").

2.      Nektar is a biopharmaceutical company that specializes in the research, discovery, and development of novel medications for areas in which there is sizeable unmet medical need. The Company's pipeline includes new investigational drugs for treatment and use in a variety of medical areas including cancer, chronic pain, and autoimmune disease.

3.      The Company purports to leverage its proprietary chemistry platform to develop new drug candidates which utilize Nektar's advanced polymer conjugate technology platforms, designed to allow the "development of new molecular entities that target known mechanisms of action."

4.      Nektar's proprietary programs include Immuno-oncology ("I-O") projects that are focused on developing targeted medicines to help the body's immune system fight cancer with medications designed to modify certain immune cell activities, such as increasing their numbers and advancing their abilities to identify and attack cancer cells.

5.      Nektar's lead I-O drug candidate is NKTR-214, also known as "bempegaldesleukin" or "bempeg," a biologic with biased signaling through Interleukin-2 ("IL-2"), a naturally occurring cytokine widely known in the scientific community to prompt the production of cancer-fighting cells within the body. According to the Company's President and

2

Chief Executive Officer ("CEO"), Howard W. Robin ("Robin"), IL-2 is a "[m]aster [g]rowth [f]actor for T Cells and Natural Killer (NK) Cells." However, the safety profile of IL-2 has limited its usage as an effective cancer therapy. IL-2's short half-life requires high doses of the protein for effectiveness, and while IL-2 prompts the production of cancer-killing cells, it also triggers the production of "Treg" cells, which are immunosuppressive. As such, IL-2 presents challenges with toxicity when given in high doses. NKTR-214, through utilizing IL-2, is designed to stimulate and facilitate the growth of "tumor-killing immune cells." Specifically, NKTR-214 was created as a modified form of IL-2, to proliferate the production of cancer-killing cells, without triggering the production of immunosuppressive cells.

6.     The Company has conducted a number of clinical trials evaluating the efficacy of NKTR-214, including the in-human multicenter phase 1 study titled, EXCEL. The first patients in the EXCEL study were dosed with NKTR-214 in December 2015. A little over a year thereafter, the Individual Defendants began touting the data from EXCEL's Phase I trial.

7.     During the Relevant Period, the investing public was led to believe that NKTR-214 successfully achieved what IL-2 could not on its own: the proliferation of cancer-fighting cells in tumors without the concurrent increase in immunosuppressive cells. Specifically, the initial results achieved in EXCEL were negative, yet, the results reported by the Company to the market were skewed due to a drastic increase in the cancer-fighting cells experienced in one of the five patients participating in the trial, rendering the initial results of the study significantly (and misleadingly) positive. Nevertheless, throughout the Relevant Period, the Individual Defendants caused the Company to repeatedly tout the study's false results publicly in presentations and videos,  over 10 times, flaunting that NKTR-214 produces a "30-fold increase," or produces 30 times the number of cancer-fighting cells with negligible increase in immunosuppressive cells. Moreover, the

3

Company's claims pertaining to the supposed 30-fold increase produced by NKTR-214 misrepresented additional information that further rendered the statements false and misleading to the investing public. In addition to intentionally utilizing outlier data from a single patient, the Individual Defendants caused the Company to falsely report the size and composition of the dataset, as well as the dosing schedule used in the EXCEL trial.

8.      In order to further develop NKTR-214 as a commercial cancer therapy, the Company also initiated clinical trials testing NKTR-214's combination with other drug company products, including Bristol-Myers Squibb Company's ("BMS") Opdivo® (nivolumab) in a Phase 2 clinical trial of NKTR-214 known as PIVOT-02, which remains ongoing. The Company announced the initial results of PIVOT-02 in November 2017, which the market reacted to favorably, resulting in a nearly 17-year high in the price of Nektar common stock. Soon after, in February 2018, the Company announced a collaboration agreement between BMS and Nektar to further analyze the combination of Opdivo and NKTR-214, with BMS providing the Company almost $2 billion upfront in cash and equity. Yet, similar to EXCEL, unbeknownst to the investing public, certain of the Individual Defendants were aware and/or actively engaged in manipulating the PIVOT-02 trial by, *inter alia*, presenting patient data that was unvalidated, prioritizing the presentation of positive results, and delaying less positive results, all of which ran contrary to industry standards and painted a false image of NKTR-214's success that was not sustainable long-term.

9.      Indeed, on June 2, 2018, the Company issued a press release concerning preliminary data from the ongoing PIVOT-02 trial. The press release revealed a significant drop in the treatment's efficacy, from a previous response rate of 85% in stage 1 of the study to a mere

50%. The results from the PIVOT-02 trial were deemed by news outlets to be both "confusing" and "disappointing" given the Company's previously touted string of success.

10.     On this news, the price per share of Nektar stock plummeted approximately 41.82% from the previous day's closing price of $90.35 on June 1, 2018, to close at $52.57 on June 4, 2018.

11.     The truth continued to emerge on October 1, 2018, when a detailed report published by short-seller Plainview LLC ("Plainview") titled, "NKTR-214: Pegging the Value at Zero" (the "Report"), revealed that while the Company had touted NKTR-214 as a promising new cancer treatment drug, Nektar had only disclosed about 31% of response rates and withheld the rest of the data on dosed patients in its PIVOT study as of its presentation at the 2018 American Society of Clinical Oncology ("ASCO") annual meeting, where the Company discussed its PIVOT phase 1/2 results. The Report maintained that the Company's hypothesis that "pegylating," i.e., adding polyethylene glycol molecules to, IL-2 would improve IL-2's function did not prove to be true. The Report further criticized that "PEGylation" ("pegylation") actually impaired the efficacy of NKTR-214, making it an ineffective cancer treatment. The Report pointed out the Company's frequent reference to a "30-fold average change" was due to a single outlier patient that had experienced drastic results, distorting the study's numbers, and categorized the statement as "Brazenly Misleading." The Report contained a link to the obscured data, buried in a clinical poster by Nektar from a European presentation that revealed that prior statements made about NKTR-214 were false. Lastly, the Report emphasized that the combination of NKTR-214 with Opdivo had not established meaningfully positive results and that IL-2 on its own was more effective than NKTR-214.

12.     On this news, the price per share of Nektar stock fell over the next two trading sessions, from a closing price of $60.96 on September 28, 2018, to a closing price of $56.65 on October 1, 2018, a decline of approximately 7%, and further fell to a closing price of $55.33 on October 2, 2018.

13.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly misrepresented and/or caused the Company to fail to disclose, *inter alia*, (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (3) thus, the claim that patients experienced a 30-fold average increase in Cluster of Differentiation antigen "8" ("CD8") cells with negligible increases in immunosuppressive cells was not supported by the clinical data relied on; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

14.     In further breach of their fiduciary duties during the Relevant Period, certain of the Individual Defendants engaged in a scheme to manipulate the clinical trial results of Nektar's PIVOT-02 trial by, *inter alia*, presenting patient data that was not validated, selectively choosing patients to participate in the trial, delaying the disclosure of results that were less positive while disclosing positive results, and neglecting the risks posed by the unsustainable fictional image they created of NKTR-214's success (the "PIVOT Manipulation Misconduct").

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading

statements and omissions of material fact to the investing public and by causing the Company to fail to maintain internal controls.

16.     Furthermore, during the Relevant Period, eight of the Individual Defendants breached their fiduciary duties by engaging in insider sales, netting proceeds of over $56.9 million.

17.     In light of the Individual Defendants' misconduct, which has subjected Nektar, its CEO, its Chief Research and Development Officer, and its former Senior Vice President, Research and Development and Chief Research and Development Officer, to being named as defendants in a federal securities fraud class action lawsuit pending on appeal in the United States Court of Appeals for the Ninth Circuit (the "Securities Class Action"),[1] the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's CEO's and other officers' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Nektar's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

---

[1] All references herein to the Securities Class Action refer to the Second Consolidated Class Action Complaint filed on August 10, 2020.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

20.     Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

25.     Venue is proper in this District because Nektar and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

26.     Plaintiff Hodes is a current shareholder of Nektar common stock and has continuously held Nektar common stock at all relevant times.

8

27.     Plaintiff Sever is a current shareholder of Nektar common stock and has continuously held Nektar common stock at all relevant times.

**Nominal Defendant Nektar**

28.     Nektar is a Delaware corporation with its principal executive offices at 455 Mission Bay Boulevard South, San Francisco, California 94158. Nektar's shares trade on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "NKTR."

**Defendant Robin**

29.     Defendant Robin has served as the Company's President and CEO since January 2007, and as a Company director since February 2007. According to the Company's Schedule 14A filed with the SEC on April 29, 2020 (the "2020 Proxy Statement"), as of April 20, 2020, Defendant Robin beneficially owned 2,152,486 shares of the Company's common stock, which represented 1.21% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $20.11, Defendant Robin owned approximately $43.3 million worth of Nektar stock.

30.     For the fiscal year ended December 31, 2018, Defendant Robin received $13,330,667 in compensation from the Company. This included $968,921 in salary, $4,998,206 in stock awards, $5,618,256 in option awards, $1,647,100 in Non-Equity Incentive Plan Compensation, and $98,184 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Robin received $18,097,411 in compensation from the Company. This included $940,700 in salary, $6,884,888 in stock awards, $8,544,658 in option awards, $1,599,190 in Non-Equity Incentive Plan Compensation, and $127,975 in all other compensation.

31.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Robin made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 1/22/2018 | 83,333 | $75.82 | $6,318,308.06 |
| 2/16/2018 | 12,788 | $82.94 | $1,060,636.72 |
| 5/1/2018 | 43,334 | $83.65 | $3,624,889.10 |
| 5/2/2018 | 43,333 | $85.63 | $3,710,604.79 |
| 5/3/2018 | 43,333 | $82.86 | $3,590,572.38 |
| 5/16/2018 | 12,791 | $83.39 | $1,066,641.49 |

Thus, in total, before the fraud was exposed, he sold 238,912 Company shares on inside information, for which he received approximately $19.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

32.     Defendant Robin's son, Michael Robin, is employed as a non-executive officer of the Company and serves as a vice president in Nektar's project management group. The Company paid Defendant Robin's son approximately $723,778, $838,237, and $1,661,068 in compensation during the fiscal year ended December 31, 2019, 2018, and 2017, respectively.

33.     The Company's 2020 Proxy Statement stated the following about Defendant Robin:

*Howard W. Robin, age 67,* has served as our President and Chief Executive Officer since January 2007 and has served as a member of our board of directors since February 2007. Mr. Robin served as Chief Executive Officer, President and a director of Sirna Therapeutics, Inc., a biotechnology company, from July 2001 to November 2006 and from January 2001 to June 2001, served as their Chief Operating Officer, President and as a director. From 1991 to 2001, Mr. Robin was Corporate Vice President and General Manager at Berlex Laboratories, Inc. ("Berlex"), a pharmaceutical products company that is a subsidiary of Schering, AG, and from 1987 to 1991 he served as Vice President of Finance and Business Development and Chief Financial Officer. From 1984 to 1987, Mr. Robin was Director of Business Planning and Development at Berlex. He was a Senior Associate with Arthur Andersen & Co. prior to joining Berlex. He received his B.S.

10

in Accounting and Finance from Fairleigh Dickinson University and serves as a member of its Board of Trustees.

**Defendant Doberstein**

34.     Defendant Stephen K. Doberstein ("Doberstein") served as Nektar's Chief Research and Development Officer from January 2010 until October 1, 2019 when he stepped down but continued with the Company, serving as the Chief Scientific Fellow and lead scientific advisor until at least March 6, 2020.

35.     For the fiscal year ended December 31, 2018, Defendant Doberstein received $4,811,856 in compensation from the Company. This included $600,000 in salary, $1,748,824 in stock awards, $1,965,476 in option awards, $480,000 in Non-Equity Incentive Plan Compensation, and $17,556 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Doberstein received $7,698,950 in compensation from the Company. This included 529,084 in salary, $2,958,794 in stock awards, $3,672,084 in option awards, $525,000 in Non-Equity Incentive Plan Compensation, and $13,988 in all other compensation.

36.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Doberstein made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 2/16/2018 | 2,426 | $82.94 | $201,212.44 |
| 4/6/2018 | 110,500 | $91.69 | $10,131,745.00 |
| 4/9/2018 | 49,500 | $96.13 | $4,758,435.00 |
| 5/16/2018 | 3,435 | $83.39 | $286,444.65 |

Thus, in total, before the fraud was exposed, he sold 165,861 Company shares on inside information, for which he received approximately $15.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

37.     The Company's website stated the following about Defendant Doberstein:[2]

Dr. Doberstein has over 25 years of experience in biotechnology research and development. Since joining Nektar in January 2010, he has spearheaded the discovery team at Nektar, which led to the identification and growth of the company's proprietary pipeline of drug candidates. This included development of NKTR-181 (a first-in-class opioid analgesic with strategic brain entry kinetics) and NKTR-214 (a CD122-biased agonist that is currently in multiple clinical studies across a wide range of tumor types). Dr. Doberstein also serves as a representative of Nektar for the National Institute of Health (NIH) Public/Private Initiative to Address the Opioid Crisis.

Prior to joining Nektar, Dr. Doberstein was Vice President of Research at XOMA where he was responsible for directing discovery and development of multiple drug candidates, including antibody discovery and support of clinical development through non-clinical safety, translational medicine and pharmacokinetics/pharmacodynamics. Previously, Dr. Doberstein served as Vice President, Research at Five Prime Therapeutics, a protein and antibody discovery and development company where he built and led the discovery research and process development group. While at Five Prime, he created several successful drug candidate programs that resulted in multiple strategic alliances with pharmaceutical partners, and moved a number of product candidates from concept to clinical stage in diabetes, oncology, rheumatoid arthritis and osteoarthritis. Prior to that, Dr. Doberstein was the Vice President of Research at Xencor and also held senior leadership positions at Exelixis.

Dr. Doberstein received his Ph.D. in Biochemistry, Cell and Molecular Biology from the Johns Hopkins University School of Medicine and completed his postdoctoral work at UC Berkeley. Earlier in his career, Dr. Doberstein held a variety of engineering roles at DuPont after receiving his B.S.Ch.E. degree in Chemical Engineering from the University of Delaware.

**Defendant Zalevsky**

38.     Defendant Jonathan Zalevsky ("Zalevsky") has served as Nektar's Chief Research & Development Officer since October 1, 2019 when he was promoted by the Company. Prior to his current position, Defendant Zalevsky served as Chief Scientific Officer since December 2017. In connection with his promotion, Defendant Zalevsky's annual base salary increased from $559,333 to $650,000.

---

[2] https://www.nektar.com/company/our-leadership. Last visited September 26, 2019.

39.     The Company's website states the following about Defendant Zalevsky:[3]

Jonathan Zalevsky was appointed Chief Research & Development Officer in October 2019 to lead all aspects of the R&D organization within Nektar, including research, clinical development, regulatory affairs and biologics process development. Dr. Zalevsky joined the Company in 2015 and has served as our Chief Scientific Officer since 2017. During his tenure at Nektar, Dr. Zalevsky's expertise in immunology, as well as his experience across biological modalities and therapeutic areas, have helped fuel the growth of the company's immuno-oncology and immunology pipeline. Dr. Zalevsky led the early development for NKTR-214 (bempegaldeskleukin, a CD122 preferential IL-2 pathway agonist being developed for the treatment of multiple cancers with partner Bristol-Myers Squibb) and NKTR-358 (a T regulatory cell stimulatory agent being developed for auto-immune diseases with partner Eli Lilly & Co.).

Prior to joining Nektar, Dr. Zalevsky was Global Vice President and Head of the Inflammation Drug Discovery Unit at Takeda Pharmaceuticals. As the leading immunologist for Takeda, he was responsible for an immunology pipeline that spanned from early target discovery to late-stage development and launched products. Prior to working at Takeda, Dr. Zalevsky held a number of research and development positions at Xencor, where he was responsible for the discovery and development of Xencor's first four clinical-stage assets.

Dr. Zalevsky received his Ph.D. in Biochemistry from the Tetrad Program at the University of California, San Francisco. He received dual bachelor degrees in Biochemistry and Molecular, Cellular and Developmental Biology from the University of Colorado at Boulder.

**Defendant Ajer**

40.     Defendant Jeff Ajer ("Ajer") served as a Company director since September 2017. He also serves as a member of the Audit Committee and the Organization and Compensation Committee. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Ajer beneficially owned 82,041 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $20.11, Defendant Ajer owned over $1.6 million worth of Nektar stock.

---

[3] https://www.nektar.com/company/our-leadership. Last visited March 1, 2021.

41.     For the fiscal year ended December 31, 2018, Defendant Ajer received $709,051 in compensation from the Company. This included $92,250 in fees earned or cash paid, $289,322 in stock awards, and $327,479 in option awards. For the fiscal year ended December 31, 2017, Defendant Ajer received $1,144,658 in compensation from the Company. This included $37,750 in fees earned or cash paid, $489,373 in stock awards, and $617,535 in option awards.

42.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ajer made the following sale of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 9/20/2018 | 6,750 | $56.76 | $383,130.00 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

43.     The Company's 2020 Proxy Statement stated the following about Defendant Ajer:

*Jeff Ajer*, age 57, was appointed to the board of directors of in September 2017. Mr. Ajer currently serves as Executive Vice President and Chief Commercial Officer at BioMarin Pharmaceutical Inc. ("BioMarin"), a global biotechnology company that develops and commercializes innovative therapies for people with serious and life-threatening rare disorders. From October 2012 to January 2014, Mr. Ajer served as Senior Vice President and Chief Commercial Officer of BioMarin. From April 2009 to October 2012, Mr. Ajer served as BioMarin's Vice President, Commercial Operations, The Americas, where he had responsibility for commercial operations throughout the Americas and led product marketing, reimbursement, and sales operations for BioMarin. Prior to joining BioMarin, Mr. Ajer served in various roles at Genzyme Corporation ("Genzyme") beginning in November 2003, most recently as Vice President, Global Transplant Operations from December 2004 to August 2005. Mr. Ajer's experience prior to Genzyme includes roles in sales, marketing and operations at SangStat Medical Corporation and ICN Pharmaceuticals. Mr. Ajer also served on the board of directors of True North Therapeutics. Mr. Ajer received both a B.S. in chemistry and an M.B.A. from the University of California, Irvine.

**Defendant Chess**

44.      Defendant Robert B. Chess ("Chess") has served as a Company director since May 1992. He also serves as Chairman of the Board. Defendant Chess additionally served the Company in a variety of positions over the years. He served as acting President and CEO from March 2006 to January 2007, and as Executive Chairman from April 1999 to January 2007. Defendant Chess also served as Co-CEO from August 1998 to April 2000, as President from December 1991 to August 1998, and as CEO from May 1992 to August 1998. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Chess beneficially owned 444,639 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $20.11, Defendant Chess owned over $8.9 million worth of Nektar stock.

45.      For the fiscal year ended December 31, 2018, Defendant Chess received $741,551 in compensation from the Company. This included $124,750 in fees earned or cash paid, $289,322 in stock awards, and $327,479 in option awards. For the fiscal year ended December 31, 2017, Defendant Chess received $556,763 in compensation from the Company. This included $114,000 in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

46.      During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chess made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/6/2018 | 25,000 | $92.14 | $2,303,500.00 |
| 5/3/2018 | 25,000 | $82.80 | $2,070,000.00 |
| 9/19/2018 | 4,500 | $56.81 | $255,645.00 |

Thus, in total, before the fraud was exposed, he sold 54,500 Company shares on inside information, for which he received over $4.6 million. His insider sales made with knowledge of material non-

public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

47.    The Company's 2020 Proxy Statement stated the following about Defendant Chess:

*Robert B. Chess*, age 63, is the Chairman of our board of directors and has served as a director since May 1992. From March 2006 until January 2007, Mr. Chess served as our Acting President and Chief Executive Officer, and from April 1999 to January 2007, served as Executive Chairman. He also served as our Co-Chief Executive Officer from August 1998 to April 2000, as President from December 1991 to August 1998, and as Chief Executive Officer from May 1992 to August 1998. Mr. Chess was previously the co-founder and President of Penederm, Inc., a publicly-traded dermatological pharmaceutical company that was sold to Mylan Laboratories. He has held management positions at Intel Corporation and Metaphor Computer Systems (now part of IBM), and was a member of the first President Bush's White House staff as a White House Fellow and Associate Director of the White House Office of Economic and Domestic Policy. From 1997 until his retirement in 2009, Mr. Chess served on the board of directors of the Biotechnology Industry Organization ("BIO"). Mr. Chess served as Chairman of BIO's Emerging Companies Section and Co-Chairman of BIO's Intellectual Property Committee. Mr. Chess was the initial Chairman of Bio Ventures for Global Health and continues to serve on its board. He also serves on the Board of Trustees of the California Institute of Technology where he chairs the Technology Transfer Committee. Mr. Chess is the co-founder and a member of the board of directors of Biota Technology, a private company developing applications of DNA-sequencing for the energy industry, and also serves on the board of directors and is a lead director of Twist Biosciences, a publicly-traded company in the synthetic DNA production field. He is currently a member of the faculty of the Stanford Graduate School of Business, where he teaches courses in the MBA program on starting technology-based businesses and the healthcare industry. Mr. Chess received his B.S. degree in Engineering with honors from the California Institute of Technology and an M.B.A. from Harvard University.

**Defendant Greer**

48.    Defendant R. Scott Greer ("Greer") has served as a Company director since February 2010. He also serves as Chair of the Audit Committee and as a member of the Organization and Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Greer beneficially owned 444,639 shares of the Company's common stock. Given that the price per share

of the Company's common stock at the close of trading on April 20, 2020 was $20.11, Defendant

Greer owned over $8.9 million worth of Nektar stock.

49.     For the fiscal year ended December 31, 2018, Defendant Greer received $732,551

in compensation from the Company. This included $115,750 in fees earned or cash paid, $289,322

in stock awards, and $327,479 in option awards. For the fiscal year ended December 31, 2017,

Defendant Greer received $542,463 in compensation from the Company. This included $99,700

in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

50.     During the period of time when the Company materially misstated information to

the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant

Greer made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/6/2018 | 30,000 | $92.22 | $2,766,600.00 |
| 6/4/2018 | 1,400 | $61.99 | $86,786.00 |
| 6/6/2018 | 8,600 | $60.00 | $516,000.00 |
| 9/4/2018 | 10,000 | $67.39 | $673,900.00 |

Thus, in total, before the fraud was exposed, he sold 50,000 Company shares on inside information,

for which he received over $4 million. His insider sales made with knowledge of material non-

public information before the material misstatements and omissions were exposed demonstrate his

motive in facilitating and participating in the scheme.

51.     The Company's 2020 Proxy Statement stated the following about Defendant Greer:

*R. Scott Greer, age 61,* has served as our director since February 2010. Mr. Greer
currently serves as Managing Director of Numenor Ventures, LLC, a venture
capital firm. In 1996, Mr. Greer co-founded Abgenix, Inc., a company that
specialized in the discovery, development and manufacture of human therapeutic
antibodies, and from June 1996 through May 2002, he served as its Chief Executive
Officer. He also served as a director of Abgenix from 1996 and Chairman of the
board of directors from 2000 until the acquisition of Abgenix by Amgen, Inc. in
April 2006. Prior to Abgenix's formation, Mr. Greer held senior management
positions at Cell Genesys, Inc., a biotechnology company, initially as Chief
Financial Officer and Vice President of Corporate Development and later as Senior

Vice President of Corporate Development, and various positions at Genetics Institute, Inc., a biotechnology research and development company. He currently serves as a member of the board of directors of Inogen, Inc., a medical device company that develops and markets oxygen therapy products. Mr. Greer served as a member of the board of directors of Sientra, Inc., a medical aesthetics company from 2014-2018, Versartis, Inc., an endocrine focused biopharmaceutical company from 2014-2018, Auspex Pharmaceuticals, a biopharmaceutical company developing drugs for patients with movement disorders and other rare diseases from 2014-2015, Sirna Therapeutics, Inc., a biotechnology company, from 2003, and as its Chairman of the board of directors from 2005, through the closing of the acquisition of Sirna by Merck & Co., Inc. in December 2006. From 2001 to 2005, Mr. Greer served as a member of the board of directors of Illumina, Inc., a provider of integrated systems for the analysis of genetic variation and biological function; and from 2001 to 2004, he served as member of the board of directors of CV Therapeutics, Inc., a biotechnology company. Mr. Greer also served as a member of the board of directors of StemCells, Inc., a biopharmaceutical company focused on stem cell therapeutics from 2010 to 2016 and additionally from 2010-2016 was Chairman of the board of Ablexis, an antibody technology company. Mr. Greer received a B.A. in Economics from Whitman College and an M.B.A. degree from Harvard University. He also was a certified public accountant.

**Defendant Kuebler**

52.     Defendant Christopher A. Kuebler ("Kuebler") served as a Company director from December 2001 until his retirement in December 2018. He also served as a member of the Organization and Compensation Committee and the Nominating and Corporate Governance Committee.

53.     For the fiscal year ended December 31, 2018, Defendant Kuebler received $708,179 in compensation from the Company. This included $83,500 in fees earned or cash paid, $289,322 in stock awards, $327,479 in option awards, and $7,878 in other compensation. For the fiscal year ended December 31, 2017, Defendant Kuebler received $515,263 in compensation from the Company. This included $72,500 in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

54.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kuebler made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 1/2/2018 | 30,000 | $58.66 | $1,759,800.00 |
| 3/6/2018 | 2,600 | $100.30 | $260,780.00 |
| 3/7/2018 | 37,400 | $97.41 | $3,643,134.00 |

Thus, in total, before the fraud was exposed, he sold 70,000 Company shares on inside information, for which he received approximately $5.7 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

55.     The Company's Schedule 14A filed with the SEC on April 30, 2018 (the "2018 Proxy Statement") stated the following about Defendant Kuebler:

> *Christopher A. Kuebler*, age 64, has served as our director since December 2001. Mr. Kuebler also currently serves on the board of directors of Waters Corporation, an analytical technologies products and services company where he serves as a member of both the audit committee and compensation committee. From January 1997 to December 2005, Mr. Kuebler served as Chairman of the Board of Covance Inc., a drug development services company, and from November 1994 to December 2004, served as its Chief Executive Officer. From March 1993 through November 1994, he was the Corporate Vice President, European Operations for Abbott Laboratories, a diversified health care company. From January 1986 until March 1993, Mr. Kuebler served in various commercial positions for Abbott Laboratories' Pharmaceutical Division and was that Division's Vice President, Sales and Marketing prior to taking the position of Corporate Vice President, European Operations. Before that, he held positions at Squibb Inc. and Monsanto Health Care. Mr. Kuebler holds a B.S. in Biological Science from Florida State University.

**Defendant Lingnau**

56.     Defendant Lutz Lingnau ("Lingnau") served as a Company director from August 2007 until September 2020. He also served as Chair of the Organization and Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According

19

to the 2020 Proxy Statement, as of April 20, 2020, Defendant Lingnau beneficially owned 178,366 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $20.11, Defendant Lingnau owned approximately $3.6 million worth of Nektar stock.

57.   For the fiscal year ended December 31, 2018, Defendant Lingnau received $715,301 in compensation from the Company. This included $98,500 in fees earned or cash paid, $289,322 in stock awards, and $327,479 in option awards. For the fiscal year ended December 31, 2017, Defendant Lingnau received $525,263 in compensation from the Company. This included $82,500 in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

58.   During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Lingnau made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| 4/5/2018 | 30,000 | $101.74 | $3,052,200.00 |
| 9/20/2018 | 9,000 | $56.98 | $512,820.00 |

Thus, in total, before the fraud was exposed, he sold 39,000 Company shares on inside information, for which he received approximately $3.6 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

59.   The Company's 2020 Proxy Statement stated the following about Defendant Lingnau:

> *Lutz Lingnau*, age 77, has served as our director since August 2007. Mr. Lingnau retired from Schering AG Group, Germany, in December 2005 as a member of Schering AG's Executive Board and as Vice Chairman, President and Chief Executive Officer of Schering Berlin, Inc., a United States subsidiary. Prior to his retirement, Mr. Lingnau was responsible for Schering AG's worldwide specialized therapeutics and dermatology businesses. He joined Schering AG's business trainee

program in 1966. Throughout his career at Schering AG, he served in various capacities and in a number of subsidiaries in South America and the United States, including his roles as President of Berlex Laboratories, Inc., from 1983 to 1985, as the Head of Worldwide Sales and Marketing in the Pharmaceutical Division of Schering AG, from 1985 to 1989, and as Chairman of Berlex Laboratories, Inc. from 1985 to 2005. Mr. Lingnau was a member of the Supervisory Board of LANXESS AG, a specialty chemicals company listed on the Frankfurt Stock Exchange from 2005 to May 2010. From December 2006 through September 2009, he served as Chairman of the board of directors of Micropharma Limited, a private biotechnology company, and was a member of the board of directors of Sirna Therapeutics, Inc., a biotechnology company, from February 2006 through the closing of the acquisition of Sirna by Merck & Co., Inc. in December 2006.

### Defendant Whitfield

60.     Defendant Roy A. Whitfield ("Whitfield") has served as a Company director since August 2000. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of April 20, 2020, Defendant Whitfield beneficially owned 399,916 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 20, 2020 was $20.11, Defendant Whitfield owned approximately $8 million worth of Nektar stock.

61.     For the fiscal year ended December 31, 2018, Defendant Whitfield received $708,301 in compensation from the Company. This included $91,500 in fees earned or cash paid, $289,322 in stock awards, and $327,479 in option awards. For the fiscal year ended December 31, 2017, Defendant Whitfield received $525,513 in compensation from the Company. This included $82,750 in fees earned or cash paid, $195,749 in stock awards, and $247,014 in option awards.

62.     The Company's 2020 Proxy Statement stated the following about Defendant Whitfield:

*Roy A. Whitfield*, age 66, has served as our director since August 2000 and as Lead Independent Director since January 2019. Mr. Whitfield is the former Chairman of the Board and Chief Executive Officer of Incyte Corporation ("Incyte"), a drug discovery and development company he co-founded in 1991. From January 1993 to November 2001, Mr. Whitfield served as its Chief Executive Officer and from November 2001 until June 2003 as its Chairman. He also served as a director of

Incyte from 1991 to January 2014. From 1984 to 1989, Mr. Whitfield held senior operating and business development positions with Technicon Instruments Corporation ("Technicon"), a medical instrumentation company, and its predecessor company, Cooper Biomedical, Inc., a biotechnology and medical diagnostics company. Prior to his work at Technicon, Mr. Whitfield spent seven years with the Boston Consulting Group's international consulting practice. He currently serves as a director of Station X, Inc. a private company. Mr. Whitfield previously served as the Executive Chairman of the board of directors of Bioseek and as member of the board of directors of Illumina, Inc. Mr. Whitfield received a B.S. in mathematics from Oxford University and an M.B.A. from Stanford University.

**Defendant Winger**

63.    Defendant Dennis L. Winger ("Winger") served as a Company director from December 2009 until his resignation in September 2018. He also served as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

64.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Winger made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|-----------------|-------|----------|
| 8/13/2018 | 17,125 | $61.04 | $1,045,310.00 |
| 8/14/2018 | 17,125 | $60.15 | $1,030,068.75 |
| 8/17/2018 | 15,000 | $59.62 | $894,300.00 |
| 8/21/2018 | 15,000 | $60.30 | $904,500.00 |

Thus, in total, before the fraud was exposed, he sold 64,250 Company shares on inside information, for which he received approximately $3.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

65.    The 2018 Proxy Statement stated the following about Defendant Winger:

*Dennis L. Winger*, age 70, has served as our director since December 2009. Mr. Winger was Senior Vice President and Chief Financial Officer of Applera Corporation, a life sciences company, from 1997 through December 2008. From 1989 to 1997, Mr. Winger served as Senior Vice President, Finance and

Administration, and Chief Financial Officer of Chiron Corporation. From 1982 to 1989, Mr. Winger served various positions, including as the Chief Financial Officer of The Cooper Companies, Inc., Mr. Winger currently serves on the board of directors of Accuray Incorporated (NASDAQ: ARAY), a radiosurgery company. Mr. Winger recently served on the board of directors of each of Vertex Pharmaceuticals Incorporated, a pharmaceutical company, until May 2012, Cephalon, Inc. a pharmaceutical company, until its merger with Teva Pharmaceuticals Industry Limited in October 2011 and Cell Genesys, Inc. until its merger with BioSante Pharmaceuticals in October 2009. Mr. Winger received a B.A. from Siena College and an M.B.A. from the Columbia University Graduate School of Business.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

66.    By reason of their positions as officers, directors, and/or fiduciaries of Nektar and because of their ability to control the business and corporate affairs of Nektar, the Individual Defendants owed Nektar and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Nektar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Nektar and its shareholders so as to benefit all shareholders equally.

67.    Each director and officer of the Company owes to Nektar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Nektar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

69.    To discharge their duties, the officers and directors of Nektar were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Nektar, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Nektar's Board at all relevant times.

71.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ-GS, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72.     To discharge their duties, the officers and directors of Nektar were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of Nektar were required to, among other things:

       (a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Nektar's own Code of Business Conduct and Ethics (the "Code of Conduct");

       (b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

       (c)     remain informed as to how Nektar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

       (d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Nektar and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       (e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Nektar's operations would comply with all applicable laws and Nektar's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

       (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73.     Each of the Individual Defendants further owed to Nektar and the shareholders the duty of loyalty requiring that each favor Nektar's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

74.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Nektar and were at all times acting within the course and scope of such agency.

75.     Because of their advisory, executive, managerial, and directorial positions with Nektar, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Nektar.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

78.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

79.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, Defendants Robin, Ajer, Chess, Greer, Lingnau, and Whitfield, all directors of Nektar during the Relevant Period, were each a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

80.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Nektar and was at all times acting within the course and scope of such agency.

## NEKTAR'S CODE OF CONDUCT

82.     The Company's Code of Conduct states that Nektar is "committed to maintaining the highest standards of business conduct and ethics" and that "[t]he integrity and reputation of Nektar depends on the honesty, fairness and integrity brought to the job by each person associated with us."

83.     The Company's Code of Conduct states that it:

…reflects the business practices and principles of behavior that support the commitment to these high standards. This Code applies to all Nektar employees, officers and directors. Therefore, every employee, officer and director is expected to read and understand the Code and its application to the performance of his or her business responsibilities. Actions by members of your immediate family, significant other(s) or persons who live in your household may also potentially result in ethical issues to the extent they involve Nektar or its business.

84.     The Company's Code of Conduct further states that "employees, officers and directors are expected to be aware of, understand and comply with Nektar's various other policies and procedures that relate to their conduct."

85.     The Code of Conduct provides that the Company and its employees, officers, and directors are aware and comply with the law in all countries in which Nektar operates, stating in relevant part:

We strive to comply not only with the letter but also with the spirit of the law. Our success depends upon everyone operating within legal guidelines and cooperating with local, national and international authorities. It is therefore essential that you understand the legal and regulatory requirements applicable to your business unit and area of responsibility. If you have a question in the area of legal compliance, you should seek answers from your supervisor or the Corporate Ethics Officer.

86.     The Code of Conduct states that the Company "avoid[s] activities involving personal interests that create, or have the appearance of creating, a conflict with the interests of Nektar."

87.     The Code of Conduct provides that documents, records, and reports to the government and other agencies are "accurate, complete and understandable." Expanding on its disclosure policy, the Code of Conduct specifically states, in relevant part:

> The integrity of our records and public disclosure depends on the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. All records and reports should be made in a timely manner, and, when applicable, should be properly authorized and maintained. Financial and other activities are to be recorded in compliance with all applicable laws and accounting practices.
>
> Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the reports we file with the Securities and Exchange Commission ("SEC"). These reports must provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. In connection with these obligations:
>
>> • no one may knowingly take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;
>>
>> • everyone must cooperate fully with our Finance Department and Legal Department, as well as our independent public accountants and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and
>>
>> • no one should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

88.     The Code of Conduct provides reporting guidelines for suspected misconduct and outlines the Company's program of "Code awareness, training, and review" which the Code of

Conduct states is overseen by the Corporate Ethics Officer. The Code of Conduct states, in relevant part:

> If you are aware of a suspected or actual violation of the Code by others or a violation or possible violation of federal or state law or regulation, including violations relating to accounting, internal accounting controls or auditing matters ("Compliance Concerns"), you have a responsibility to report it. You are expected to promptly provide your supervisor or one of the Corporate Ethics Officers with a specific description of the violation that you believe has occurred, including any information you have about the persons involved and the time of the violation.

89.    The Individual Defendants violated the Code of Conduct by engaging in or permitting the schemes to engage in the PIVOT Manipulation Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

90.    Nektar is a biopharmaceutical company that specializes in researching, discovering, and developing innovative medications in areas with unaddressed significant medical need. The Company develops a number of investigational medications designed to treat cancer, autoimmune disease, and chronic pain.

91.    Nektar hold itself out to be a leader in the field of polymer conjugation, known as pegylation. As described in more detail below, pegylation occurs through conjugating certain molecules with a non-immunogenic polymer called polyethylene glycol. The goal of pegylation is to enhance the pharmacokinetic behavior of a drug, or the way the drug is processed by the body. The Company aims to develop and design new drug candidates which then utilize Nektar's advanced pegylation platforms designed to engage activity at a molecular level. For example, the

Company's I-O area focuses on developing drugs that can "stimulate and sustain the body's immune response in order to fight cancer . . . . [by] directly or indirectly modulat[ing] the activity of key immune cells such as cytotoxic T cells and natural killer (NK) cells, to increase their numbers and improve their function to recognize and attack cancer cells."

92.     One such investigational medicine developed by the Company is NKTR-214, also known as bempegaldesleukin or bempeg. NKTR-214 is an immunotherapy, i.e., a treatment aimed at enabling the body's immune system to fight infections and diseases, designed specifically to supplement the body's natural ability to fight cancer. Specifically, the immune system has the natural capacity to produce cancer-killing cells such as "tumor-infiltrating lymphocytes" ("TILs"). TILs then produce certain proteins which function as receptors that then may signal the body to increase the production of cancer-killing cells. The signal is sent through IL-2, a cytokine molecule which naturally occurs in the body. Cytokines are proteins involved in cell signaling. NKTR-214 purportedly functions to stimulate the immune system's response to cancer and increase the production of certain cancer-killing cells, ultimately facilitating the body's capacity to attack and reduce tumor size. This is supposedly done through pegylating IL-2 in order to address some of the cytokine's weaknesses such as its short half-life and certain undesirable side effects which may result from using IL-2 on its own as a cancer therapy.

93.     According to the Company's annual report filed on March 1, 2019 with the SEC on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"), the Company is "highly dependent" on the success of NKTR-214, stating in relevant part: "[w]e are highly dependent on the success of NKTR-214, our lead I-O candidate. We are executing a broad development program for NKTR-214 and clinical and regulatory outcomes for NKTR-214, if not successful, will significantly harm our business." The 2018 10-K further outlined the vital

importance of the Company's success in its clinical trials on its market valuation and overall performance, stating in relevant part that:

> To date, reported clinical outcomes from NKTR-214 have had a significant impact on our market valuation, financial position, and business prospects and we expect this to continue in future periods. If one or more clinical studies of NKTR-214 are delayed or not successful, it would materially harm our market valuation, prospects, financial condition and results of operations. For example, under the BMS Collaboration Agreement, we are entitled to up to $1.43 billion in development milestones that are based upon clinical and regulatory successes from the NKTR-214 development program. One or more failures in NKTR-214 studies could jeopardize such milestone payments, and any product sales or royalty revenue or commercial milestones that we would otherwise be entitled to receive could be reduced, delayed or eliminated.

94.     The Company classifies NKTR-214 as an immunostimulatory cytokine drug. NKTR-214 is designed to preferentially activate IL-2 receptors to proliferate tumor-killing cells in the body without stimulating certain regulatory cells, thereby increasing IL-2's efficiency and NKTR-214's safety and efficacy as a cancer therapy. Nektar has conducted several clinical trials of NKTR-214 as a monotherapy (on its own) as well as in combination with other drugs, such as BMS's Opdivo® (nivolumab), a human monoclonal antibody cancer medication.

95.     Nektar began Phase 1 of its EXCEL clinical trial of NKTR-214 in December 2015 and announced the dosing of the first set of human patients with advanced solid tumors. The study was initiated to evaluate the usage, efficacy, and safety of NKTR-214 as a monotherapy in a variety of tumor types. Throughout 2017 and 2018, the Individual Defendants repeatedly touted that NKTR-214 supposedly increased cancer-fighting cells by an average of 30-fold in the tumors of purportedly ten patients dosed with NKTR-214 every 3 weeks. The Individual Defendants presented the impressive results at several healthcare conferences during the Relevant Period. Notably, these claims were not accompanied by context or supportive data.

96.     As noted above, the performance of NKTR-214 was and remains a significant aspect of the Company's success and valuation and as such, the Company's clinical trials,

including PIVOT-02 were and remain of vital importance to Nektar. Consequently, each of the Individual Defendants had motive to participate in the fraud, directly or indirectly, in order to reap the benefits secured by insider sales, lavish compensation packages, and incentive plans further discussed below.

### The Body's Immune System and Response to Antigens

97.     The immune system is a network of biological processes that protects a body from unwanted organisms and diseases by detecting and responding to a variety of pathogens, including but not limited to viruses, parasitic worms, and cancer cells. According to MedlinePlus, a service of the National Library of Medicine, the immune system:

> [P]rotects the body from possibly harmful substances by recognizing and responding to antigens. Antigens are substances (usually proteins) on the surface of cells, viruses, fungi, or bacteria. Nonliving substances such as toxins, chemicals, drugs, and foreign particles (such as a splinter) can also be antigens. The immune system recognizes and destroys, or tries to destroy, substances that contain antigens.

98.     The human body's immune system's response to potentially harmful antigens includes attacking them with antibodies (i.e., protective proteins), intended to fight off and destroy antigens. This response might also include producing and dispelling leukocytes or white blood cells that can identify antigens and destroy the cell, bacteria, parasite, or virus carrying the antigen.

99.     White blood cells are a specialized type of immune system cell that aids in the body's fight to remain healthy. White blood cells originate as hematopoietic stem cells that are created in bone marrow. By way of a cellular differentiation process, stem cells mature and develop into various "daughter" cells including common lymphoid progenitor cells and myeloid stem cells. Then, these cells can continue to differentiate into additional subsets of immune system cells. The image below depicts this differentiation process:[4]

---

[4] David D. Chaplin, M.D., PhD, *Overview of the Immune Response*, J. Allergy Clin Immunol., 125 (Feb. 2010).



100.    One type of cell that springs from common lymphoid progenitor cells are the T lymphocytes, often referred to as "T cells." T cells can also form further subsets of cells after undergoing additional differentiation to form even more specialized T cells. Generally, the product of this differentiation process yields either killer T cells or helper T cells.

101.    Certain proteins and sugars act as markers of cells since they are typically and uniquely found on the surface of only certain cells and not others. Certain of these protein and sugar markers on T cells are referred to as "differentiation antigens."

102.    Human Cell Differentiation Molecules, an international council, names and characterizes newly identified cell surface molecules. These are defined, registered, and assigned cluster of differentiation (CD) numbers. For example, the killer T cells referenced above are

referred to as CD8+ T cells (cytotoxic T cells); this expresses the Cluster of Differentiation antigen "8" (i.e., CD8) glycoprotein on their surface. Among other things, the CD8+ T cells kill infected or malignant cells. "Resting naive CD8+ T cells have an astounding capacity to react to pathogens by massive expansion and differentiation into cytotoxic effector cells that migrate to all corners of the body to clear the infection."[5] Additionally, the helper T cells referenced above are referred to as CD4+ T cells, indicating that CD4 glycoprotein is on their surface. Even still, these cells can further differentiate into subsets, including "regulatory" T cells, also known as Treg cells, or Tregs. Tregs help to regulate or suppress other cells, including but not limited to the triggering and spread of CD8+ T cells in the immune system. Tregs also suppress CD4+ T cells, B cells, and NK cells. According to the Company, CD4+ regulatory T cells can "suppress tumor-killing T cells."[6]

103.    Although there are times when advancing the production of Tregs and, in turn, suppressing the body's immune response is a desired outcome, when dealing with cancer, i.e., "diseases in which abnormal cells divide without control and can invade nearby tissues,"[7] it is not.

104.    A key feature of the immune system is its capacity to differentiate cells created by the host and cells that originated outside of the host. Thus, a proper immune response will act to guard the host without damaging the host while attacking non-host cells.

105.    Although cancer cells are derived from the human host, the immune system can detect cancer cells as non-host cells because of their altered structures. However, cancer cells rely on their ability to avoid immune system detection to survive.[8] Thus, cancer cells work to build a

---

[5] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3303224/. Last visited March 2, 2021.

[6] https://www.nektar.com/pipeline/rd-pipeline/nktr-214. Last visited March 2, 2021.

[7] https://www.cancer.gov/publications/dictionaries/cancer-terms/def/cancer. Last visited March 2, 2021.

[8] Maonan Wang, et al., *Role of tumor microenvironment in turmorigenesis*, 8 J. of Cancer (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5381164/pdf/jcav08p0761.pdf.    Last    visited March 4, 2021.

"tumor microenvironment,"—a sort of disguise that allows cancerous cells to live, reproduce, and spread, around a tumor—which is immunosuppressive, i.e., it, at least partially, suppresses the body's immune response.

106.   To combat this, treatments known as immunotherapy endeavor to eliminate the tumor microenvironment to enable a patient's immune system to properly recognize, attack, and destroy cancerous cells. Some immunotherapy tactics include the use of monoclonal antibodies, vaccines, and cytokines.

107.   As discussed herein, cells release cytokines, or proteins, that affect nearby cells. T cells depend on IL-2 (a type of cytokine) for their survival, which promotes T cell proliferation. However, IL-2 is also critical for the growth of Treg cells, which suppress cytokine production of CD4+ T cells and CD8+ T cells. Therefore, IL-2 contributes to both the triggering and suppression the body's immune system.

108.   DNA molecules formed by laboratory methods, known as recombinant DNA, permits industrial scale production of recombinant human ("rh") substances, such as cytokine proteins. In 1992, recombinant human Interleukin-2, or rhIL-2, known as aldesleukin, became the first cancer immunotherapy to obtain regulatory approval by the United States Food and Drug Administration ("FDA") for the treatment of malignant melanoma. Thereafter, the FDA approved it for use in patients with renal cell carcinoma, too.

109.   IL-2 therapy "has been used with success in curing metastatic renal cell carcinoma and melanoma in a small minority of patients. However, the benefits can be accompanied by severe toxicity"[9] which can cause hypotension and vascular leak syndrome. Hypotension is abnormally

---

[9] Laura A. Pachella, et al., *The Toxicity and Benefit of Various Dosing Strategies for Interleukin-2 in Metastatic Melanoma and Renal Cell Carcinoma*, 6 J. Adv. Pract. Oncol (May/Jun. 2015).

low blood pressure. Vascular or capillary leak syndrome is a "life-threatening toxicity resembling septic shock that may occur with intravenous high-dose IL-2. The increased IL-2 in the circulation and immune stimulation [might produce] massive cytokine release and inflammatory reaction. Capillaries become more permeable, leading to the loss of intravascular fluid into extravascular space."[10]

110.    As a kind of extracellular signaling molecule, i.e., a cue designed to transmit specific information to target cells, cytokines can have an effect on cells nearby when they are recognized by specific proteins on the surface of target cells called receptors. Upon recognition, cytokines initiate intracellular signaling cascades that elicit specific cellular responses.

111.    Certain cell surface proteins named IL-2 receptors (IL-2R) can recognize IL-2. Particularly, IL-2 "binds" to three classes of cell surface receptors which are formed by various combinations of three subunits of IL-2R. The three IL-2R subunits (each identified by its cluster of differentiation antigens) are: (1) the IL-2 receptor alpha (α) subunit (CD25); (2) beta (β) subunit (CD122); and (3) gamma (γ) subunit (CD132).

112.    IL-2 binds to or interacts with those receptors at varying levels of strength. The binding affinity, i.e., the strength of the interaction between the two molecules, is "high" when all three IL-2 receptor subunits (IL-2Rαβγ) are present. When just beta and gamma subunits (IL-2Rβγ) are present, the binding affinity is "intermediate." A "low" binding affinity exists when just a single IL-2 receptor subunit is present.

113.    "At high doses, IL2 binds to … IL2Rβγ [the beta-gamma] receptor leading to desired expansion of tumor killing CD8+ memory effector T (CD8 T) cells."[11] However, there is

---

[10] *Id.*

[11] Deborah H. Charych, et al. *NKTR-214, an Engineered Cytokine With Biased IL2 Receptor Binding, Increased Tumor Exposure, and Marked Efficacy in Mouse Tumor Models*, 22 Clinical

a greater affinity when IL-2 binds to receptor IL2Rαβγ. Also, high doses of IL-2 expand immunosuppressive Treg cells (an undesirable effect of rhIL-2 for cancer immunotherapy).

### NKTR-214

114.    As discussed above, NKTR-214 was designed as an "engineered" cytokine. Nektar describes NKTR-214 as "a novel CD122-biased cytokine designed to preferentially activate the beta and gamma sub-units of the IL-2 receptor in order to proliferate tumor-killing T cells within the body (CD8-positive effector T cells and natural killer T cells) without stimulating regulatory T cells (CD4-positive T cells)."[12]

115.    The "bias" towards CD122 (the beta (β) IL-2 receptor subunit) occurs through pegylation—the process by which molecules like IL-2 are altered by chemically linking them to chains of Polyethylene glycol molecules. pegylation has developed into a top drug delivery method for proteins, partly since pegylated molecules typically exhibit protracted circulatory periods, i.e., the body takes more time to clear a pegylated molecule, thus prolonging the biologic "half-life" (the time required for a quantity to reduce to half of initial value) of the pegylated molecule.

116.    According to an article published in February 2016 in Clinical Cancer Research that was co-authored by over 20 Company employees, the premise behind NKTR-214 is:

> We hypothesized IL2 conjugation with polyethylene glycol (PEG) could be used to mask the region of IL2 that interacts with the IL2Rα subunit responsible for activating immunosuppressive Tregs, biasing activity towards tumor killing CD8+ T cells. PEGylation could alter the immunostimulatory profile of aldesleukin without mutation of its amino acid sequence while creating an inactive prodrug, mitigating rapid systemic immune activation, and improving tolerability.[13]

---

Cancer Research 680 (Feb. 1, 2016).

[12]   https://ir.nektar.com/news-releases/news-release-details/nektar-announces-first-patient-dosed-phase-12-clinical-study. Last visited March 3, 2021.

[13] Deborah H. Charych, *NKTR-214, an Engineered Cytokine With Biased IL2 Receptor Binding, Increased Tumor Exposure, and Marked Efficacy in Mouse Tumor Models*.

117.    Additionally, a different article that was co-authored by Company employees states that "[t]he design uses the same amino acid sequence of FDA-approved aldesleukin with the addition of multiple releasable polyethylene glycol (PEG) chains located at the region of IL2 that binds to the IL2Rα subunit of the heterotrimeric IL2Rαβγ complex." "Free-IL2 protein is undetectable in vivo as it is eliminated faster than formed," but when NKTR-214 is administered, "the PEG chains slowly release, creating a cascade of increasingly active IL2 protein conjugates bound by fewer PEG chains. The 1-PEG-IL2 and 2-PEG-IL2 species derived from NKTR-214 are the most active conjugated-IL2 species."[14]

118.    Although the Individual Defendants portrayed NKTR-214 as a unique solution designed to increase cancer-fighting cells without affecting the production of immunosuppressive cells, they were forced to resort to falsehoods and misleading tactics to drum up investor enthusiasm and funding after, unbeknownst to the public, its clinical trials began to produce disappointing results.

**The Misleading "30-Fold" Claim**

119.    EXCEL, the Company's Phase 1 clinical trial of NKTR-214 commenced in December 2015 when the Company announced that it administered the first patient with the drug. A little over a year thereafter, the Individual Defendants began touting the data from the EXCEL trial. During a presentation at the annual JP Morgan HealthCare Conference on January 10, 2017, Defendant Robin discussed NKTR-214, stating:

> Let's start with NKTR-214. Now IL-2, as many of you know, is the master growth factor for T cells and natural killer cells ... And that stimulates the immune system,

---

[14] Deborah H. Charych, et al., *Modeling the receptor pharmacology, pharmacokinetics, and pharmacodynamics of NKTR-214, a kinetically-controlled interleukin-2 (IL2) receptor agonist for cancer immunotherapy* PLoS One (July 5, 2017). https://journals.plos.org/plosone/article/file?id=10.1371/journal.pone.0179431&type=printable. Last visited March 4, 2021.

and that's very, very important. But ... that causes the proliferation of CD4 regulatory T [immunosuppressive] cells. And consequently, you're starting to— you're trying to stimulate the immune system at the same time you're down-regulating the immune system. And that therapeutic window is very, very tight ... it's wildly toxic.

So what we've done with NKTR-214 is something unique. We've designed a new IL-2 molecule with a biased action to the beta gamma receptors [where] *you can produce significant quantities of CD8-positive T [cancer-fighting] cells without affecting the production or the proliferation of regulatory T [immunosuppressive] cells*.

(Emphasis added.)

120.    Moreover, Defendant Robin provided visual slides for the audience during his presentation, one of which illustrated that NK and CD8+ T cells, or cytotoxic T cells (cancer-fighting cells), purportedly multiplied by an average of 30 times within tumors of the 10 patients that were supposedly given NKTR-214 every three weeks. As the slide was shown to the audience, Defendant Robin explained the following:

So here's some data from the Phase I trial. Demonstrating — and these are 10 patients where we have tumor biopsies. *And you can clearly see that we had a significant increase in CD8-positive T-effector cells [cancer-fighting] with no increase in T-reg cells … So very, very pleased with these results*. The Phase I study was designed to show these biomarkers. And this is clearly what we set out to do, cause the proliferation of T-effector [cancer-fighting] cells and not cause the proliferation of regulatory T [immunosuppressive] cells.

(Emphasis added.)

121.    Notably, however, Defendant Robin failed to point out that this data was driven by only a single outlier patient while the tumors in the remaining patients that were dosed with NKTR-214 did not exhibit or come anywhere close to showing a 30-fold increase in cancer fighting cells, let alone pairing such a result together with no increase in the patients' immunosuppressive cell count. Specifically, none of the patients in the Phase 1 EXCEL clinical trial actually exhibited a 30-fold increase in cancer fighting cells. Instead, each patient, except for one outlier, had experienced only a modest or negligible increase in cancer-fighting cells.

40

122.    "Expert 1," as identified in the Securities Class Action, further explained why the "30-Fold" increase claim is brazenly false and misleading. Expert 1 earned a PhD in statistics and is the Director of Cancer Biostatistics at a major research university. Additionally, Expert 1 has more than 15 years of experience as a cancer biostatistician at two academic comprehensive cancer centers, has designed dozens of clinical trials, evaluated clinical protocols, and has published articles in leading cancer journals. According to Expert 1's analysis of the 30-fold increase claim, which included running three different scenarios, Expert 1 concluded that one of the patients was "clearly an outlier" who had a "profound effect on the analyses and interpretation of the EXCEL data" contained in the Company's presentation first given at the 2017 JP Morgan Conference on January 10, 2017.

123.    Based upon Expert 1's analysis of the line graph contained in the poster at the 2017 ASCO GU Conference, Expert 1 estimated that the cancer-fighting increase for the outlier patient was approximately 250-fold, an assumption which was accounted for in all three of Expert 1's tests. Specifically, in the first test that Expert 1 ran, 250 of the aggregate 300-fold increase (the supposed "30-fold" increase multiplied by ten patients) was assigned to the single outlier patient while the remaining 50-fold increase was apportioned equally to the remaining nine patients, giving each of them a 5.55-fold increase in cancer-fighting cells, not a 30-fold increase. In the second test that Expert 1 ran, 250 of the aggregate 300-fold increase was assigned to the single outlier patient while another patient was given a 30-fold increase and the remaining 20-fold was apportioned equally to the remaining eight patients giving each of them a 2.5-fold increase in cancer-fighting cells, not a 30-fold increase. In the third test that Expert 1 ran, 250 of the aggregate 300-fold increase was assigned to the single outlier patient while four of the remaining patients were assigned their actual data from the clinical trial (i.e., 2.6-fold 1.2-fold, 1.8-fold, 1.4-fold) and

41

the remaining 43-fold increase was apportioned equally to the remaining five patients giving each of them an 8.6-fold increase in cancer-fighting cells, not a 30-fold increase. For each of these tests performed by Expert 1, the Standard Error was approximately 24.5, which aligns with the Standard Error of 25 that was reported in the Company's poster at the European Society for Medical Oncology meeting in Madrid, Spain in September 2017. Importantly, a large Standard Error suggests more variation in the data and that the mean might not be representative of the dataset as a whole.

124.    Moreover, Expert 1 characterized the Company's use of the data from this outlier patient as "highly misleading" since (1) that outlier patient was dosed every two weeks, rather than every three weeks as was represented; and (2) even if that patient had been dosed every three weeks, the Individual Defendant's reliance on both incomplete and outlier driven data violated industry and scientific standards, particularly since such a large standard error existed in the dataset. Moreover, Expert 1 determined that the Individual Defendants failed to follow the following guidelines, designed to exclude potential bias in non-randomized clinical trials for treatment evaluation:[15]

> (a)    Flow of participants through each stage of the study: enrollment, assignment, allocation, and intervention exposure, follow-up, analysis;
>
> (b)    Allocation and intervention exposure: the number of participants assigned to each study condition and the number of participants who received each intervention;
>
> (c)    The number of participants included in or excluded from the main analysis, by study condition;
>
> (d)    Description of protocol deviations from study as planned, along with reasons;

_____

[15] Des Jarlais, D. C., *et al.*, *The TREND statement*. Am. J. of Pub. Health, 94, 61-366 (2004), https //www.cdc.gov/trendstatement/pdf/trendstatement_TREND_Checklist.pdf.   Last   visited March 10, 2021.

(e)     Number of participants (denominator) included in each analysis for each study condition, particularly when the denominators change for different outcomes; statement of the results in absolute numbers when feasible;

(f)     For each primary and secondary outcome, a summary of results for each estimation study condition, and the estimated effect size and a confidence interval to indicate the precision;

(g)     Inclusion of null and negative findings;

(h)     Interpretation of the results, taking into account study hypotheses, sources of potential bias, imprecision of measures, multiplicative analyses, and other limitations or weaknesses of the study; and

(i)     Generalizability (external validity) of the trial findings, taking into account the study population, the characteristics of the intervention, length of follow-up, incentives, compliance rates, specific sites/settings involved in the study, and other contextual issues.

125.     Despite this outlier, the reported average increase barely topped the Standard Error and was not near statistical significance which illustrates that the data was driven by variation rather than by efficacy of NKTR-214. Moreover, that outlier patient, along with another patient, was not actually on a three-week dosing schedule but, in fact, was dosed every two weeks. Accounting only for patients who were dosed every three weeks, the average increase of cancer-fighting cells in patients who participated in the Phase 1 EXCEL clinical trial was only 1.8 fold, a far reach from the supposed "30-fold" average increase. Notwithstanding the false and misleading nature of this contention, as detailed herein, certain of the Individual Defendants continued to repeat this "30-fold" increase claim over and over throughout the Relevant Period, including during various conferences and/or meetings as well as in a short video released by the Company on June 1, 2018 which stated, "in clinical studies, treatment with NKTR-214 resulted in ***increases in cancer-fighting cells of up to thirty-fold.***" (Emphasis added.)

**The PIVOT Manipulation Misconduct**

126.     In September 2016, the Company entered into a collaboration agreement with BMS to conduct Phase 1/2 trials evaluating the combination of NKTR-214 and BMS's Opdivo in thirty-eight patients (the PIVOT-02 study). Phase 2 of the PIVOT-02 study evaluated the clinical benefit, safety, and tolerability of the combined therapy in thirty-eight patients. The Company presented interim data from the study at the 2017 Society for Immunotherapy of Cancer ("SITC") meeting in November 2017. The Company presented impressive early-stage trial data for the study of NKTR-214, and those results were well received by the market. Market analysts published positive reports on the news, with *Investor Business Daily* reporting on November 13, 2017 that "Nektar Therapeutics launched to a nearly 17-year high Monday on strong combination data for its immune-oncology drug combined with Bristol-Myers Squibb's Opdivo in skin, kidney and lung cancers."[16]

127.     In February 2018, Nektar and BMS entered into a second collaboration agreement to jointly develop NKTR-214, including in combination with Opdivo and other drugs. Pursuant to the joint commercialization agreement, BMS paid Nektar $1 billion cash up front and purchased $850.0 million of Nektar's common stock at a purchase price of $102.60.[17] The collaboration agreement provided that BMS and Nektar would develop and conduct clinical studies of NKTR-214 to determine the safety, benefit, and tolerability of the combined therapy. This deal, the type which the Company relies upon to fund its operations and research, was buoyed by the misconduct alleged herein including both the "30-fold" claim and the PIVOT Manipulation Misconduct. Without collaborations with larger drug companies, like BMS, Nektar would not survive. On

---

[16]https://www.investors.com/news/technology/biotech-nektar-therapeutics-stock-nears-17-year-high-on-cancer-regimen/. Last visited March 4, 2021.
[17] *See* Nektar's 2018 10-K.

October 10, 2018, a report published by Zacks Investment Research, Inc. stated that "Nektar relies heavily on partners for revenues in the form of collaboration, license and milestone payments" and explained that the reason to "buy" stock in the Company was that "Nektar gained a strong partner in the form of Bristol-Myers, a company with immense expertise in the field of immuno-oncology." Even Defendant Doberstein acknowledged that the agreement with BMS was a "very stabilizing event" and that it helped the Company achieve "the next stage of [Nektar's] development." Thus, because the development of NKTR-214 was critical to closing the agreement with BMS, which materially improved the Company's standing and financial condition, the Individual Defendants had reason to perpetrate their fraudulent scheme to mislead investors.

128.    Although the PIVOT-02 trial seemed a success from the outset, during the Relevant Period, certain of the Individual Defendants engaged in a scheme to manipulate the clinical trial results of Nektar's PIVOT-02 trial by presenting patient data that was not validated, selectively choosing patients to participate in the trial, delaying the disclosure of results that were less positive while disclosing positive results, and neglecting the risks posed by the unsustainable fictional image they created of NKTR-214's success. The details of the scheme are provided by former employees of the Company cited to in the Securities Class Action as confidential witnesses, who were aware of and personally witnessed practices that formed part of the misconduct discussed herein.

129.    One of these employees, a former Nektar Director of Clinical Development Operations identified in the Securities Class Action as "CW # 1" worked on the development of NKTR-214 and reported directly to Mary Tagliaferri ("Tagliaferri"), Nektar's Chief Medical Officer starting in December 2017. According to CW # 1, the Company directed employees to ignore standard protocols for reading scans, leading to reports of inaccurate and overly-positive

data. CW # 1 claimed that the PIVOT trial was actually ineffective and required amending several times and that rather than await conclusive data on the research being conducted in the trial, certain of the Individual Defendants directed telephone calls to the trial sites in order to obtain unverified patient data to announce at public conference presentations, including ASCO 2018. CW # 1 stated, "[i]t is never done like this. I was disgusted."

130.    Another former employee who worked in the same department throughout the Relevant Period, and is a former head of infectious disease research at a large public university, identified in the Securities Class Action as "CW # 2," reported to both Ivan P. Gergel ("Gergel"), Nektar's Chief Medical Office from 2014 until December 2017, and Tagliaferri and maintained that, due to the focus on reporting positive trial data for the PIVOT-02 trial, the environment at the Company was "chaotic." CW # 2 further confirmed the outlier patient data behind the Company's "30-fold" claims and claimed that the Individual Defendants were aware of the issues posed by the use of this information and were only concerned with making the Company look good through positive clinical trial data that would, in turn, allow Nektar to gain support and attention from other biopharmaceutical companies that could offer funding for Nektar. According to CW # 2, among others, Gergel and Tagliaferri would contact doctors involved in the PIVOT-02 study for unverified data, but would exclude patient data that was negative by utilizing deadlines and extensions for those deadlines selectively.  This unverified patient data would then be presented at public presentations, including ASCO conferences in 2017 and 2018 and the SITC conference in November 2017. The positive data reported by Nektar at these conferences was critical to driving the positive perception of the Company in the market and as such, the stock price. Further, according to CW # 2, "all hell broke loose" since, contrary to standard industry practice, Nektar required its trial site personnel to scramble to "collect favorable data" and include it in the

Company's presentations. Moreover, according to CW # 2, Gergel and Tagliaferri, neither of whom had the requisite scientific qualifications, were actively engaged in the patient information reported, including by cherry-picking which patients to exclude from the study altogether. Further, Nektar employees Dr. Michael Imperiale ("Imperiale") and Dr. Margaret Ziola ("Ziola"), the Senior Director of Clinical Development had made calls to trial sites to gather positive data after cutoff dates over protest to Tagliaferri who on at least three occasions had directed them to "do it anyway" explaining because Defendant Robin "wants it." CW # 2 also stated that Nektar's efforts were also meant to challenge data that had already been reported with the intent of securing better outcomes. For example, Tagliaferri met with central-read facility Bioclinica on the East coast to successfully convince them to reclassify tumor scans and use more favorable images. According to CW # 2, Tagliaferri and Gergel and Defendants Robin, Doberstein, and Zalevsky, were all aware of these practices and discussed them at bi-weekly Executive Committee meetings related to the development of NKTR-214 and ultimately "came out with data and jumped to a bunch of conclusions with a very small amount of data focusing on the positives and sweeping some of the lesser positive stuff under the carpet."

131.    CW # 2, who was in attendance for the presentation at the 2017 ASCO GU conference, confirmed that the patient referenced in the presentation was the single outlier patient who experienced a unique increase in cancer-fighting cells and that subsequent presentations pertaining to NKTR-214 also included the outlier patient. CW # 2 also established that if the outlier patient was excluded from the dataset, the data would have been "nowhere near" the 30-fold increase that the Company claimed.

132.    CW # 2 stated that scientists were concerned regarding the "misleading," and "deceitful" nature of the business-focused individuals' skewed presentation of the trial data and

concluded that the Company's practices and presentations "lack[ed] scientific integrity." CW # 2 observed that the scheme worked as attendees of the 2017 ASCO GU conference left with optimism unsupported by the trial results. Notably, CW # 2 mentioned that during the conferences when the false and misleading statements were issued Defendant Robin would meet with investors to obtain new funding.

133.    Moreover, according to CW # 2, the Company would often be slow to publish trial results that tended to discredit previously reported outliers. Instead, as CW # 2 recalls, the Company surprisingly kept touting the 30-fold increase claim through, Relevant Period since additional data that the Company had already collected at that time continued to offset the effect of the outlier patient.

> (i)     Another former employee who worked as a senior member of the clinical team at Nektar from 2018 through, at least, the end of the Relevant Period, identified in the Securities Class Action as "CW # 3," confirmed that Nektar employees, including Tagliaferri, would often communicate with purportedly objective trial sites to focus on gathering patient data that was expected to be favorable. CW # 3 also corroborated that these calls had been placed by, among others, Imperiale and Ziola. Additionally, CW # 3 agreed that this practice was not common within the industry and considered it to be inappropriate.

**Additional Information on the Individual Defendants' Knowledge**

134.    Throughout the Relevant Period, NKTR-214 was the Company's main drug candidate and thus represented a core operation. The 2017 10-K (defined below) stated that its business was "highly dependent" on the "success of NKTR-214" and warned that if "clinical and regulatory outcomes for NKTR-214" are not successful the Company's business would be "significantly harm[ed]." The 2017 10-K also acknowledged that the clinical outcomes from NKTR-214 have had and will likely continue to have "a significant impact on [Nektar's] market valuation, financial position, and business prospects" and that unsuccessful clinical studies would "materially harm [Nektar's] market valuation, prospects, financial condition and results of

operation." Similarly, the Company's quarterly report for the period ended June 30, 2018 which was filed on Form 10-Q with the SEC on August 9, 2018 stated that the Company's business plan was subject to "significant uncertainties and risks" because of the "clinical and regulatory outcomes for NKTR-214 [.]"As the Company's primary product, NKTR-214 was undoubtedly vital to the Company's financial viability and its business prospects, and the development of NKTR-214 was therefore Nektar's core operation. This is further evidenced by certain of the Individual Defendants' involvement in that development process of NKTR-214, as detailed herein. Consequently, senior executives and directors of the Company are presumed to have knowledge and awareness of facts and circumstances related to NKTR-214, including the status of its clinical trials. This is bolstered by many of the Individual Defendants' background in science, healthcare, and the pharmaceutical industry and their resultant familiarity with industry norms for developing drugs and conducting clinical trials.

135.   In addition to the foregoing, given their extensive and relevant education and experience in the healthcare industry, as detailed herein, Defendants Robin, Doberstein, and Zalevsky, among others, fully understood that reliance on highly incomplete and/or outlier data would be highly misleading. Defendant Robin's experience as President and CEO provided him with full access and knowledge regarding the relevant data which he went through and opted to selectively include only positive results. Moreover, Defendant Robin repeatedly presented on the dataset at issue and, thus, his intimate knowledge of it can be inferred. Additionally, Defendants Doberstein and Zalevsky each earned a PhD and have experience working in the pharmaceutical industry, including as scientists in the development of NKTR-214. Thus, Defendants Doberstein and Zalevsky also both understood the dataset and that the fold increase in CD8 cancer-fighting cells was driven by the inclusion of data from a single outlier patient.

136.     Although the Individual Defendants acknowledged that the data was driven by a single outlier patient in the background section of a medical conference poster for a presentation given at the European Society for Medical Oncology meeting in Madrid, Spain in September 2017, they otherwise took active steps to conceal this information by failing, repeatedly, to disclose this fact clearly and thoroughly to the public. In fact, posters that were released in connection to subsequent presentations had removed that problematic information. Thus, coupled with the Company's level of sophistication, the foregoing lends itself toward inferring the Individual Defendants' intent to conceal and deceive.

**Materially False and Misleading Statements**

*January 10, 2017 JP Morgan Conference*

137.     On January 10, 2017, Defendant Robin, on behalf of Nektar, gave an oral presentation at the 35th annual JP Morgan Healthcare Conference. The presentation included data from the Phase 1 trial of NKTR-214 with results based on a sample size of 10 patients. The Company later included this same data in its presentation at 2017 ASCO GU in February.



50

138.    At the conference, Defendant Robin made several remarks during his presentation representing that this data came from a single 10-patient data pool that experienced a single, unified treatment plan, stating, in relevant part:

> We've designed a new IL-2 molecule with a biased action to the beta gamma receptors and not the alpha receptor. And ***consequently, there, you can produce significant quantities of CD8-positive cells without affecting the production or the proliferation of regulatory T-cells.*** The other thing we've done is made a prodrug because one of the problems you have with native IL-2 is when you administer a native IL-2, it releases immediately in plasma, and you get this massive unwanted immune response. It's very short-lived but it has very, very serious side effects in terms of cytokine storm, et cetera. ***And what we've done is designed a molecule where the biological linker's released in the tumor microenvironment, and you don't see—and therefore, you get the full effect of the cytokine in the tumor, not in circulation.*** So with that, you're also able to achieve antibody-like dosing. So we're dosing—***we're dosing NKTR-214 once every 2 to—once every 3 weeks in an outpatient setting***.
>
> So here's some data from the Phase 1 trial. Demonstrating—and ***there are 10 patients where we have tumor biopsies.*** And you can clearly see that ***we had a significant increase in CD8-positive T-effector cells with no increase in T-reg cells… And this is clearly what we set out to do, cause the proliferation of regulatory T-effector cells and not cause the proliferation of regulatory T-cells***.

(Emphasis added.)

### *March 7, 2017 Cowen & Company Healthcare Conference*

139.    On March 7, 2017, Defendant Doberstein, on behalf of Nektar, showed a data slide at the 37th annual Cowen & Company Healthcare Conference. The slide was identical to one of those displayed at the JP Morgan Conference in January 2017. This same data was included in the Company's presentation at 2017 ASCO GU in February 2017.



140.    At the conference, Defendant Doberstein made several remarks about the data, again purporting to show data from a single 10-patient data pool that experienced a unified treatment plan, stating, in relevant part:

> Now, what we have found in patients from NKTR-214 is that first, ***as a monotherapy, it does pretty much exactly what we designed it to do. You can see a 30-fold increase in CD8 cells inside the tumors of patients from tumor biopsies who received NKTR-214 with almost no increase in T-regs***, and that's exactly the way that we designed the medicine to act.

(Emphasis added.)

***May 1, 2017 Proxy Statement***

141.    The Company filed its Schedule 14A (the "2017 Proxy Statement") with the SEC on May 1, 2017. Defendants Robin, Chess, Greer, Kuebler, Lingnau, Winger, and Whitfield, as

well as non-Defendant Joseph J. Krivulka, solicited the 2017 Proxy Statement filed pursuant to

Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[18]

142.   The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have adopted a code of business conduct and ethics that applies to all employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions."

143.   The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by eight of the Individual Defendants (as of May 1, 2017), and the Individual Defendants' failures to report violations of the Code of Conduct.

144.   The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "performance-based incentives," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

145.   The 2017 Proxy Statement also failed to disclose, *inter alia*, the PIVOT Manipulation Misconduct and that: (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (3) thus, the claim that patients experienced a 30-fold average increase in CD8 cells with negligible increases in

---

[18] Plaintiffs' allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

immunosuppressive cells was not supported by the clinical data relied on; and (4) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

*May 22, 2017 UBS Healthcare Conference*

146.    On May 22, 2017, Defendant Zalevsky, on behalf of Nektar, displayed a data slide at the UBS Healthcare Conference. The slide was identical to one of those displayed at the JP Morgan Conference and the Cowen & Company Conference in January 2017 and March 2017, respectively. This same data was included in the Company's presentation at 2017 ASCO GU in February.



147.    At the conference, Defendant Zalevsky made several remarks about the data, representing that this data came from a single 10-patient data pool that experienced a unified

treatment plan, stating that "***CD8 T-cells increased by 30-fold in the tumor microenvironment. This is shown just after a single-dose administration of NKTR-214, and completely consistent with the design, the T-regs, which are not touched due to the bias of the molecule, are unchanged***." (Emphasis added.)

*June 3, 2017 ASCO Annual Meeting and Investor & Analyst Event*

148.  On June 3, 2017, Dr. Adi Diab, an assistant professor of melanoma oncology at MD Anderson and Co-Chair of the Scientific Advisory Board for the PIVOT Program, displayed a NKTR-214 data slide at the annual ASCO Meeting and Analyst & Investor Event. The slide was a slightly modified version of a slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, and the UBS Healthcare Conference in January, March, and May 2017, respectively. This same data was included in the Company's presentation at 2017 ASCO GU in February.



149.    At the conference, Dr. Diab made several remarks about the data, again representing the source of the data as a 10-patient data pool that experienced a single, unified treatment plan, stating, in relevant part:

> *And so to summary, this—the most important, as you can see when you look at the left column here, and you can see what we've been talking about, and I reemphasize that point because this is a very important marker, not only mobilizing the T-cells in the tumor microenvironment, but you're also mobilizing CD8 more than T-regs, achieving very high CD8-to-T reg ratio of—in the tumor microenvironment, that's very impressive. That's very beneficial for the patients…*
> *And NKTR-214, in addition of mobilizing the CD8 cells, there is also increasing in the number of NK cells, the natural killers. This happens without an increase of the T-regulatory cells and that a—leads to the high ratio of CD8 to T-regs.*

(Emphasis added.)

### June 7, 2017 Jeffries Conference

150.    On June 7, 2017, Defendant Doberstein, representing the Company, displayed a NKTR-214 data slide at the Jeffries Conference. The slide was identical to a slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, and the UBS Healthcare Conference in January, March, and May 2017, respectively. This same data was included in the Company's presentation at 2017 ASCO GU in February, which was unrevealed to the public rendering it, for among other reasons, false and misleading.



151.    At the conference, Defendant Doberstein made several remarks about the data, once

more representing its source as a single 10-patient data pool that experienced a unified treatment

plan, stating, in relevant part:

> It's very important that there be resident T-cells there in the tumor so that we can
> activate them and even when we think about using checkpoint inhibitors, if there
> are no T-cells there to release the brakes on, then that—then those therapies aren't
> going to work. So very important that we increase the T-cell populations. ***You can
> see here when we do Q3-week dosing, almost a thirtyfold increase in tumor cells
> within the biopsy—T-cells within the tumor biopsy of the effector cell type.*** So
> very important observations from the biomarker standpoint.

(Emphasis added.)

***November 11, 2017 Press Release and Investor Meeting***

152.    On November 11, 2017, Nektar issued a press release entitled "First Data for

NKTR-214 in Combination with OPDIVO® (nivolumab) for Patients with Stage IV Melanoma,

Renal Cell Carcinoma and Non-Small Cell Lung Cancers, Including Patients with PD-L1 Negative

Status, Revealed at SITC 2017." The press release announced the results of a study done by the

Company with BMS evaluating the combination of NKTR-214 with BMS's drug, Opdivo. The

press release indicated that "[t]he initial results presented at the 2017 Society for Immunotherapy of Cancer (SITC) Annual Meeting reported both safety and efficacy data for patients enrolled in the dose-escalation phase of the trial."

153.   The press release also detailed the specific findings of the study, including statements about the treatment's purported success from Tagliaferri. The release stated, in relevant part:

> "These initial findings underscore the potential benefit of the combination of Opdivo and NKTR-214 across several tumor types," said Fouad Namouni, M.D., Head of Oncology Development, Bristol-Myers Squibb. "We believe that a combination regimen which utilizes two different, complementary, and non-overlapping mechanisms designed to harness the body's own immune system to fight cancer has the potential to benefit patients and should be the subject of additional research."

> *Opdivo* is a PD-1 immune checkpoint inhibitor designed to overcome immune suppression. NKTR-214 is an investigational immuno-stimulatory therapy designed to expand and activate specific cancer-fighting T cells and natural killer (NK) cells directly in the tumor micro-environment and increase expression of cell-surface PD-1 on these immune cells.

> "In the dose-escalation stage of the PIVOT trial, we've observed important response rates across all three tumor types-melanoma, renal cell carcinoma and non-small lung cancer - in both PD-L1 positive and PD-L1 negative patients," said Mary Tagliaferri, M.D., Senior Vice President of Clinical Development at Nektar Therapeutics. "All patients with responses in the trial continue on treatment. Of note, we observed responses in 3 of 4 Stage IV non-small cell lung cancer patients whose tumors did not express PD-L1 and who had progressed on prior chemotherapy, including one patient who experienced a complete response. In the combination treatment, there were no Grade 3 or higher immune-mediated adverse events at the recommended Phase 2 dose or below. Nektar and Bristol are now actively enrolling patients in the Phase 2 expansion part of the PIVOT study in 5 different tumor types."

154.   The press release continued to detail the study, highlighting important points that had been presented in an oral session at the Society for Immunotherapy of Cancer Annual Meeting:

> A total of 38 patients were enrolled in the dose-escalation phase of the ongoing PIVOT study in a number of dose cohorts. Responses were measured per RECIST 1.1 for efficacy-evaluable (> 1 on treatment scan) patients as of November 2,

2017.

Highlights from the oral presentation include:
- Advanced Treatment-Naïve 1L Melanoma Patients (Stage IV):
  - Responses were observed in 7/11 (63%) efficacy-evaluable patients (2 CR and 5 PR). Median time to response was 1.7 months. DCR, also known as disease control rate (CR + PR + 3 SD), was 91%. All 7 patients with responses continue on treatment in the trial.
- Advanced Treatment-Naïve 1L Renal Cell Carcinoma Patients (Stage IV):
  - For patients with one or more baseline scans, responses were observed in 6/13 patients (46%) (1 CR+ and 5 PR). DCR (CR + PR + 5 SD) was 85%. Median time to response in these patients was 1.9 months. For patients with two or more scans available, responses were observed in 6/10 patients (60%) (1 CR, 5 PR, 2 SD). All 11 patients with disease control (CR, PR or SD) continue on treatment in the trial.
- Advanced 2L Renal Cell Carcinoma Patients (Stage IV, I-O Naïve)
  - For patients with one or more baseline scans, responses were observed in 1/7 patients (14%) (1 PR). DCR (CR + PR + 6 SD) was 100%. Median time to response was 3.5 months. All 7 patients with disease control (PR or SD) continue on treatment in the trial.
- Advanced 2L PD-L1 Negative Non-Small Cell Lung Cancer Patients (Stage IV, I-O Naïve)
  - Responses were observed in 3/4 patients (75%) (1 CR± and 2 PR). DCR (CR + PR) was 75%. Median time to response was 1.7 months. All 3 patients with responses continue on treatment in the trial.
- Robust expansion of ICOS+ CD4 and CD8+ T cells in the blood and increased ICOS gene expression in the tumor were both observed with the combination of NKTR-214 and nivolumab.
- The most common grade 1-2 adverse events were fatigue (74%), flu-like symptoms (68%), rash (60%) and pruritus (42%). There were no treatment discontinuations due to adverse events (AEs) or study deaths.
- There were no grade 3 or higher immune-mediated AEs (such as colitis, dermatitis, hepatitis, pneumonitis or endocrinopathies) at the recommended Phase 2 dose or below
- A recommended Phase 2 dose of NKTR-214 0.006 mg/kg q3w + nivolumab 360 mg q3w was established and is being evaluated in expansion cohorts in over 10 patient populations with melanoma, renal cell carcinoma, non-small cell lung cancer, bladder, and triple-negative breast cancers (n=~330).

155.   The press release briefly discussed the agreement between Nektar and BMS related to the commercialization of NKTR-214 in combination with Opdivo, and touched on NKTR-214's function and clinical results.

156.    The day of the press release, the Company also held an Investor Meeting at the annual meeting for the SITC to discuss the PIVOT-02 trial results and to expound on the efficacy of NKTR-214 when combined with Opdivo. Defendant Zalevsky made statements to this effect during the meeting, stating that "*[W]e know that in the presence of 214 there's such a high amount of activated immune cells. Different clones of immune cells recognizing multiple antigens, increasing the tumor killing army*." (Emphasis added.) This knowledge was based on data that appeared in the presentation at the February 2017 ASCO GU, which was unrevealed to the public, rendering it, among other reasons, false and misleading.

### November 15, 2017 Jeffries London Healthcare Conference

157.    On November 15, 2017, Defendant Zalevsky, on behalf of the Company, displayed a NKTR-214 data slide at the Jeffries London Healthcare Conference. The slide was identical to the slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, the UBS Healthcare Conference, and the Jeffries Conference in January, March, May, and June of 2017, respectively. This same data was included at the Company's presentation at 2017 ASCO GU in February 2017, which was unrevealed to the public rendering it, for among other reasons, false and misleading.



158.  At the conference, Defendant Zalevsky gave an oral presentation with the slideshow about the benefits of NKTR-214. In describing the data on the slide, he stated, in relevant part:

> *We know that with NKTR-214, it can fill the gap of actually replenishing the patient's own immune system. In fact as a T-cell growth factor, it acts like an engine to grow armies and armies of antigen-specific, tumor reactive T-cells.* These T-cells can infiltrate into the body, *they can enter the tumor microenvironment and they can go to work, attacking the tumor with cells*…

> We profiled NKTR-214 in a monotherapy clinical trial and we reported these results over the last year and a half. Now *the key with this monotherapy study was that we wanted to prove the mechanism of action in the patient's tumor itself.* And so we collected a number of biopsies, both pretreatment and on-treatment, and we use those biopsies to characterize the functions of NKTR-214, *shown here in this slide is the effect that NKTR-214 has on inducing T-cell infiltrates into the tumor. And you can see there's a 30-fold increase in the amount of CD8 T-cells that entered into the tumor and because of the biased signaling, you can see there's no change in Tregs. So this is very much skewed and dominated tumor killing cytotoxic T-cell response.*

(Emphasis added.)

***November 28, 2017 Piper Jaffray Healthcare Conference***

159.    On November 28, 2017, Defendant Zalevsky, on behalf of the Company, displayed a NKTR-214 data slide at the Piper Jaffray Healthcare Conference. The slide was identical to the slide that had been previously displayed at the JP Morgan Conference, the Cowen & Company Conference, the UBS Healthcare Conference, the Jeffries Conference, and the Jeffries London Conference in January, March, May, June, and November of 2017, respectively. This same data was included at the Company's presentation at 2017 ASCO GU in February 2017, which was unrevealed to the public rendering it, for among other reasons, false and misleading.



***January 9, 2018 JP Morgan Healthcare Conference***

160.    On January 9, 2018, Defendant Robin, displayed a NKTR-214 data slide at the 36th Annual JP Morgan Healthcare Conference. This same data was included in the Company's presentation at 2017 ASCO GU in February.



161.    At the conference, Defendant Robin made several remarks about the data, again

representing that the patient pool received a single, unified treatment plan, stating, in relevant part:

> So what we've done is, using our technology we have a biased receptor binding in
> such a way that ***we cause the proliferation of effector T-cells and we don't cause
> an increase in regulatory T-cells. And because of that, you can give very low
> doses of NKTR-214 dosed on an antibody-like schedule once every 3 weeks on an
> outpatient basis. You see nominal side effects, and you get a profound stimulation
> of the immune system… Here you could see on the chart on the left, a great—
> significant increase in effector T-cells with no increase in regulatory T-cell.*** Also,
> very important, in the left chart, you see that NKTR-214also increases PD-1
> expression. We take patients who are PD-L1 negative and turn them PD-L1
> positive, another very, very important aspect of treating patients in the
> immunotherapy world.

(Emphasis added.)

### *March 1, 2018 Press Release and Form 10-K*

162.    On March 1, 2018, Nektar issued a press release announcing the Company's

financial results for the fourth quarter and year ended December 31, 2017. The press release quoted

Defendant Robin touting NKTR-214's clinical success and the transformative year Nektar had experienced:

> "This past year was truly transformational for Nektar as we achieved a number of successes with Nektar medicines across our three key therapeutic areas of immuno-oncology, immunology and pain," said Howard W. Robin, President and Chief Executive Officer of Nektar. "In the area of pain, we completed a successful Phase 3 program for NKTR-181 in over 2,100 patients and healthy volunteers that will comprise our NDA submission in the second quarter of this year. In immunology, we entered into a major partnership with Eli Lilly for NKTR-358, a potential first-in-class T regulatory resolution therapeutic, which will be developed to treat a broad range of auto-immune disorders. Finally, in immuno-oncology, the clinical success we achieved with NKTR-214 led to a groundbreaking collaboration with Bristol-Myers Squibb that now enables us to broadly and rapidly advance NKTR-214 into over 20 registrational trials in up to 15,000 patients."

163.    On the same day, the Company filed with the SEC its annual report for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by Defendants Robin, Chess, Ajer, Greer, Kuebler, Lingnau, Whitfield, and Winger.

164.    The 2017 10-K outlined Nektar's activities relating to the combination of NKTR-214 and Opdivo. The 2017 10-K detailed the Company's agreement with BMS to commercially develop combination therapy drugs with NKTR-214 and BMS compounds:

> On September 21, 2016, we entered into a Clinical Trial Collaboration Agreement (BMS Agreement) with Bristol-Myers Squibb Company (BMS), pursuant to which we and BMS are collaborating to conduct Phase 1/2 clinical trials evaluating NKTR-214 and BMS' human monoclonal antibody that binds PD-1, known as Opdivo® (nivolumab), as a potential combination treatment regimen in at least five tumor types and eight indications, and such other clinical trials evaluating the combined therapy as may be mutually agreed upon by the parties (each, a Combined Therapy Trial). Under the BMS Agreement, BMS is responsible for 50% of all out-of-pocket costs reasonably incurred by us in connection with third party contract research organizations, laboratories, clinical sites and institutional review boards. Each party is otherwise responsible for its own internal costs, including internal personnel costs, incurred in connection with each Combination Therapy Trial.  Interim data from the dose-escalation phase of the trial was presented at the 2017 Society for Immunotherapy of Cancer (SITC) meeting in November 2017. We identified the Phase 2 dose for NKTR-214 and we are currently enrolling subjects in the expansion phase of the study.

On February 13, 2018, we entered into a Strategic Collaboration Agreement (the BMS Collaboration Agreement) with BMS, pursuant to which we and BMS will jointly develop NKTR-214, including, without limitation, in combination with BMS's Opdivo® (nivolumab) and Opdivo® plus Yervoy® (ipilimumab), and other compounds of BMS, us or any third party. The parties have agreed to jointly commercialize NKTR-214 on a worldwide basis. BMS will pay us a non-refundable upfront cash payment of $1.0 billion and purchase $850.0 million of shares of our common stock at a purchase price of $102.60 per share pursuant to a Share Purchase Agreement (Purchase Agreement).

165.    Attached to the 2017 10-K were SOX certifications signed by Defendant Robin attesting to the accuracy of the 2017 10-K.

### March 14, 2018 Cowen & Company Healthcare Conference

166.    On March 14, 2018, Defendant Zalevsky, on behalf of Nektar, showed a data slide at the 38th annual Cowen & Company Healthcare Conference. This same data was included in the Company's presentation at 2017 ASCO GU in February.



167.    At the conference, Defendant Zalevsky made several remarks about the data, representing that this data came from a patient pool that experienced a single, unified treatment plan, stating, in relevant part:

> And we're evaluating immunological changes in those biopsy tissues. ***And shown on the left is the proportion of the cytotoxic T-cells or regulatory T-cells that you see is a full change from week 3 to baseline. And you can see that there's a 30-fold induction of CD8 T-cells, but there's essentially no change in Tregs. This is exactly the design goal and this drives a very high CD8-to-Treg ratio.***

(Emphasis added.)

### *April 30, 2018 Proxy Statement*

168.    The Company filed its 2018 Proxy Statement with the SEC on April 30, 2018. Defendants Robin, Ajer, Chess, Greer, Kuebler, Lingnau, Winger, and Whitfield solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[19] Among the proposals to be voted on by shareholders was the approval of an amendment and restatement to the Company's 2017 Performance Incentive Plan to increase the available shares under the plan by 10.9 million shares for a total reserve of 19.2 million shares for use as awards to both members of the Board as well as the Company's executive officers.

169.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have adopted a code of business conduct and ethics that applies to all employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions."

---

[19] Plaintiffs' allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

170. The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by ten of the Individual Defendants (as of April 30, 2018), and the Individual Defendants' failures to report violations of the Code of Conduct.

171. The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "performance-based incentives," while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

172. The 2018 Proxy Statement also failed to disclose, *inter alia*, the PIVOT Manipulation Misconduct and that: (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (3) thus, the claim that patients experienced a 30-fold average increase in CD8 cells with negligible increases in immunosuppressive cells was not supported by the clinical data relied on; and (4) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *May 10, 2018 Press Release*

173. On May 10, 2018, the Company issued a press release announcing its financial results for the first fiscal quarter ended March 31, 2018. Defendant Robin promoted the progress of the Company, its NKTR-214 studies, and collaboration with BMS, stating, in relevant part:

> Nektar begins 2018 in a very strong position with a major collaboration with Bristol-Myers Squibb for NKTR-214 and key advancements in our immuno-oncology and immunology pipeline . . . . The PIVOT study of NKTR-214 in

combination with nivolumab continues to enroll patients and we are exceptionally pleased that the preliminary data from PIVOT was accepted for an oral presentation at this year's ASCO Meeting.

**The Truth Begins to Emerge While False and Misleading Statements Continue**

***June 2, 2018 ASCO 2018 Presentation and Press Release***

174.       On June 2, 2018, the rose-colored image that the Individual Defendants had painted of the Company's successful clinical trials, including the PIVOT-02 study, began to reveal its true colors. Nektar presented data from the Phase 1 dose-escalation and early data from the Phase 2 dose expansion phase of the Company's ongoing PIVOT study during an oral presentation at the ASCO annual meeting. The presentation disclosed objective response rates for 87 of the 283 patients that had been enrolled in the study as of May 7, 2018.[20] Following the presentation, Nektar held an "Analyst and Investor Event" where a number of the same slides used during the ASCO presentation were shown. The data presented revealed that the overall response rate for NKTR-214 in treating melanoma had dropped significantly from the 85% response rate reported by the Company in November 2017 to a mere 50%.

175.       The same day, the Company issued a press release highlighting points from the oral presentation, stating in relevant part:

Stage IV Metastatic Treatment-Naïve 1L Melanoma Patients (Enrolled Per Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for Objective Response Rate (ORR) in Stage 1 (N1=13) with 11/13 (85%) of patients achieving either a partial response (PR) or complete response (CR). Median time on study for 28 patients in Stage 2 (N1+N2) is 4.6 months.  Responses were observed in 14/28 (50%) patients (3 CR, 10 PR, 1 *u*PR).  Amongst the 25 patients with known PD-L1 status, ORR in PD-L1 negative patients was 5/12 (42%) and in PD-L1 positive patients was 8/13 (62%).  One patient with unknown PD-L1 baseline status experienced a CR.

---

[20]https://ir.nektar.com/news-releases/news-release-details/preliminary-data-nktr-214-combination-opdivo-nivolumab-patients. Last visited March 4, 2021.

Stage IV Metastatic Treatment-Naïve 1L Renal Cell Carcinoma Patients (Enrolled Per Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for ORR in Stage 1 (N1=11) with 7/11 (64%) of patients achieving a partial response (PR).  Median time on study for 26 patients in Stage 2 (N1 + N2) is 5.6 months.  Responses were observed in 12/26 (46%) patients (11 PR, 1 *u*PR).  Amongst the 24 patients with known PD-L1 status, the ORR in PD-L1 negative patients was 9/17 (53%) and in PD-L1 positive patients was 2/7 (29%). One of two patients (50%) with unknown PD-L1 baseline status experienced a PR.

Stage IV Metastatic Treatment-Naïve 1L Urothelial Carcinoma (Enrolled Per Fleming 2-Stage Design at RP2D):

Pre-specified efficacy criteria were met for ORR in Stage 1 (N1=10) with 6/10 (60%) of patients achieving either a partial or complete response (2 *u*CR, 3 PR, 1 *u*PR). Median time on study for 10 patients in Stage 1 is 3.9 months. The ORR in PD-L1 negative patients was 3/5 (60%) and in PD-L1 positive patients was 3/5 (60%).

176.   These disappointing results came as a shock to investors, who had been primed by the Individual Defendants throughout the Relevant Period to expect further positive results. On this news, the price per share of Nektar stock plummeted approximately 41.82% from the previous day's closing price of $90.35 on June 1, 2018, to close at $52.57 on June 4, 2018.

### *June 2018 Mechanism of Action Video*

177.   In June 2018, Nektar released a video purporting to demonstrate (with digitally created graphics) the efficacy of NKTR-214, including the successful creation of CD8 T-cells without triggering growth of Tregs, or regulatory T-cells, within a tumor. In addition to the computer graphics representation, the video was voice-narrated, describing the events depicted in the visual representation. The narration contained information based partially on data from the Company's poster at the February 2017 ASCO Conference, stating, in relevant part:

> Cancer immunotherapies are designed to enable a patient's own immune system to attack tumor cells, but existing therapies do not work for most patients, in part due to an insufficient number of cancer-fighting cells, and too many suppressive cells, which can blunt tumor-killing. What is needed is an immunotherapy that expands, mobilizes and accumulates these powerful cancer-fighting cells, namely CD8-

positive effector T-cells and NK cells, within tumors—without expanding unwanted suppressive regulatory T-cells. ***NKTR-214 selectively grows cancer-fighting cells, with the goal of making cancer immunotherapy more effective. Administration of this biologic pro-drug is by infusion once every three weeks.*** In the body, active conjugates emerge slowly over time, which avoids the overstimulation of the immune system. ***Activated NKTR-214 targets CD122 receptors found on the surfaces of cancer-fighting cells, which in turn drives their proliferation and accumulation inside the tumor. In clinical studies, treatment with NKTR-214 resulted in increases in cancer-fighting cells of up to 30-fold.***

(Emphasis added.)

### June 6, 2018 Jeffries Conference

178.   On June 6, 2018, Defendant Zalevsky, representing the Company displayed a NKTR-214 data slide at the Jeffries Conference. The slide was identical to one that had been previously displayed at the 2018 Cowen & Company Conference in June. This same data was included in the Company's presentation at 2017 ASCO GU in February, which was unrevealed to the public rendering it, for among other reasons, false and misleading.

## NKTR-214 Selectively Grows T Cells and Increases PD-1 Expression in Cancer Patients





NEKTAR   Source: SITC 2016 and SITC 2017                                                                                     7

70

179.    At the conference, Defendant Zalevsky made several remarks about the data, representing that this data came from a patient pool that experienced a single, unified treatment plan, stating, in relevant part:

> Now this slide shows clinical data from the monotherapy program for NKTR-214. What you can see in the bar chart on the right-hand side, you can see that *for patients for whom we have collected several biopsies, you can see an elevation up to 30-fold in the proportion off tumor-infiltrating cytotoxic T-cells*, shown in orange, with essentially no change in regulatory T-cells or Tregs. This is exactly the design goals of NKTR-214, demonstrated in principle in human patients.

(Emphasis added.)

### *August 8, 2018 Press Release*

180.    On August 8, 2018, the Company issued a press release announcing its financial results for the second fiscal quarter ended June 30, 2018, in which Defendant Robin boasted of Nektar's "significant progress," specifically stating, "[o]ver the past few months, we have reported significant progress across all areas of our pipeline, with notable milestones for our immuno-oncology, immunology and pain programs . . . ."

181.    The statements in ¶¶ 137–140, 146–167, 173, and 177–180 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose *inter alia*, the PIVOT Manipulation Misconduct and that: (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (3) thus, the claim that patients experienced a 30-fold average increase in CD8 cells with negligible increases in immunosuppressive cells was not supported by the clinical data relied on; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

71

## The Truth Fully Emerges

182.     On October 1, 2018, Plainview published the Report, revealing that NKTR-214 did not live up to Nektar's claims and expectations with respect to the drug's safety and efficacy. According to the Report, the Company promoted NKTR-214 as "a promising treatment for cancer, particularly in combination with checkpoint inhibitors." Specifically, "Nektar hypothesized that IL-2 could be improved by adding polyethylene glycol molecules to it (pegylating it) to extend the half-life and block interaction with IL2Rαβγ [a particular receptor.]" In truth, the Report noted, "the anticipated benefits did not materialize and pegylation has proved to be a drag on efficacy."

183.     The Report stated that Nektar's plan to create a "new universal cancer treatment" by taking an unsuccessful monotherapy and expecting success when used as part of a combination therapy "has **never** worked in practice." Furthermore, the Report stated that Nektar's decision to withhold 69% of response rates resulted in "an unprecedented level of data opacity" and stated further that the "[f]irst rule of biotechnology investing: if a company withholds data from investors, that data is always bad."

184.     Further delving into the comparative analysis between IL-2 on its own versus NKTR-214, the Report found "[i]n clinical trials and retrospective analysis" that, while IL-2 had a historic objective response rate (ORR) of 15%-29% from data between 1995 and 2005, "NKTR-214, on the other hand, posted a stunning 0% ORR."

185.     In addition, the Report explained that pegylating IL-2 was not a novel concept, stating, "NKTR-214 is not the first attempt at pegylating IL-2"; indeed, the first paper on the topic was published in 1987. Due to "NKTR-214's 0% ORR," the Report noted that it was "very hard to believe that NKTR-214 [would] work as part of a combination therapy," and stated, in relevant part:

72

For combination therapies in oncology, 2+2=3, not 2+2=5—the total effect is nearly always less than the sum of the parts. We are unaware of any oncology drug that reported a 0% ORR as a monotherapy and then went on to achieve success as part of a combination therapy, but there are many therapies with meaningful monotherapy ORR rates that have failed to add value as part of a combination therapy.

186.     Although NKTR-214's intended mechanism was to trigger proliferation of certain lymphocytes for clinical success, according to the Report the Company's recent PIVOT trial data revealed that the triggered response of lymphocytes came nowhere close to the required percent increase for actual effective treatment. Specifically, studies on IL-2 on its own established that "an IL-2 treatment requires a 200-300% increase in lymphocytes in order to elicit a response" and in "its most recent PIVOT trial data, NKTR-214 has induced a 33-50% increase in lymphocytes— missing the bar for efficacy by a wide margin and explaining why the monotherapy data was so poor."

187.     Turning to NKTR-214's extended half-life, the Report stated that it had no significant impact on the therapy's efficacy, specifically stating, "NKTR-214 is too weak to work, with a pharmacokinetic profile yielding only 7-20% of the active AUC of a standard cycle of IL-2 due to 1) lower maximum tolerated dose and 2) pegylation interfering with NKTR-214 drug activity." In fact, the extended half-life actually raised further safety issues due to the irreversibility of the front-loaded dosing.

188.     The Report pointed out that the Company's claims regarding CD8+ data were "brazenly misleading," and Nektar's frequently cited "30-fold average change in tumor-infiltrating lymphocyte (TIL) CD8+" was "distorted by a single outlier patient who purportedly recorded an extreme change in TIL CD8+ but saw no clinical benefit." The source of this claim, as revealed by the Report was a chart contained in a poster displayed at a February 2017 ASCO symposium. Specifically, a line chart included in the poster revealed the outlier patient data and further depicted

that no patient had actually experienced a 30-fold increase, but one patient—the outlier patient—saw a 300x increase, thereby skewing the reported average as reflected in the chart below provided in the Report:



189.    However, until the Report was published, investors had little to no opportunity to examine the relevant data themselves. The line chart, provided by the Report via accessible link, showed the charted data for the five patients in the study and further revealed that two of the five patients were dosed on a 2 week, rather than 3-week dosing schedule. Moreover, the data reported for negligible increases of Tregs came from five different patients. The repeated implication of the Individual Defendants throughout the Relevant Period was that NKTR-214 drastically increased cancer-fighting cells while concurrently causing minimal increases in immunosuppressive cells in purportedly ten patients, revealing that the Individual Defendants' conclusions about NKTR-214's success and efficacy rested on fragile data that provided no reasonable basis for such conclusions. Additionally, the Report noted that there was a "lack of significant effect [of NKTR-214] in combination with nivolumab," which was particularly concerning.

190.    In conclusion, the Report stated that the Company's aim to improve IL-2 resulted in a product "that is completely useless for treating cancer," and further determined that Nektar's approach with NKTR-214 was problematic from the start:

> ***Elongating half-life with pegylation makes sense for many indications where the goal is to reach and maintain steady state.*** These include many neurological or

74

chronic conditions that cannot be cured directly, such as pain or ADHD. ***However, it makes no sense for treating cancer.*** The goal is not to reach steady-state exposure to IL-2, it is to kill the malignant tumor cells.

In exchange for the long half-life of NKTR-214, Nektar was forced to sacrifice both total and peak therapeutic effect. NKTR-214's PEG polymers also forced Nektar to use a significantly lower dose compared to IL-2. ***The end result is a drug with AUC that is much lower than IL-2, therapeutic effect (target receptor binding) that is even lower than the AUC would imply, and a maximum concentration that does not appear to meet the minimum threshold for efficacy.***

With a 0% ORR as a monotherapy, ***NKTR-214 has already failed where IL-2 succeeded, and by combining NKTR-214 with checkpoint inhibitors, Nektar is now trying to succeed where IL-2 failed. Neither the science nor the data support NKTR- 214, and we are betting against it.***

(Emphasis added.)

191.   On this news, the price per share of Nektar stock fell over the next two trading sessions, from a closing price of $60.96 on September 28, 2018, to a closing price of $56.65 on October 1, 2018, a decline of approximately 7%, and further fell to a closing price of $55.33 on October 2, 2018. One article reporting on the Report stated in relevant part:

Top-line data from the phase 1/2 PIVOT trial of NKTR-214 in combination with Bristol-Myers Squibb's checkpoint inhibitor Opdivo were reported at this year's ASCO meeting and spooked investors by showing a reduced overall response rate from an earlier read-out. While the company said the patients hadn't been on the combination long enough to show a response, concerns were voiced that the company may be pitching into a phase 3 program with a fairly limited set of clinical data.[21]

192.   On October 3, 2018, *Seeking Alpha* published a response to the Report, by Nektar's Senior Vice President for Investor Relations and Corporate Affairs, Jennifer Ruddock which confirmed the source cited to in the Report for the claim that NKTR-214 resulted in a 30-fold increase in cancer-fighting cells. The response criticized the Report for not using more recent data, though notably, the Company itself relied on such data in a number of its presentations in 2018.

---

[21]https://www.fiercebiotech.com/biotech/nektar-s-long-acting-il-2-nktr-214-has-zero-value-claims-analyst. Last visited March 3, 2021.

Moreover, the response failed to include a more recent source or identify any clinical trial evidence that could have been relief upon at the time the Individual Defendants made their statements to support the repeated 30-fold claim.

193.    On October 4, 2018, Plainview published a reply to Nektar's response to the Report highlighting that that the Company's more recent data "appears to be manipulated to portray NKTR214 as having a strong effect when it actually doesn't."[22] Further, Plainview noted that Nektar was "pulling the exact same stunt" with the Company's ASCO 2018 presentation by manipulating and touting data in a way that generates a "Biased Appearance of Efficacy."

**Subsequent Developments**

194.    Thereafter, the Plainview Report's reproach of the Individual Defendant's false and misleading statements regarding the purported 30-fold increase claims has been proven warranted since the primary efficacy endpoint of the EXCEL trial was not ultimately met.[23] In fact, using RECIST criteria[24], the patients in the study did not experience a noticeable efficacy response. Out of 26 patients measured, not one patient experienced a complete or even a partial response indicating efficacy. Of the 26 patients evaluated, 14 remained the same and 12 worsened during treatment. The foregoing bears out what the Individual Defendants had known throughout the Relevant Period: that the 30-fold increase claim was merely the result of outlier data which did not provide a reasonable basis to substantiate that false and misleading assertion.

---

[22] *See* Plainview's responsive article published on *Seeking Alpha* October 4, 2018, included hereto as Exhibit 1.
[23] https://pubmed.ncbi.nlm.nih.gov/30988166/. Last visited March 2, 2021.
[24] RECIST (Response Evaluation Criteria in Solid Tumors) criteria is a set of published rules that define when tumors in cancer patients improve, stay the same, or worsen during treatment.

## DAMAGES TO NEKTAR

195.   As a direct and proximate result of the Individual Defendants' conduct, Nektar has

lost and expended, and will lose and expend, many millions of dollars.

196.   Such expenditures include, but are not limited to, legal fees associated with the

Securities Class Action filed against the Company, its CEO, and certain of its officers, and amounts

paid to outside lawyers, accountants, and investigators in connection thereto.

197.   Such expenditures include, but are not limited to, legal fees and other costs of

defending any potential investigations of and/or lawsuits related to the PIVOT Manipulation

Misconduct and for the Company's loss of profits caused by the PIVOT Manipulation Misconduct.

198.   Such losses include, but are not limited to, handsome compensation and benefits

paid to the Individual Defendants who breached their fiduciary duties to the Company, including

incentive bonuses provided by the 2017 Performance Incentive Plan and other bonuses tied to the

Company's attainment of certain objectives, and benefits paid to the Individual Defendants who

breached their fiduciary duties to the Company.

199.   As a direct and proximate result of the Individual Defendants' conduct, Nektar has

also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount"

that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust

enrichment.

## DERIVATIVE ALLEGATIONS

200.   Plaintiffs bring this action derivatively and for the benefit of Nektar to redress

injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Nektar, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

201.     Nektar is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

202.     Plaintiffs are shareholders of Nektar and have continuously held Nektar common stock at all relevant times. Plaintiffs will adequately and fairly represent the interests of Nektar in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

203.     Plaintiffs incorporate by reference and re-alleges each and every allegation stated above as if fully set forth herein.

204.     A pre-suit demand on the Board of Nektar is futile and, therefore, excused. At the time of filing of this Verified Shareholder Derivative Consolidated Amended Complaint, the Board consists of the following seven individuals: Defendants Robin, Ajer, Chess, Greer, and Whitfield, (the "Director-Defendants"), and non-defendants Karin Eastham and Myriam J. Curet (together with the Director-Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was commenced.

205.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while four of them engaged in insider sales based on material non-public information, netting proceeds of over $28.4 million, which renders

them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

206.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly engaged in the PIVOT Manipulation Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

207.   Additional reasons that demand on Defendant Robin is futile follow. Defendant Robin has served as the Company's President and CEO since January 2007 and as a member of the Board since February 2007. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Robin with his principal occupation, and he receives handsome compensation, including $13,330,667 during the fiscal year ended December 31, 2018. Defendant Robin was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the 2017, and 2018 10-Ks, which he signed and signed SOX certifications for and the false representations made in various healthcare conference presentations. As the Company's highest officer and as a trusted long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Robin is a defendant in the Securities Class Action. His insider sales before the fraud was exposed, which yielded at least

approximately $19.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Defendant Robin's son, Michael Robin, is employed by the Company as a vice president in its project management group and was paid approximately $838,237 by the Company for the fiscal year ended December 31, 2018. Defendant Robin may further fear retaliation against his son, in addition to himself, if he were to consider a demand against the Individual Defendants. For these reasons, too, Defendant Robin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

208. Additional reasons that demand on Defendant Ajer is futile follow. Defendant Ajer has served as a Company director since September 2017 and serves as a member of the Audit Committee and Organization and Compensation Committee. Defendant Ajer receives lavish compensation, including $709,051 during the fiscal year ended December 31, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ajer signed, and thus personally made the false and misleading statements in, the 2017 and 2018 10-Ks. His insider sale before the fraud was exposed, which yielded $383,130 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Ajer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209. Additional reasons that demand on Defendant Chess is futile follow. Defendant Chess has served as a Company director since May 1992 and has served in a variety of positions

at Nektar throughout his years with the Company. From March 2006 to January 2007, he was the acting President and CEO; from April 1999-January 2007 he was the Executive Chairman; from August 1998 to April 2000, he was Co-CEO; from December 1991 to August 1998, he served as President; and from May 1992 to August 1998, he served as the Company's CEO. Defendant Chess receives handsome compensation, including $741,551 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results, and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Chess signed, and thus personally made the false and misleading statements in, the 2017, and 2018 10-Ks. His insider sales before the fraud was exposed, which yielded at least approximately $4.6 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Chess breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210.   Additional reasons that demand on Defendant Greer is futile follow. Defendant Greer has served as a Company director since February 2010 and serves as Chair of the Audit Committee and as a member of the Organization and Compensation Committee and the Nominating and Corporate Governance Committee. Defendant Greer receives handsome compensation, including $732,551 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the

schemes, and consciously disregarded his duties to protect corporate assets. Defendant Greer signed, and thus personally made the false and misleading statements in, the 2017, and 2018 10-Ks. His insider sales before the fraud was exposed, which yielded at least $4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Greer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.    Additional reasons that demand on Defendant Whitfield is futile follow. Defendant Whitfield has served as a Company director since August 2000. He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Whitfield receives handsome compensation, including $708,301 during the fiscal year ended December 31, 2018. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the schemes to manipulate the PIVOT-02 trial results and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Whitfield signed, and thus personally made the false and misleading statements, in the 2017, and 2018 10-Ks. For these reasons, too, Defendant Whitfield breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

212.    Additional reasons that demand on the Board is futile follow.

213.    According to the Company's Charter of the Organization and Compensation Committee of the Board of Directors, the Organization and Compensation Committee's responsibilities included "[r]eview[ing] the Company's executive compensation arrangements to evaluate whether incentive and other forms of compensation do not encourage inappropriate or

excessive risk taking and review[ing] and discuss[ing], at least annually, the relationship between risk management policies and practices, corporate strategy and the Company's executive compensation arrangements." Defendants Ajer and Greer failed to appropriately carry out these responsibilities adequately, as evidenced by the Individual Defendants' engagement in the PIVOT Manipulation Misconduct and/or the dissemination of false and misleading statements throughout the Relevant Period.

214.   As described above, four of the Director-Defendants directly engaged in insider trading, in violation of federal law. Director-Defendants Robin, Ajer, Chess, and Greer collectively received proceeds of over $28.4 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

215.   Demand in this case is excused because the Director-Defendants face a substantial likelihood of liability on Plaintiffs' proxy claims. In the 2018 Proxy Statement, the Director-Defendants had personal interests at stake in the approval of the 2017 Performance Incentive Plan, which would not have been voted for were it not for the dissemination of the false and misleading statements discussed herein. The approval of the 2017 Performance Incentive Plan further damaged the Company by providing unjust benefits to the Individual Defendants while they breached their fiduciary duties to the Company. The Director-Defendants would not be able to view such a demand impartially. As the 2018 Proxy Statement recognized, "[a]ll members of the board of directors and all of the Company's executive officers will be eligible for awards under the 2017 Plan and thus have a personal interest in the approval of the amendment and restatement to the 2017 Plan." For these reasons too, a demand against the Director-Defendants would be futile.

216.     Demand in this case is further excused because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example: Defendants Robin, Greer, and Lingnau served as directors of Sirna Therapeutics, Inc. ("Sirna"), a biotechnology company, during the same time period. Defendant Robin served as a President and director of Sirna from January 2001 to November 2006, as Sirna's CEO from July 2001 to November 2006 and as Sirna's Chief Operating Officer from January 2001 to June 2001. Defendant Greer served as a director of Sirna from 2003, and as Sirna's chairman from 2005 until December 2006 when Sirna was acquired by Merck & Co., Inc. ("Merck"). Defendant Lingnau was a member of Sirna from February 2006 until December 2006 when Sirna was acquired by Merck. Moreover, Defendants Robin and Lingnau were colleagues at Schering, AG ("Schering") and a pharmaceutical products company, Berlex Laboratories, Inc. ("Berlex"), (a subsidiary of Schering). From 1991 to 2001, Defendant Robin worked as the Berlex's Corporate Vice President and General Manager. Defendant Robin served as Berlex's Vice President of Finance and Business Development and Chief Financial Officer from 1987 to 1991. Defendant Robin also served as the Director of Business Planning and Development at Berlex from 1984 to 1987. Defendant Lingnau retired from Schering, Germany, in December 2005 as a member of Schering's Executive Board and as Vice Chairman, President and CEO of Schering Berlin, Inc., a U.S. subsidiary to Schering. In that role, Defendant Lingnau was responsible for Schering's worldwide specialized therapeutics and dermatology businesses. Defendant Lingnau joined Schering's business trainee program in 1966. Throughout his career at Schering, Defendant Lingnau served in various capacities and in a number of subsidiaries in South America and the U.S. From 1983 until 1985 Defendant Lingnau

served as President of Berlex. From 1985 to 1989 Defendant Lingnau served as the Head of Worldwide Sales and Marketing in the Pharmaceutical Division of Schering. From 1985 to 2005 Defendant Lingnau served as Chairman of Berlex. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

217.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' schemes to engage in the PIVOT Manipulation Misconduct, to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

218.    Nektar has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Nektar any part of the damages Nektar suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

219.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

220.    The acts complained of herein constitute violations of fiduciary duties owed by Nektar officers and directors, and these acts are incapable of ratification.

221.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Nektar. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Nektar, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

222.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Nektar to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

223.    Thus, for all of the reasons set forth above, all of the Director-Defendants and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

224.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

225.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

226.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

227.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

228.    Under the direction and watch of the Director-Defendants, the 2017 and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*: (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (3) thus, the claim that patients experienced a 30-fold average increase in CD8 cells with negligible increases in immunosuppressive cells was not supported by the clinical data relied on; and (4) the Company failed to maintain internal controls.

229.    The Individual Defendants also caused Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "performance-based incentives," while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

230.    The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

231. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval and/or amendment of the 2017 Performance Incentive Plan.

232. The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Robin and Winger, which allowed them to continue breaching their fiduciary duties to Nektar. In a similar manner, the statements in the 2018 Proxy Statement led to the re-election of Defendants Ajer, Chess, and Whitfield.

233. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

234. Plaintiffs on behalf of Nektar have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

235. Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nektar's business and affairs.

237. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

238.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nektar.

239.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

240.    In further breach of their fiduciary duties owed to Nektar during the Relevant Period the Individual Defendants willfully or recklessly engaged in and/or caused the Company to engage in the PIVOT Manipulation Misconduct and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia* that (1) the data results of the EXCEL clinical trial intentionally included outlier data that skewed the trial results; (2) a 2-week dosing schedule was used for at least two of the five dosed patients, including the outlier patient; (3) thus, the claim that patients experienced a 30-fold average increase in CD8 cells with negligible increases in immunosuppressive cells was not supported by the clinical data relied on; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

241.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

242.    In breach of their fiduciary duties, eight of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

243.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

244.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

245.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

246.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nektar has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

247.     Plaintiffs on behalf of Nektar have no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

248.     Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Nektar.

250.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Nektar that was tied to the performance or artificially inflated valuation of Nektar, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

251.     Plaintiffs, as shareholders and representatives of Nektar, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

252.     Plaintiffs on behalf of Nektar have no adequate remedy at law.

### FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

253.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

254.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

255.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

256.    Plaintiffs on behalf of Nektar have no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Nektar, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Nektar;

(c)    Determining and awarding to Nektar the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Nektar and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Nektar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions

for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of Nektar to nominate at least four candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Nektar restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: March 16, 2021                          Respectfully submitted,

                                               **PHILLIPS, MCLAUGHLIN & HALL, P.A.**

                                               */s/ Megan C. Haney*
                                               Megan C. Haney (Bar No. 5016)
                                               1200 North Broom Street
                                               Wilmington, DE 19806
                                               Telephone: (302) 655-4200
                                               Facsimile: (302) 655-4210
                                               Email: mch@pmhdelaw.com

*Liaison Counsel for Plaintiffs*


**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Co-Lead Counsel for Plaintiffs*